**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

CENTER FOR LEGAL ADVOCACY
D/B/A DISABILITY LAW COLORADO,

        Plaintiff,

v.

 COLORADO DEPARTMENT OF CORRECTIONS,

        Defendant.

---

## COMPLAINT

Plaintiff Center for Legal Advocacy d/b/a Disability Law Colorado ("DLC"), by and through counsel, hereby files this Complaint against Defendant Colorado Department of Corrections ("CDOC"), alleging systemic and ongoing discrimination against people with hearing disabilities.

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION …………………………………………………………..3

II.    JURISDICTION AND VENUE ………………………………………………7

III.   PARTIES ……………………………………………………………………7

IV.   FACTS. ……………………………………………………………………11

        A. Background on CDOC's Policies, Practices, and Procedures as Related to DHOH People……………………………………………………11

B.  Defendant CDOC's Failure to Provide Qualified Sign Language Interpreters ………………………………………………….…….…...18

C.  Defendant CDOC's Failure to Provide Functioning Hearing Aids to DHOH People …………………………………………..….………44

D.  Defendant CDOC's Failure to Provide Other Auxiliary Aids to DHOH People: Captioning ……………………………………………………59

E.  Defendant CDOC's Failure to Provide Equal Access to Notifications and Alarms for DHOH People……………………………..…………62

F.  Unequal and Improper Treatment of DHOH People by Defendant CDOC………………………………………………………………81

G.  Summary…………………………………………………………90

H.  DLC's Advocacy for Incarcerated People who are DHOH in CDOC's Custody …………………………………………………….…....91

V.      CLAIMS FOR RELIEF …………………………………………….....92

VI.     PRAYER FOR RELIEF …………………………………………….....98

## I.     <u>INTRODUCTION</u>

1.      Two different incarcerated people sit inside their separate cells. The intercom goes off to announce mealtime. Person one gets up and walks to the pod door to get their meal. Person two sits inside their cell, unaware of the announcement, eventually missing their meal.

2.      Two different incarcerated people sit inside their separate cells. The fire alarm goes off to notify people that emergency evacuation is necessary. Person one gets up and quickly evacuates. Person two sits inside their cell, unaware of the emergency.

3.      Two different incarcerated people attend different medical appointments. Person one speaks freely with their doctor about their symptoms and concerns. Person one walks away understanding their treatment plan. Person two writes notes in a non-native language to attempt to communicate their symptoms and concerns. The doctor writes notes back with complex medical terminology in the person's non-native language. Person two leaves their doctor's appointment confused and feeling as though their ailment remains unresolved.

4.      Two different incarcerated people attend a CDOC class. Person one listens to every word spoken by the teacher, takes copious notes based on these words, and participates regularly in class. Person two only gathers bits and pieces of what the teacher says, has sparse notes, and does not understand enough of what is said to meaningfully participate in class.

5.      In each of these scenarios, person one is a hearing person—someone who has functional hearing. Person two is a person with a hearing disability—someone who has limited or no hearing and requires accommodations to meaningfully participate in the same activities as the hearing person.

6.      Defendant CDOC's unfair and unequal treatment condemns people with hearing disabilities to inhumane treatment during their incarceration. CDOC demonstrates that it does not care about whether people with hearing disabilities eat when it does not provide them with accessible notifications of mealtimes. CDOC demonstrates it does not care about whether people with hearing disabilities die in a fire when it does not provide them access to emergency notification systems. CDOC demonstrates it does not care about whether people with hearing disabilities receive necessary and adequate health care when it denies them access to their health providers in their primary language. CDOC demonstrates it does not care about providing people with hearing disabilities access to educational, vocational, and rehabilitative opportunities when it makes these opportunities unavailable and/or inaccessible to those with hearing disabilities.

7.      CDOC's mission statement indicates that one goal for incarcerating people in Colorado is to "engag[e] them in opportunities to make positive behavioral changes and become law-abiding citizens;" however, this goal remains out of reach for those with hearing disabilities because of CDOC's unfair and unequal treatment of people with hearing loss.

8.      A person with a hearing disability is a person who has limited or no hearing in one or both ears. Hearing disabilities encompass both deafness and hearing loss. d/Deaf[1] and hard of hearing people are referred to throughout the remainder of this Complaint as "DHOH."

---

[1] As the Fourth Circuit Court of Appeals recently explained, "[t]he National Center on Disability and Journalism recommends using the adjective 'deaf' to describe the audiological condition of hearing loss. By contrast, 'Deaf' is an adjective used to describe individuals who view themselves as members of the Deaf community." *Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 349 n.2 (4th Cir. 2021). Throughout this Complaint, we use the term d/Deaf to encompass both groups of people.

9.      A d/Deaf person has little to no functional hearing, whereas a hard of hearing person has some residual hearing, but needs an amplification device, such as a hearing aid, to provide effective communication.

10.      Hearing loss can be progressive, meaning that a hard of hearing person may become deaf over time.

11.      Prison can be a difficult environment for DHOH people to have effective communication if the prison does not accommodate them. Such is the case in CDOC.

12.      Without the necessary accommodations and assistive devices/services, DHOH incarcerated people are deprived of equal access to CDOC's programs, services, and activities.

13.      CDOC has denied and continues to deny DHOH incarcerated people equally effective communication and equal access to CDOC's programs, services, and activities at every stage of their incarceration, from intake and orientation to parole services and re-entry planning.

14.      As a result of CDOC's failures, DHOH incarcerated people face a more and more isolating and confusing life in prison every day. This isolation and confusion are punitively demeaning, limiting, and distressing. DHOH incarcerated people with serious (sometimes life-threatening) illnesses are deprived equal access to medical and mental health services. They are subjected to arbitrary and unjust abuses and punishments. They are denied equal access to the support and programming necessary to successfully reintegrate into society.

15.      CDOC's failure to provide DHOH incarcerated people with equally effective communication and equal access to CDOC's programs, services, and activities is part of its longstanding and ongoing pattern and practice of discrimination against DHOH incarcerated people.

16.     DHOH incarcerated people have repeatedly informed CDOC of the barriers to equally effective communication and equal access to DHOH people and the federal rights CDOC infringed upon by imposing those barriers and requested that CDOC remove these barriers.

17.     Despite these repeated requests, CDOC continues to fail to provide equally effective communication and equal access to DHOH incarcerated people and continues to be in violation of federal antidiscrimination laws.

18.     Systemic problems like those described herein require systemic solutions.

19.     DLC is an independent, public interest, nonprofit organization, specializing in civil rights and discrimination issues. DLC works to promote systemic change to sustain or improve the quality of life for people with disabilities in Colorado, including people with disabilities incarcerated in CDOC.

20.     DLC's DHOH constituents, including but not limited to the people discussed herein, have suffered injury—and continue to suffer injury—due to CDOC's failure to comply with Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA" or "Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504").

21.     Andrew Atkins, Cathy Begano, Dennis Dunann, James Fling, Kerry Gallegos, Edward Hicks, Bradley Hogue, Kyotee Knobee, Rogerio Martinez, Kennith Meadows, Merl Mitchell, Kevin Montgomery, Robert O'Dell, Jeremy Peterson, Leonid Rabinkov, Zachary Radford, Bruce Scheiber, Marc Trevithick, and Justyn Tyme are people who are d/Deaf or hard of hearing and currently incarcerated by CDOC. They are all constituents of DLC and are referred to herein as "Exemplar Constituents."

22.     DLC brings this action on behalf of both its individual Exemplar Constituents and all people who are DHOH in the custody of CDOC.

23.     DLC brings claims under the ADA and Section 504 to challenge CDOC's discrimination against and resulting injury to Exemplar Constituents and all other DHOH incarcerated people who are or will be in CDOC's custody.

24.     CDOC has discriminated against and continues to discriminate against Exemplar Constituents and all other DHOH incarcerated people who are or will be in CDOC's custody in violation of the ADA and Section 504.

## II.     JURISDICTION AND VENUE

25.     This action arises under the laws of the United States. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

26.     Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b)(1) because CDOC resides in the District of Colorado.

## III.     PARTIES

27.     Plaintiff Center for Legal Advocacy, d/b/a Disability Law Colorado ("DLC"), is a Colorado nonprofit corporation with its principal place of business in Denver, Colorado. DLC also maintains a regional office in Grand Junction, Colorado, and serves people with disabilities in all 64 counties in Colorado.

28.     DLC is the federally mandated protection and advocacy ("P&A") system for the State of Colorado. As such, DLC is authorized by multiple federal statutes to, among other things, pursue administrative, legal, and other remedies on behalf of people with disabilities. DLC is

therefore authorized to seek relief on behalf of people who are DHOH in the custody of CDOC and whose federally protected rights are being violated.

29.     DLC is the P&A system designated for the State of Colorado. Governor Richard Lamm designated DLC as Colorado's P&A in 1977.

30.     DLC advocates for people with disabilities across Colorado. DLC is headquartered in Denver with a regional office in Grand Junction.

31.     Congress has charged DLC with the statutory responsibility to represent and advocate for the rights of people with disabilities, including DHOH people in state institutions, including state prisons, who have standing to sue on their own right.

32.     DLC's mission is to protect and promote the rights of people with disabilities and older people in Colorado through direct legal representation, advocacy, education, and legislative analysis.

33.     DLC is also committed to protecting the rights of people in institutions to be treated with dignity and respect.

34.     DLC has statutory authority to pursue legal remedies on behalf of people with disabilities whose federal rights are being violated pursuant to the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 300d-53(k), the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10805(a)(1)(B), and the Protection and Advocacy for Individual Rights Act ("PAIR Act"), 29 U.S.C.A § 794e(f)(2).

35.     Specifically, these statutes give P&As "the authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of, and advocacy for the rights of such people within the State…." 42 U.S.C. § 15043(a)(2)(A)(i).

36.     DLC has associational standing to bring this action. DLC is the functional equivalent of a voluntary membership organization created by Congress to protect and advocate for its Colorado constituents, which include DHOH people in CDOC's custody.

37.     DLC's Colorado constituents possess many indica of membership, including influence over what issues DLC takes on in the performance of its federal mandate.

38.     DLC has a governing board of directors composed of members who broadly represent and who are knowledgeable about the needs of people with disabilities, including DHOH people who are incarcerated in CDOC.

39.     DLC represents people with sensory disabilities, including those who are DHOH, and provides means by which they express their collective views and protects their collective interests.

40.     DLC provides ADA compliance training to educate attorneys, policymakers, employers, and government agencies about the rights of people with disabilities, including DHOH people who are incarcerated in CDOC.

41.     DLC maintains a grievance procedure for constituents to ensure people with disabilities have full access to and input into DLC's advocacy, services, and areas of work.

42.     DLC publishes the annual PAIMI Program Priorities and Objectives on its website, inviting constituents to comment on their relative importance to DLC's statutory charge to protect and advocate for people with mental illness.

43.     DLC has established a PAIMI Advisory Council which advises DLC on the policies, priorities, and objectives designed to protect and advocate for the rights of DLC's constituents.

44.     As a result of DLC's organizational structure, leadership, allocation of resources and outreach, connections with constituents in the disability community, and involvement in disability rights advocacy, people with disabilities have a strong voice in and a direct influence on the work of DLC.

45.     DLC brings this lawsuit in its representative capacity on behalf of and to vindicate the rights of Exemplar Constituents and all other DHOH people incarcerated in CDOC's custody who are being denied equally effective communication and equal access to CDOC's programs, services, and activities in violation of the ADA and Section 504.[2]

46.     Defendant Colorado Department of Corrections ("CDOC") is a department of the State of Colorado.

47.     CDOC is responsible for the operation of the Colorado state prison system and for the care and custody of incarcerated people in its twenty-two facilities.

48.     CDOC receives federal financial assistance as that term is used in 29 U.S.C. § 794 and it is a "public entity" within the meaning of Title II of the ADA. 42 U.S.C. § 12131(1).

---

[2] In *Cunningham v. Fed. Bureau of Prisons*, this Court held that "[t]he [Center for Legal Advocacy d/b/a Disability Law Colorado] has established [associational] standing to pursue claims for declaratory and injunctive relief for prisoners with mental illness housed at ADX." 222 F. Supp. 3d 959, 961 (D. Colo. 2015).

## IV.   <u>FACTS</u>

49.     For years, CDOC has failed to provide the DHOH people incarcerated in its facilities the accommodations that are required by Title II of the ADA and Section 504 of the Rehabilitation Act.

50.     CDOC is aware of its obligations under the federal antidiscrimination laws. Nevertheless, it has not remedied its past pattern and practice of discrimination and continues to discriminate against DHOH people.

**A.  Background on CDOC's Policies, Practices, and Procedures as Related to DHOH People**

51.     When a person enters CDOC's custody, they go through intake and orientation, typically at Denver Reception and Diagnostic Center ("DRDC") or Denver Women's Correctional Facility ("Denver Women's").

52.     CDOC's intake process includes physical, dental, and mental health examinations and screenings; an "ADA intake screening" for disabilities, including hearing disabilities; a battery of tests assessing educational skills, basic intellectual ability, general personality patterns, addiction issues, and other "problem areas;" photographing and fingerprinting; disposition of personal property; and assignment to a housing unit and custody level. Denver Complex Offender Orientation Handbook, at 2–3 (2014).

53.     CDOC's orientation is intended to assist people entering CDOC in understanding what will be expected of them and provides them with the information necessary to create and maintain a safe and orderly living environment during incarceration.

54.     CDOC's orientation is designed to introduce and educate newly incarcerated people to the wide variety of programs, services, and activities that CDOC offers.

55.     CDOC's orientation covers topics including: (1) the Code of Penal Discipline ("COPD"); (2) mail; (3) telephone regulations; (4) visitation; (5) indigent assistance; (6) canteen; (7) case management and re-entry; (8) Clinical Services, including medical, dental, and optometry services and co-payment procedure; (9) mental health services; (10) prison rape elimination procedure; (11) grievance procedures; (12) the ADA and notice of disabilities; (13) legal access, including assistance and materials access; (14) life and fire safety and emergency evacuation; (15) dress code; (16) laundry; (17) personal property; (18) searches and contraband control; (19) work assignments and work pay; (20) movements, including scheduled and unscheduled movements, and room/cell transfers; (21) count; (22) emergency notification; (23) food services; (24) identification cards; (25) programs offered by CDOC, including religious, library, law library, recreational, and educational programs; (26) security threat groups; (27) non-discrimination; and (28) facility specific information.

56.     CDOC's intake and orientation is where discrimination against and unequal treatment of DHOH people begins. Despite American Sign Language ("ASL") being the primary language of many d/Deaf people incarcerated in CDOC prisons, CDOC often does not provide qualified sign language interpreters for intake; this means d/Deaf people are often forced to go through intake in a language they do not fully comprehend. This is problematic because intake is the process where CDOC is supposed to identify the (often severe) medical needs of incarcerated people and newly incarcerated people are encouraged to perform to the best of their ability on the battery of tests listed in paragraph 52 so that CDOC can provide them with adequate and appropriate care during their incarceration. Denver Complex Offender Orientation Handbook, at 2 (2014).

57.    Moreover, CDOC often does not provide orientation to DHOH people in an accessible format. For example, CDOC often does not provide qualified sign language interpreters or captioning for orientation programming. This causes immediate confusion, apprehension, safety concerns, and unequal opportunity to assimilate into CDOC for DHOH people. While CDOC gives hearing people the opportunity to fully understand all information conveyed during the intake and orientation process, CDOC denies this opportunity to DHOH people. As a result, a DHOH person may wait days, weeks, even months before fully understanding, or may never fully understand this information.

58.    During intake and orientation, DHOH people may be approved for temporary accommodations if their initial screening shows a hearing disability.

59.    In order to receive a permanent hearing disability accommodation, an incarcerated person must then fill out a "Request for Accommodation" form.

60.    CDOC designates ADA Inmate Coordinators ("AIC's") in Legal Services who are responsible for carrying out CDOC's obligations under the ADA.

61.    Additionally, each CDOC facility designates a staff member to serve as the on-site "facility/office coordinator" to assist Legal Services with ADA compliance.

62.    The AIC's responsibilities include, but are not limited to, investigating and responding to requests for accommodations, implementing reasonable accommodations, responding to ADA grievances, and ensuring incarcerated people with disabilities are housed in a manner that provides for their safety, security, and integration with other incarcerated people. CDOC Administrative Regulation ("AR") 750-04 (IV)(B).

63.     The "Request for Accommodation" approval or denial process can take months or years.

64.     This process takes even longer if a person's hearing disability is not identified during the initial hearing screening conducted during the intake process.

65.     When a person's disability is not identified during the initial intake screening, they must request further screening from Clinical Services in order for CDOC to even consider their request for accommodation.

66.     Even if an accommodation is approved, it does not guarantee that CDOC staff will actually provide the accommodation.

67.     For example, many d/Deaf people have ASL interpretation as an approved accommodation; however, CDOC often does not provide qualified sign language interpreters for CDOC's programs, services, and activities.

68.     When CDOC does not provide a qualified sign language interpreter, it forces d/Deaf people to use other, less effective ways to try to communicate.

69.     These include relying on other incarcerated people to tell them what is going on, using other incarcerated people as translators or interpreters, or being forced to exchange written notes.

70.     Relying on other incarcerated people to interpret is problematic because they are not qualified to provide sign language interpreting services.

71.     Relying on other incarcerated people to interpret in formal proceedings, due process hearings, or when confidential or security information could be compromised is contrary to CDOC regulations. AR 850-03 (VI)(C)(2)(c).

72.     A "[q]ualified interpreter" is one who "is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 36.104.

73.     Written communication in English is problematic for many Deaf people because ASL is a distinct language from English, and is often learned only as a second and incomplete language for people whose primary language is ASL.

74.     Written communication also takes much more time than a spoken conversation. So d/Deaf people forced to use written communication during, for example, health appointments, will get much less out of the time spent with the health provider than a hearing person in the same timeframe.

75.     Written notes to communicate are especially problematic in health appointments because the medical terminology is complicated.

76.     Similarly, many DHOH people have face-to-face communication as an approved accommodation, but CDOC's staff does not always communicate with them in compliance with this approved accommodation.

77.     Face-to-face communication is necessary for many DHOH people because it allows them to attempt to read lips and be aware of when others speak to them.

78.     AICs in Legal Services are responsible for recording a person's approved accommodations in their Offender Accommodation Report ("OAR"), which lists the person's approved accommodations and whether the accommodations are active or inactive.

79.     According to CDOC's own policy, for a previously approved accommodation to become inactive or expire, the OAR must include either an end date for the accommodation or show that the person refused the accommodation. AR 750-04 (III)(G).

80.     In turn, if the OAR does not explicitly include an accommodation end date or accommodation refusal, the accommodation remains active.

81.      Despite this policy, CDOC routinely fails to record and provide active, previously approved accommodations to incarcerated people who are DHOH when CDOC transfers them to new facilities. As a result, DHOH people are deprived of necessary accommodations and are often forced to re-request previously approved accommodations when transferred between CDOC's facilities, a process that can take months or even years.

82.     CDOC does not consider hearing aids to be an accommodation.

83.     Instead, CDOC treats hearing aids as a health care appliance, which means DHOH people are required to go through Clinical Services instead of the AIC to get hearing aids to accommodate their hearing disability.

84.     After intake and orientation at DRDC or Denver Women's, CDOC houses DHOH people in one of twenty-two CDOC facilities.

85.     Once in their new facility, a DHOH person must assimilate to their new living environment. This includes adapting to prison notification systems, such as announcements and calls; learning prison movement procedures;[3] communicating and interacting with other

---

[3] "Prison movement procedures" refers to all individual and group movements by people who are incarcerated in CDOC facilities from one authorized area to another.

incarcerated people and prison staff, including learning the facility "kite"[4] system; and exploring CDOC's various programs, services, and activities.

86.     In almost all of its facilities, CDOC uses announcements over a loudspeaker system to alert incarcerated people of daily events or movement calls. Such calls include calls for laundry, meals, count,[5] med-line,[6] recreation time, and other prison programs, services, and activities.

87.     Without necessary accommodations, auditory announcements over a loudspeaker are insufficient to notify DHOH incarcerated people of such events; therefore, DHOH incarcerated people are not granted equal access to such events.

88.     Without necessary accommodations or assistive devices/services, DHOH incarcerated people have an unequal opportunity to assimilate into their new environment as hearing people do. Their inability to equally and effectively communicate with other incarcerated people and prison staff exacerbates the already isolating and sometimes fear-provoking prison environment.

89.     CDOC has a number of programs, services, and activities that incarcerated people qualify for and can benefit from while in CDOC's custody.

---

[4] "Kite" is a slang term used in prisons to refer to a written request by an incarcerated person for something. For example, an incarcerated person can send a medical kite to request a medical appointment with Clinical Services or a kite to their case manager to request a meeting.
[5] "Count" refers to the process where a counting officer ensures all incarcerated people are secure, alive, and well. There are formal and informal counts. Informal counts may be conducted at any time. Formal counts occur at designated times, two of which occur during the night. Three of the counts require incarcerated people to stand at their cell doors with their ID cards visible to the counting officer.
[6] "Med-line" refers to a medication delivery process where incarcerated people line up in either their housing unit or the medical unit to receive medication.

90. CDOC programs, services, and activities include, but are not limited to: academic and vocational education; work programs/work release programs; recreation, exercise, and activities; mail, telephone, and visiting; library; religious programs; reception and orientation; transportation services; classification; food service; sanitation and hygiene; health care; release; discipline, grievance procedures; and due process COPD proceedings; safety and emergency procedures; access to media, courts, counsel, and law library; canteen; volunteer programs; psychological and psychiatric services; and mandates of parole. AR 750-04 (IV)(C)(2).

91. CDOC engages in disability-based discrimination against the DHOH people it incarcerates in at least five different areas. CDOC (1) fails to provide qualified sign language interpreters either on-site or by video remote interpreting; (2) fails to provide functioning hearing aids; (3) fails to provide other auxiliary aids and services, including closed captioning, Communication Access Realtime Translation, and Assistive Listening Devices; (4) fails to provide equal access to notifications and alarms; and (5) engages in other unequal and improper treatment.

**B.  Defendant CDOC's Failure to Provide Qualified Sign Language Interpreters**

92. ASL is a visual language distinct from English. It is a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body.

93. ASL is not English in gestures. Its grammar and syntax are completely different from English.

94. When d/Deaf people are raised using ASL as their first or primary language, written English is a foreign language, which is often acquired incompletely and imperfectly.

95.     d/Deaf people for whom ASL is their primary language almost always require the services of a qualified sign language interpreter for equally effective communication with people who speak English, especially when exchanging lengthy and complex information, such as medical information.

96.     Becoming a qualified sign language interpreter takes many years of training and experience.

97.     Knowing some sign language is not a sufficient substitute for a qualified sign language interpreter.

98.     According to the Registry of Interpreters for the Deaf, "[i]nterpreting is a complex process that requires a high degree of linguistic, cognitive and technical skills in both English and American Sign Language….Interpreters must thoroughly understand the subject matter in which they work so that they are able to convert information from one language, known as the source language, into another, known as the target language." *Professional Sign Language Interpreting Standard Practice Paper*, Registry of Interpreters for the Deaf, Inc. (Updated 2007), http://rid.org/about-interpreting/standard-practice-papers/. The Department of Justice regulations implementing Title II of the ADA define a "[q]ualified interpreter" as one who "is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include, for example, sign language interpreters…." 28 C.F.R. § 36.104.

99.     There are two ways to provide ASL interpreters, either through on-site interpretation or video remote interpretation ("VRI").

100.    VRI is a telecommunication service that uses a device such as a web camera or video conferencing system to provide sign language interpretation, or a spoken language interpretation for situations where there is a communication barrier. VRI is used when the interpreter is located remotely.

101.    VRI can be useful in settings such as ad hoc meetings, brief communications, or emergency situations, so that a person who uses ASL can communicate with a non-ASL user without the delay caused by waiting for an on-site interpreter.

102.    VRI is not a replacement for an on-site interpreter, as on-site interpreters remain necessary for equally effective communication in some settings and under some circumstances, such as medical and mental health appointments, disciplinary hearings, and classes, communications involving multiple DHOH people, and when a DHOH person prefers an on-site interpreter.

### Cathy Begano

103.    Ms. Begano has been deaf since the age of three.

104.    Ms. Begano is currently incarcerated at Denver Women's, a prison operated by CDOC.

105.    CDOC is aware that Ms. Begano is Deaf.

106.    In CDOC's preliminary hearing screening of Ms. Begano on March 5, 2004, CDOC identified Ms. Begano as completely deaf in both ears.

107.    CDOC keeps comprehensive health records of people incarcerated in its custody.

108.    These health records include medical and mental health history, lab reports, test results, and secondary consultation records with health specialists located outside of the prison.

109.   In her medical record, CDOC identifies Ms. Begano as deaf at least thirty-five times.

110.   ASL is Ms. Begano's primary language.

111.   Ms. Begano's need for a qualified sign language interpreter for effective communication is obvious.

112.   Ms. Begano has repeatedly requested CDOC provide her with qualified sign language interpreters when necessary to ensure equally effective communication, including but not limited to using  CDOC's "Request for Accommodation" forms and its grievance procedure.

113.   Because CDOC does not provide qualified sign language interpreters to Ms. Begano, it is impossible for her to have equally effective communication with CDOC staff for all but the most basic information. For example, if there is a problem or incident in her pod, she is often unable to understand what is going on.

114.   Because CDOC does not provide qualified interpreters for her medical and mental health appointments, Ms. Begano does not have equally effective communication with medical and mental health providers. Ms. Begano and CDOC medical and mental health staff are completely unable to communicate effectively.

115.   CDOC approved ASL interpretation as an accommodation for Ms. Begano at her ADA intake screening on September 24, 2015.[7]

---

[7] After serving her initial sentence in 2004, CDOC released Ms. Begano. Ms. Begano then returned to CDOC's custody in 2015.

116.    Despite acknowledging her deafness and need for interpreter services, CDOC has consistently failed to provide a qualified sign language interpreter for effective communication between Ms. Begano and others.

117.    In Ms. Begano's October 5, 2015 intake, CDOC staff noted that Ms. Begano is illiterate in English.

118.    Despite this, CDOC medical staff relies on written notes to attempt to communicate with Ms. Begano.

119.    Written communication does not provide Ms. Begano communication that is equally effective as that provided to hearing people.

120.    Between January 2017 and March 2020, Ms. Begano had at least forty-one appointments with CDOC medical staff where CDOC did not provide her a qualified sign language interpreter.

121.    CDOC forced Ms. Begano to write notes back and forth with its health providers during at least ten of these appointments.

122.    On January 19, 2018, CDOC nurse Kimberly Retallack used written notes with Ms. Begano because CDOC did not provide a qualified sign language interpreter for the medical encounter. At this appointment, Nurse Retallack noted in Ms. Begano's medical records that Ms. Begano "is having a very hard time explaining what is wrong."

123.    On July 6, 2018, CDOC nurse Debra Reilly used written notes with Ms. Begano because CDOC did not provide a qualified sign language interpreter for the medical encounter. At this appointment, Nurse Reilly stated in Ms. Begano's medical records that Ms. Begano "has difficulty using words to describe details regarding her pain, gets somewhat frustrated."

124.   In written notes between Ms. Begano and a CDOC medical staff member at a medical appointment on July 6, 2018, Ms. Begano wrote, "I wish interpreter help explain you," to which the medical staff member responded, "tell me in words…use your words." (emphasis in original).

125.   At another undated medical appointment, Ms. Begano wrote, "I need interpreter come."

126.   Of Ms. Begano's forty-one health service encounters without an interpreter from January 2017 to March 2020, two involved ASL interpretation by a non-qualified sign language interpreter. On one occasion, Ms. Begano brought her cellmate to try to help her communicate, and on the other, CDOC attempted to use an unqualified Denver Women's correctional officer as an interpreter. This correctional officer only knows limited sign language.

127.   This Denver Women's correctional officer is not a qualified sign language interpreter because they cannot interpret in ASL effectively, accurately, and impartially to Ms. Begano.

128.   CDOC policy prohibits the use of other incarcerated people as translators or interpreters under any circumstances. AR 100-19 (IV)(E)(6).

129.   CDOC violated this policy on at least one occasion with Ms. Begano.

130.   Of Ms. Begano's forty-one health service encounters without an interpreter from January 2017 to March 2020, CDOC staff made Ms. Begano rely on lip reading on two occasions.

131.   Lip reading rarely, if ever, results in equally effective communication for anyone. For a profoundly d/Deaf person like Ms. Begano who has been deaf since a very young age, lip reading does not result in equally effective communication.

132.    Ms. Begano has several serious, chronic medical conditions, including high blood pressure, osteoarthritis in her knee, chondromalacia of the patella, and plantar fasciitis. She also had cataract surgery in 2019.

133.    In order to receive proper care for these conditions and engage in thorough discussion about symptoms, care, and treatment, Ms. Begano requires qualified sign language interpreters for equally effective communication with CDOC medical staff.

134.    Due to CDOC's failure to provide qualified sign language interpreters, Ms. Begano's medical issues are not fully resolved because Ms. Begano and the medical staff cannot communicate effectively. This prolongs Ms. Begano's physical pain and causes emotional suffering.

135.    On information and belief, CDOC has not provided qualified sign language interpreters for Ms. Begano's recent medical appointments; thus, her injuries caused by CDOC's discriminatory treatment are ongoing.

### *Zachary Radford*

136.    Mr. Radford has been deaf since the age of two.

137.    Mr. Radford is currently incarcerated at Colorado Territorial Correctional Facility ("Territorial"), a prison operated by CDOC.

138.    CDOC is aware that Mr. Radford is Deaf.

139.    On September 24, 2019, Mr. Radford's first day in CDOC's custody, CDOC staff made a note in his medical file that Mr. Radford is "completely deaf in both ears."

140.    ASL is Mr. Radford's primary language.

141. Mr. Radford's need for a qualified sign language interpreter for effective communication is obvious.

142. CDOC approved Mr. Radford's accommodation for ASL interpretation on October 13, 2019.

143. Despite acknowledging his deafness and his need for interpreter services, CDOC has consistently failed to provide a qualified sign language interpreter for effective communication between Mr. Radford and others.

144. According to his medical file, CDOC did not provide a qualified sign language interpreter for at least three of Mr. Radford's preliminary health screening and full health examination appointments during his intake at DRDC, where CDOC is supposed to identify the medical needs of incarcerated people.

145. Instead, CDOC made Mr. Radford rely on lip reading and written notes to communicate about these important matters.

146. After Mr. Radford's time at DRDC, CDOC sent him to Crowley County Correctional Facility ("Crowley"), a private facility operated by CoreCivic, Inc., under a contract with CDOC.

147. At the time, CDOC housed no other d/Deaf people at Crowley.

148. During his facility orientation at Crowley, CDOC failed to provide a qualified sign language interpreter and instead forced Mr. Radford to attempt to communicate with staff by typing back and forth in a Microsoft Word document as he read through the orientation packet.

149. Mr. Radford did not understand these orientation materials because English is not his primary language and he is not fluent in written English.

150.   On or around October 15, 2019, CDOC transferred Mr. Radford to Territorial.

151.   Since his arrival in October 2019, CDOC has not provided Mr. Radford a qualified sign language interpreter at any of his medical appointments. In his medical records for his appointments on November 4, November 22, and December 4, 2019, a CDOC health care provider wrote that they relied on lip-reading to attempt to communicate with Mr. Radford.

152.   CDOC continued this practice even though medical staff wrote in Mr. Radford's medical records on November 19, 2019 that "reading lips is challenging" for Mr. Radford.

153.   For a profoundly d/Deaf person like Mr. Radford, who has been deaf since a very young age, lip reading does not result in equally effective communication.

154.   In these appointments, Mr. Radford feels frustrated because he cannot provide the necessary details of his medical conditions such as depression, anxiety, sleep disorder, and Chronic Obstructive Pulmonary Disease, which limits the treatment he receives.

155.   Further, CDOC has denied Mr. Radford the benefit of several educational and rehabilitative programs, such as "Thinking for a Change."

156.   Thinking for a Change is a cognitive behavioral change program created by the National Institute of Corrections that incorporates cognitive restructuring theory, social skills development, and the learning of problem-solving skills.

157.   Mr. Radford enrolled in Thinking for a Change in or around the summer or fall of 2020.

158.   CDOC failed to provide a qualified sign language interpreter for the classes.

159.   Mr. Radford did not understand what the teachers and other classmates communicated in the class.

160.   Eventually, the teacher removed Mr. Radford from the class, while hearing incarcerated people continued attending.

161.   CDOC told Mr. Radford that CDOC will not provide a qualified sign language interpreter for programs unless at least two d/Deaf people are enrolled in the program.

162.   Because of this policy, CDOC puts d/Deaf people on the waitlist for classes until at least two d/Deaf people sign up.

163.   CDOC put Mr. Radford on the waitlist for the educational and rehabilitative classes "The 7 Habits on the Inside" and "Why Try?" in November 2019.

164.   Mr. Radford remains on the waitlist for these classes while CDOC has admitted hearing people.

165.   Additionally, CDOC holds a "Deaf Offender Staffing" at Territorial, which is a bi-weekly meeting with all of the d/Deaf incarcerated people at Territorial, a case manager, and a qualified sign language interpreter.

166.   On information and belief, CDOC holds Deaf Offender Staffings so that it can avoid scheduling multiple qualified sign language interpreters for the various one-on-one meetings between d/Deaf people and their case managers.

167.   Currently, Deaf Offender Staffing is the only access Mr. Radford has to a case manager, while hearing people have ready access to one-on-one meetings with their assigned case managers.

### *Leonid Rabinkov*

168.   Mr. Rabinkov has been deaf since infancy.

169.   Mr. Rabinkov is currently incarcerated at Territorial.

170.   CDOC is aware that Mr. Rabinkov is Deaf.

171.   In his preliminary health screening and full health examination during his intake to CDOC on January 30, 2014, CDOC identified Mr. Rabinkov as congenitally deaf.

172.   In his medical record, CDOC identifies that Mr. Rabinkov is deaf at least thirty-nine times.

173.   ASL and Russian Sign Language are Mr. Rabinkov's primary languages.

174.   Mr. Rabinkov's need for a qualified sign language interpreter for effective communication is obvious.

175.   CDOC approved ASL interpretation as an accommodation for Mr. Rabinkov at his ADA intake screening on January 29, 2014.

176.   Mr. Rabinkov repeatedly requested CDOC provide qualified sign language interpreters when necessary to ensure effective communication.

177.   Mr. Rabinkov made these requests in his kites asking for medical appointments and through CDOC's grievance procedure.

178.   CDOC did not provide Mr. Rabinkov with a qualified sign language interpreter during at least forty-two health service encounters between July 2016 and December 2020.

179.   Of these forty-two health service encounters without a qualified sign language interpreter, CDOC forced Mr. Rabinkov to write notes with his health providers during at least thirty-eight appointments.

180.   Because English is not his primary language, writing notes does not provide Mr. Rabinkov communication that is equally effective as that provided to hearing people.

181.    During two of Mr. Rabinkov's forty-two health service encounters without a qualified sign language, CDOC staff forced Mr. Rabinkov to rely on lip reading.

182.    For a profoundly d/Deaf person like Mr. Rabinkov, who has been deaf since a very young age, lip reading does not result in equally effective communication.

183.    CDOC staff have recognized that communication is difficult with Mr. Rabinkov because of the lack of interpretation during his medical appointments.

184.    On August 29, 2017, a CDOC medical staff member wrote in Mr. Rabinkov's medical encounter notes that Mr. Rabinkov "needs a sign language interpreter [because] writ[ing] back [and] forth…will be very slow."

185.    At his last psychiatry appointment in the summer of 2020, Mr. Rabinkov and his psychiatrist met virtually.

186.    Mr. Rabinkov requested to reschedule the appointment to ensure effective communication, as there was no qualified sign language interpreter at the virtual appointment.

187.    As of February 9, 2021, CDOC has not rescheduled Mr. Rabinkov's psychiatry appointment.

188.    Mr. Rabinkov has several serious chronic medical conditions, including asthma, vision loss, and a history of cancer.

189.    In order to receive proper care for these conditions and engage in thorough discussion about symptoms, care, and treatment, Mr. Rabinkov requires qualified sign language interpreters for equally effective communication with CDOC medical staff.

190.    Because CDOC does not provide him with qualified sign language interpreters, Mr. Rabinkov's medical issues are not fully resolved because Mr. Rabinkov and the medical staff

cannot communicate effectively. This prolongs Mr. Rabinkov's physical pain and causes emotional suffering.

191.   Mr. Rabinkov must reschedule his medical appointments when no qualified sign language interpreter is provided. This frustrates Mr. Rabinkov because hearing people do not need to go through the process of showing up for a previously scheduled appointment, being forced to reschedule this appointment, and losing unnecessary time from work, school, and other activities when doing so.

192.   This rescheduling process also delays Mr. Rabinkov's medical and mental health care.

193.   CDOC continues to fail to provide interpreter services to Mr. Rabinkov during medical appointments. Mr. Rabinkov had no qualified sign language interpreter at his most recent medical appointment on December 30, 2020; thus his injuries caused by CDOC's discriminatory treatment are ongoing.

194.   In addition to medical appointments, CDOC consistently fails to provide qualified sign language interpreters for Mr. Rabinkov in other programs, services, and activities it offers to people incarcerated in its custody.

195.   Mr. Rabinkov enrolled in a General Education Diploma ("GED") class with CDOC in September 2019 and attempted to re-enroll in this GED class in December 2020.[8]

196.   CDOC offers these GED classes to incarcerated people who do not already have a high school diploma or its equivalent as part of its academic programming. According to CDOC,

---

[8] CDOC suspended GED classes in April 2020 due to COVID-19 restrictions. On information and belief, CDOC has started its GED classes up again.

its academic programming aims to "address illiteracy among incarcerated [people] and increase educational and career technical proficiency to support re-entry into society." CDOC Overview of Educational and Vocational Programs Fiscal Year 2018.

197.   Incarcerated people in CDOC may remain in GED classes until they achieve a GED.

198.   Mr. Rabinkov enrolled in half day GED classes because CDOC refused to provide a qualified sign language interpreter for the full day GED class.

199.   Mr. Rabinkov's case manager told him that CDOC cannot afford to pay for qualified sign language interpreters for the full day GED class.

200.   Hearing people in CDOC's GED class can stay for the full day GED class and get their GED sooner than Mr. Rabinkov.

201.   When CDOC does not provide qualified sign language interpreters for full day GED classes, Mr. Rabinkov does not receive equal access to his GED class as would a hearing person.

202.   His delay in completing his GED denies him access to the janitorial program and the incentive pod, which both require a GED.

203.   Mr. Rabinkov has difficulty understanding GED assignments in written English because CDOC denies Mr. Rabinkov GED tutoring support with a qualified sign language interpreter.

204.   CDOC offers tutoring support to hearing people enrolled in its GED classes.

205.   Mr. Rabinkov also has difficulty understanding and taking GED exams in written English because CDOC denies Mr. Rabinkov the accommodation of a qualified sign language interpreter to sign the questions and choices of response on the exams.

206.   Without a qualified sign language interpreter to assist in tutoring and translating exams, Mr. Rabinkov cannot understand the information taught  in this GED class as would a hearing person in the same class. Therefore, Mr. Rabinkov does not have equal access to his GED class.

207.   Since CDOC's GED classes began again, following a pause due to the pandemic, CDOC has denied Mr. Rabinkov admittance into the GED class because CDOC refuses to provide a qualified sign language interpreter for the class.

208.   CDOC also does not provide Mr. Rabinkov with qualified sign language interpreters at one-on-one meetings with his case manager.

209.   Because of this, Mr. Rabinkov does not receive the same benefit from his one-on-one case manager meetings as a hearing person would.

### Marc Trevithick

210.   Mr. Trevithick has been deaf since birth.

211.   Mr. Trevithick is currently incarcerated at Territorial.

212.   CDOC is aware that Mr. Trevithick is Deaf.

213.   On September 10, 2007, CDOC classified Mr. Trevithick as "ADA Hearing Impaired" when determining Mr. Trevithick's facility designation during orientation.

214.   ASL is Mr. Trevithick's primary language.

215.   Mr. Trevithick's need for a qualified sign language interpreter for effective communication is obvious.

216.   CDOC approved Mr. Trevithick's accommodation for ASL interpretation on September 28, 2007.

217.   However, CDOC consistently fails to provide a qualified sign language interpreter for effective communication between Mr. Trevithick and others.

218.   In or around April 2020, CDOC failed to provide a qualified sign language interpreter for Mr. Trevithick at his colonoscopy appointment.

219.   A colonoscopy is an invasive examination where the medical provider inserts a long, flexible tube with a video camera on the tip into the patient's rectum to view the patient's colon.

220.   Without the ability to communicate with the medical provider, Mr. Trevithick was confused throughout the examination, as he was consistently unaware of what to expect next.

221.   When Mr. Trevithick attempted to ask the medical provider for his results, the medical provider responded by gesturing "thumbs up."

222.   Additionally, on June 4, 2020, Mr. Trevithick had a medical appointment at Rocky Mountain Eye Center ("RMEC"). A few months prior to his appointment, Mr. Trevithick asked for a qualified sign language interpreter for this appointment.

223.   A CDOC nurse assured Mr. Trevithick that a qualified sign language interpreter would be present for his eye appointment.

224.   However, after being transported from Territorial to the RMEC in Pueblo, CDOC failed to provide a qualified sign language interpreter for the appointment.

225. The RMEC nurse made Mr. Trevithick write notes in an attempt to communicate, despite the inherent complexity of the conversation, Mr. Trevithick's difficulty in understanding written English, and CDOC staff's decision to keep Mr. Trevithick shackled with highly restrictive black box handcuffs[9] for the entire duration of the appointment.

226. Because English is not his primary language, writing notes does not provide Mr. Trevithick communication that is equally effective as that provided to hearing people.

227. Further, CDOC's failure to provide a qualified sign language interpreter jeopardizes Mr. Trevithick's eligibility to parole.

228. Mr. Trevithick has been eligible to parole since September 14, 2013.

229. In mid-February 2021, Mr. Trevithick met with his counselor from his rehabilitative treatment program, a program that Mr. Trevithick is required to complete before he is eligible to parole.

230. The purpose of this meeting was to review the test he must complete in order to finish the program.

231. CDOC did not provide a qualified sign language interpreter for this meeting.

232. Instead, Mr. Trevithick and his counselor attempted to communicate with written notes.

233. Because Mr. Trevithick and his counselor were not able to effectively communicate, Mr. Trevithick did not know how to prepare for the test.

---

[9] Black box handcuffs are explained in greater detail in paragraphs 702 and 703 below.

234.   When Mr. Trevithick complained to CDOC about not having an interpreter for this meeting, Mr. Trevithick's counselor told him that he had no right to request an interpreter and threatened his parole eligibility.

235.   Mr. Trevithick, fearful fear that his long-awaited opportunity to parole may be jeopardized if he pursued his complaint, withdrew his complaint and apologized for requesting an interpreter to understand the test.

236.   In addition, CDOC forces Mr. Trevithick to meet with a case manager on a group basis and does not consistently provide qualified sign language interpreters for his one-on-one case manager meetings.

### Andrew Atkins

237.   Mr. Atkins has been deaf since the age of three.

238.   Mr. Atkins is currently incarcerated at Territorial.

239.   CDOC is aware that Mr. Atkins is Deaf.

240.   On February 12, 2008, CDOC identified that Mr. Atkins is "completely deaf without his hearing aids" during his initial ADA intake screening.

241.   Even with hearing aids, Mr. Atkins cannot discern speech.

242.   ASL is Mr. Atkins's primary language.

243.   Mr. Atkins's need for a qualified sign language interpreter for effective communication is obvious.

244.   CDOC approved Mr. Atkins's accommodation for ASL interpretation on April 9, 2008.

245. Nevertheless, CDOC consistently fails to provide a qualified sign language interpreter for effective communication between Mr. Atkins and others.

246. Mr. Atkins is housed in the incentive pod at Territorial.

247. Incarcerated people who reside in the incentive pod are given privileges, such as vending machines and artwork in the pod and group activities.

248. In order to live in the incentive pod, incarcerated people must meet several requirements, such as maintaining a clear conduct record with no COPD violations.

249. On information and belief, people who reside in the incentive pod are required to attend incentive pod meetings.

250. During these meetings, incarcerated people and staff discuss scheduled activities for people in the incentive pod, collaborate on how to build a stronger community, and resolve any issues amongst incarcerated people or CDOC staff.

251. CDOC has never provided a qualified sign language interpreter for an incentive pod meeting.

252. Because of this, d/Deaf people, including Mr. Atkins, cannot contribute to the discussion like hearing people can.

253. d/Deaf people, including Mr. Atkins, cannot understand the information that CDOC staff and other incarcerated people communicate—information that could affect their incentive pod eligibility or give them the opportunity to equally access an activity.

254. Instead, Mr. Atkins relies on notes taken by a hearing incarcerated person in the incentive pod, which is an unreliable and alienating alternative.

255.    Because English is not his primary language, written notes do not provide Mr. Atkins communication that is equally effective as that provided to hearing people.

256.    Additionally, Mr. Atkins works at Colorado Correctional Industries' ("CCI")[10] Tab Shop in a leadership position, where he oversees the printing of license plate validation tags.

257.    On at least one occasion at the Tab Shop, CDOC forced Mr. Atkins to have a lengthy and complex discussion without a qualified sign language interpreter.

258.    On October 2, 2020, an error occurred in the print room, the part of the Tab Shop where Mr. Atkins works.

259.    CDOC staff at the Tab Shop forced Mr. Atkins to try to explain the situation with written notes.

260.    Mr. Atkins does not have strong English literacy skills.

261.    As a result, he could not adequately explain the error, and the staff misunderstood the situation.

262.    As a result, CDOC staff gave Mr. Atkins a negative chron,[11] and Mr. Atkins left feeling angry and frustrated.

---

[10] CCI, created by the Colorado legislature in 1977, is a self-supporting division of CDOC that oversees and manages prison work programs in the state. *See* Colo. Rev. Stat. Ann. §§ 17-24-101 to -126 (2021). CCI manages many businesses, categorized into three divisions: services, manufacturing, and agribusiness. As of 2017, CCI operates industries in nineteen of CDOC's facilities and employs approximately 1,300 incarcerated people. Incarcerated people who work for CCI work an average of 34 hours a week earning $0.84 per day.

[11] A "chron" is a note of negative or positive behavior entered into the incarcerated person's chronological file, i.e. record, at the discretion of prison personnel. Incarcerated people receive no notice of chrons, cannot dispute their issuance, and there is no meaningful way for incarcerated people to challenge the chrons after their issuance, as there is with formal infractions. Among other things, CDOC uses chrons to determine an incarcerated person's security classification and whether to parole an incarcerated person.

### Kevin Montgomery

263. Mr. Montgomery is deaf.

264. Mr. Montgomery began to progressively lose his hearing as an adult in 2011.

265. Currently, Mr. Montgomery has profound hearing loss in his left ear, meaning he is unable to hear speech and can only hear very loud sounds. He has moderate to severe hearing loss in his right ear, meaning he cannot hear normal-level speech.

266. Mr. Montgomery is currently incarcerated at Sterling Correctional Facility ("Sterling"), a prison operated by CDOC.

267. CDOC is aware that Mr. Montgomery is deaf.

268. CDOC medical staff wrote that Mr. Montgomery is deaf in his medical records on January 12, 2015.

269. ASL is Mr. Montgomery's preferred method of receptive communication. Expressively, because he was late-deafened, Mr. Montgomery is able to speak English.

270. Mr. Montgomery requested CDOC provide qualified sign language interpreters for programs, services, and activities such as medical appointments and classes on multiple occasions.

271. Mr. Montgomery has several serious chronic medical conditions including asthma, high blood pressure, bipolar disorder, a spinal cord injury, and an overactive bladder.

272. In order to receive proper care for these conditions and engage in thorough discussion about symptoms, care, and treatment, Mr. Montgomery requires qualified sign language interpreters for equally effective communication with CDOC medical staff.

273. Despite this necessity, CDOC did not provide a qualified sign language interpreter for at least 155 of Mr. Montgomery's medical appointments since February 2017.

274.   Without a qualified sign language interpreter, Mr. Montgomery and his medical providers cannot effectively communicate and he does not have access to adequate medical treatment.

275.   Additionally, CDOC has never provided a qualified sign language interpreter for Mr. Montgomery's COPD disciplinary hearings.

276.   CDOC holds disciplinary hearings in order to provide incarcerated people with the basis of the COPD charges against them and to give them the opportunity to defend themselves against these charges.

277.   Effective communication for such hearings is necessary for the incarcerated person to understand the allegations and communicate their defense.

278.   Because CDOC does not provide a qualified sign language interpreter for these hearings, Mr. Montgomery and CDOC staff cannot effectively communicate, and CDOC deprives Mr. Montgomery of the due process that is afforded to hearing incarcerated people.

***Jeremy Peterson***

279.   Mr. Peterson has been deaf since infancy.

280.   Mr. Peterson is currently incarcerated at Territorial.

281.   CDOC is aware that Mr. Peterson is Deaf.

282.   CDOC indicated that Mr. Peterson is Deaf at his ADA intake screening on August 29, 2018.

283.   ASL is Mr. Peterson's primary language.

284.   Mr. Peterson's need for a qualified sign language interpreter for effective communication is obvious.

285.   CDOC approved Mr. Peterson's accommodation for ASL interpretation on August 31, 2018.

286.   Mr. Peterson requested CDOC provide qualified sign language interpreters for CDOC programs, services, and activities such as medical appointments and classes.

287.   However, CDOC failed and continues to fail to provide a qualified sign language interpreter for effective communication between Mr. Peterson and others since he arrived at DRDC in August of 2018.

288.   While at DRDC, CDOC failed to provide a qualified sign language interpreter to Mr. Peterson for his medical, dental, and mental health intake appointments on August 29, August 31, and September 4, 2018.

289.   In at least one of these intake appointments at DRDC, the health provider attempted to communicate with Mr. Peterson by writing notes back and forth.

290.   Mr. Peterson does not understand complex written English, which conversations about medical history often include.

291.   Because English is not his primary language, written notes do not provide Mr. Peterson communication that is equally effective as that provided to hearing people.

292.   Since his intake at DRDC, CDOC has failed to provide Mr. Peterson with a qualified sign language interpreter at all but one of his medical appointments.

293.   Additionally, on at least four occasions, CDOC required Mr. Peterson to write notes in attempt to communicate at medical appointments.

294.   CDOC's failure to provide qualified sign language interpreters also excludes Mr. Peterson from educational programs and vocational opportunities.

295.   In November or December of 2019, Mr. Peterson submitted a kite requesting an interpreter for a class that would give him a custodian certification.

296.   CDOC staff at Territorial told Mr. Peterson that there must be multiple d/Deaf people in a class in order for CDOC to provide an interpreter for it, so Mr. Peterson would have to wait until another d/Deaf person signed up.

297.   By making Mr. Peterson wait to take the custodian certification class when hearing people do not have to wait, CDOC fails to provide Mr. Peterson equal access to its programs.

298.   CDOC also does not provide Mr. Peterson with equal access to one-on-one meetings with his case manager.

299.   CDOC frequently cancels Mr. Peterson's one-on-one meetings with his case manager because of the lack of a qualified sign language interpreter.

300.   The only consistent access Mr. Peterson has to a case manager is in a group setting in Deaf Offender Staffing.

*Kyotte Knobee*

301.   Mr. Knobee is Deaf.

302.   Mr. Knobee is currently incarcerated at Territorial.

303.   CDOC is aware that Mr. Knobee is Deaf.

304.   ASL is Mr. Knobee's primary language.

305.   Mr. Knobee's need for a qualified sign language interpreter for effective communication is obvious.

306.   During his ADA intake screening, CDOC identified Mr. Knobee as deaf on January 19, 2016.

307.   CDOC approved an accommodation for ASL interpretation for Mr. Knobee on January 21, 2016.

308.   Nevertheless, CDOC consistently fails to provide a qualified sign language interpreter for Mr. Knobee.

309.   CDOC did not provide Mr. Knobee with a qualified sign language interpreter during at least four health service encounters between March 2018 and December 2020.

310.   At Mr. Knobee's most recent health service encounter on December 21, 2020, CDOC did not provide a qualified sign language interpreter for the appointment.

311.   At the December 21, 2020 appointment, CDOC health providers x-rayed Mr. Knobee's foot for possible broken bones.

312.   At the appointment, the CDOC health provider attempted to communicate with Mr. Knobee with written notes.

313.   These written notes included complex medical terminology.

314.   Mr. Knobee did not understand this complex medical terminology and left his appointment unaware of the next steps and what he needed to do for his foot to heal properly.

315.   In early January 2021, Mr. Knobee requested to again meet with a medical provider to follow up on his injured foot.

316.   When he arrived for that appointment in approximately the second or third week of January, there was no sign language interpreter. After Mr. Knobee requested an interpreter, CDOC medical staff cancelled the appointment and said they would make a new appointment.

317. Since that time, Mr. Knobee has submitted three kites to request another appointment. He has ongoing pain in his injured foot. In addition, he is placing extra weight on his non-injured foot which is causing heel pain in that foot.

318. Because English is not his primary language, written notes do not provide Mr. Knobee communication that is equally effective as that provided to hearing people.

319. On information and belief, because CDOC did not provide qualified sign language interpreters, Mr. Knobee's medical issues are not fully resolved because Mr. Knobee and the medical staff cannot communicate effectively. This prolongs Mr. Knobee's physical pain and causes emotional suffering.

320. Because Mr. Knobee has not had interpreter services at his recent medical appointments, his injuries caused by CDOC's discriminatory treatment are ongoing.

321. Mr. Knobee has repeatedly requested mental health services.

322. CDOC has repeatedly denied Mr. Knobee access to mental health services.

323. On information and belief, CDOC denies Mr. Knobee mental health services because CDOC does not want to provide qualified sign language intepreters for these mental health appointments.

324. In addition to not providing qualified sign language interpreters at medical and mental health appointments, CDOC also does not provide qualified sign language interpreters at one-on-one meetings with his case manager.

325. Mr. Knobee's case manager attempts to communicate with Mr. Knobee during these one-on-one meetings through written notes.

326.    With only written communication, Mr. Knobee does not receive the same benefit from or equally effective communication with his one-on-one case manager meetings as a hearing person would.

327.    In addition, CDOC forces Mr. Knobee to meet with a case manager on a group basis and does not consistently provide qualified sign language interpreters for his one-on-one case manager meetings

## C.  Defendant CDOC's Failure to Provide Functioning Hearing Aids to DHOH People

328.    Hearing aids are assistive devices that improve hearing and speech comprehension for people who have hearing loss. Hearing aids do not correct a hearing disability, but they do assist the hard of hearing person with communication and equal access to programs, services, and activities. *Hearing Aids*, National Institute on Deafness and Other Communication Disorders (Updated 2017), https://www.nidcd.nih.gov/health/hearing-aids.

329.    People who use hearing aids most commonly have sensorineural hearing loss, which is hearing loss resulting from damage to sensory cells, known as hair cells, in the inner ear. This type of hearing loss can be a result of aging, disease, or injury. *Id*.

330.    Hearing aids work by amplifying sound vibrations entering the ears, so the surviving hair cells can detect these larger vibrations and signal the brain. The greater the damage to these hair cells, the greater the amplification needed in the hearing aids. *Id*.

331.    Many hard of hearing people in prison require hearing aids to ensure effective communication and enable meaningful and equal participation in prison programs, services, and activities. Hard of hearing people require hearing aids to hear prison alerts and announcements, to hear emergency notifications, to communicate with other incarcerated people and prison staff, to

listen to what is said in prison programs and activities, to actively participate in these programs and activities, and to be aware of their surroundings in prison.

332.     Additionally, some d/Deaf people wear hearing aids because most d/Deaf people have some residual hearing, typically in very low frequencies. Thus, some d/Deaf people can hear very loud and low sounds, but they are often unable to make out the exact sound – much less words – and often only experience vibrations.

333.     Hearing aids can assist d/Deaf people by amplifying sounds to create a higher environmental awareness of the world around them. This helps alert d/Deaf people of potential dangers such as nearby traffic or something crashing down behind them. It also helps d/Deaf people participate in various activities, such as basketball, because it helps make them aware of where the ball and other players are on the court. This is so even when hearing aids do not make spoken language intelligible.

334.     Hearing aids can also assist d/Deaf people with listening to music or television. Some hearing aids have features that allow d/Deaf people to plug their music or television into them so that they can hear varying levels of the audio.

335.     To ensure equally effective communication for people who rely on hearing aids, it is critical that their hearing aids are calibrated and working properly. If hearing aids are not properly calibrated, the hearing aids will not work effectively and can produce static noise that causes pain and discomfort, rendering the hearing aids unusable.

336.     In order for hearing aids to be effective, repairs must be made in a timely manner.

337.     On information and belief, necessary maintenance for CDOC-issued hearing aids should occur about every six months.

338.    It is also critical that DHOH people are provided the necessary tools and batteries to maintain and use their hearing aids.

339.    If a hearing aid is non-functional, the DHOH user does not receive any benefit from the device and is thus denied equally effective communication and meaningful participation in CDOC's programs, services, and activities.

340.    On information and belief, CDOC will delay hearing aid repair appointments by at least a month if a hearing aid provider has been at a CDOC facility recently.

341.    On information and belief, CDOC only allows for two secondary consults (i.e., consultations with specialists like audiologists, cardiologists, neurologists, and the like) to be generated at one time.

342.    In order to request a secondary consult, an incarcerated person must first request to see their facility's Clinical Services for an examination. CDOC medical staff will generate the secondary consult once this medical staff member determines the secondary consult is necessary.

343.    People with multiple health problems (like many DHOH people) often have to decide what two issues are most pressing when deciding to seek a consult with a secondary health professional. For DHOH people, this often means foregoing hearing aid consultations because of the necessity of meeting with other secondary health professionals, such as a cardiologist or neurologist.

### Dennis Dunann

344.    Mr. Dunann is hard of hearing.

345.    Mr. Dunann is currently incarcerated at Sterling.

346.    CDOC is aware that Mr. Dunann is hard of hearing.

347.     On August 9, 2013, CDOC identified in Mr. Dunann's AIC file that Mr. Dunann is hard of hearing.

348.     Mr. Dunann requires hearing aids for effective communication.

349.     Mr. Dunann requires hearing aids to assist him in hearing at a minimal level.

350.     Mr. Dunann requires hearing aids for equally effective communication and equal access to CDOC's programs, services, and activities, including but not limited to receiving information from CDOC staff, receiving medical care from CDOC's medical providers, and interacting with others during mealtimes. Without functioning hearing aids, he is excluded from these programs and activities.

351.     CDOC delayed Mr. Dunann's hearing aid repairs on at least three occasions.

352.     First, Mr. Dunann submitted a request for a hearing aid repair on January 30, 2017. At that time, Mr. Dunann had submitted two prior requests for this hearing aid repair.

353.     CDOC did not schedule an audiologist appointment for him until April 12, 2017.

354.     Second, in 2019, Mr. Dunann requested a hearing aid repair on March 30, April 19, and April 26.

355.     CDOC did not generate a consultation for repair until April 29, 2019. Mr. Dunann did not see the audiologist until June 18, 2019.

356.     Mr. Dunann did not have his hearing aid refitted until July 9, 2019. Thus, CDOC left him without working hearing aids from March 30 through July 9 of 2019.

357.     Third, Mr. Dunann requested a hearing aid repair in June 2020.

358.     Mr. Dunann did not get his hearing aids repaired until December 2020.

359.     CDOC also delays Mr. Dunann's access to new hearing aid batteries when his current batteries stop working.

360.     Mr. Dunann often goes one or two days without functional hearing aids because CDOC denies him access to new batteries.

361.     CDOC delayed Mr. Dunann's access to new batteries at least twice between December 2020 and January 2021.

362.     Mr. Dunann is injured each hour, let alone each day, he goes without fully functioning hearing aids because he cannot fully converse with those around him, and he is unable to fully participate in CDOC's programs and activities, like communicating with correctional staff and other incarcerated people, and interacting with others during mealtimes.

### Justyn Tyme

363.     Mr. Tyme is hard of hearing.

364.     Mr. Tyme is currently housed at Fremont Correctional Facility ("Fremont"), a prison operated by CDOC.

365.     CDOC is aware that Mr. Tyme is hard of hearing.

366.     CDOC identified that Mr. Tyme is hard of hearing in his "Request for Accommodation" response in October 2013.

367.     Mr. Tyme requires hearing aids for equally effective communication and equal access to CDOC's programs, services, and activities, including but not limited to work, meals, recreation, and hygiene. Without functioning hearing aids, he is excluded from these programs, services, and activities.

368.    In December 2018, Mr. Tyme's hearing aids began malfunctioning and needed to be repaired and re-calibrated.

369.    When Mr. Tyme's hearing aids are not properly funtioning, his hearing aids are rendered ineffective and produce ambient noise and static feedback, causing Mr. Tyme constant pain.

370.    Additionally, Mr. Tyme needed access to a hearing aid remote to be able to adjust the settings on his hearing aids.

371.    Because CDOC failed to repair Mr. Tyme's hearing aids and provide him with access to a hearing aid remote to adjust the settings on his hearing aids, Mr. Tyme could not understand information conveyed to him verbally, fully participate in classes or programs, or hear auditory announcements.

372.    In February 2019, Mr. Tyme requested CDOC repair his hearing aids and provide him with a hearing aid remote to allow him to adjust the settings on his hearing aids.

373.    In April 2019, Sterling's chief medical officer told Mr. Tyme that he would schedule him for a medical appointment to repair his hearing aids and get Mr. Tyme a remote for his hearing aids to adjust the settings on his hearing aids himself.

374.    Despite this, Mr. Tyme did not see medical services to repair his hearing aids for another four months.

375.    Between February 2019 and August 2019, Mr. Tyme repeatedly requested that his hearing aids be repaired through kites, grievances, and meetings with Sterling staff.

376.     When Mr. Tyme arrived at his medical appointment in August 2019, medical staff informed Mr. Tyme that they did not receive any paperwork on his requests for CDOC to repair his hearing aids or for a remote to adjust the settings on his hearing aids and denied his requests.

377.     From August 2019 to January 2020, Mr. Tyme continued requesting that CDOC repair his hearing aids and that he be provided access to a hearing aid remote to adjust the settings on his hearing aids.

378.     In January 2020, eleven months after his initial request, CDOC took Mr. Tyme on a day trip from Sterling to Territorial to have his hearing aids repaired.

379.     CDOC required Mr. Tyme to leave his hearing aids at Territorial for the hearing aids to be repaired. This forced Mr. Tyme to return to Sterling without hearing aids.

380.     CDOC refused to provide Mr. Tyme with replacement hearing aids or any other type of auxiliary aid or service.

381.     In February 2020, CDOC transferred Mr. Tyme from Sterling to Fremont.

382.     After requiring Mr. Tyme to leave his hearing aids at Territorial in January 2020, CDOC failed to return Mr. Tyme's hearing aids until September 16, 2020.

383.     As a result, CDOC deprived Mr. Tyme of the assistive device that he relies on to navigate his daily life in CDOC and converse with those around him for nearly eight months.

384.     Despite his hearing aids being repaired, Mr. Tyme's hearing aids still do not function properly because he cannot adjust the hearing aid settings.

385.     Because Mr. Tyme is not able to adjust the settings on his hearing aids, Mr. Tyme's hearing aids do not properly function in loud environments, rendering them ineffective in most areas.

386.    Without properly functioning hearing aids, Mr. Tyme cannot understand information conveyed to him verbally or auditorily.

387.    As a result of not having functioning hearing aids, Mr. Tyme has missed calls for work, meals, recreation, and showers.

388.    Further, Mr. Tyme endures consistent hostility from Fremont staff for not responding to auditory announcements or verbal commands that he cannot hear.

389.    Without functioning hearing aids that he has the ability to adjust the settings of, Mr. Tyme is deprived of equally effective communication and equal opportunity to participate in and benefit from CDOC's programs, services, and activities.

***Edward Hicks***

390.    Mr. Hicks is hard of hearing.

391.    Mr. Hicks is currently incarcerated at Colorado State Penitentiary ("CSP"), a prison operated by CDOC.

392.    CDOC is aware that Mr. Hicks is hard of hearing.

393.    CDOC identified that Mr. Hicks is completely deaf in his left ear and has moderate to severe hearing loss in his right ear during his ADA intake screening in June 2015.[12]

394.    Mr. Hicks requires a hearing aid in his right ear for equally effective communication and equal access to CDOC's programs, services, and activities, including communication with other incarcerated people and prison staff, and receiving information from

---

[12] After serving his initial sentence, CDOC released Mr. Hicks. Mr. Hicks returned to CDOC's custody in 2018.

prison announcements and notifications conveyed auditorily. Without functioning hearing aids, he is excluded from these programs, services, and activities.

395.   Mr. Hicks's hearing aid broke in April 2020, and he immediately requested his hearing aid be repaired by CDOC.

396.   Despite repeated requests, CDOC failed to repair Mr. Hicks's hearing aid for five months.

397.   Further, Mr. Hicks is not able to adjust the settings on his hearing aids.

398.   Because Mr. Hicks is not able to adjust the settings on his hearing aids, Mr. Hicks's hearing aids do not properly function in loud environments, rendering them ineffective in most areas.

399.   Without properly functioning hearing aids, Mr. Hicks experiences many adverse effects.

400.   Without properly functioning hearing aids, Mr. Hicks talks louder to CSP staff, which some CSP staff perceive as yelling and threatening.

401.   Mr. Hicks also uses increased body language and gestures to communicate, which some CSP staff perceive as acts of aggression.

402.   In order for Mr. Hicks to properly care for his mental health, it is critical that he have the ability to converse with other incarcerated people and prison staff and to be aware of his surroundings.

403.   Because CDOC fails to provide Mr. Hicks with the necessary accommodations, such as functioning hearing aids, for him to effectively communicate with other incarcerated people and prison staff and to be aware of his surroundings, his mental health is deteriorating.

404.    Without functioning hearing aids, Mr. Hicks does not understand what CSP's mental health providers say to him during his mental health appointments.

405.    Because of this, Mr. Hicks cannot properly care for his mental health.

406.    Without functioning hearing aids, Mr. Hicks often cannot understand commands and orders given by CSP staff and thus cannot comply with them.

407.    For example, when CSP staff break up fights, staff yell orders that Mr. Hicks does not hear.

408.    Mr. Hicks fears that he will be injured by CSP staff for failing to respond to an order that he does not hear.

409.    As a result of CDOC's failure to provide Mr. Hicks with properly functioning hearing aids, Mr. Hicks endures constant worry about his safety and wellbeing during incarceration.

### *Robert O'Dell*

410.    Mr. O'Dell is hard of hearing.

411.    Mr. O'Dell is currently incarcerated at Limon Correctional Facility, a prison operated by CDOC.

412.    CDOC is aware that Mr. O'Dell is hard of hearing.

413.    CDOC identified that Mr. O'Dell is hard of hearing during his hearing disability evaluation in July 2009.

414.    Mr. O'Dell requires bilateral hearing aids to participate in CDOC programs and activities including receiving information from staff that is conveyed verbally and auditorily. Without functioning bilateral hearing aids, he is excluded from these programs and activities.

415.    Mr. O'Dell's hearing aids regularly break, resulting in his hearing aids not properly functioning.

416.    In July 2019, Mr. O'Dell's hearing aids broke and began making a constant rattling sound.

417.    As a result, Mr. O'Dell developed severe headaches that caused him constant pain.

418.    When Mr. O'Dell's hearing aids are not functioning properly, he is not able to converse and communicate effectively with other incarcerated people and prison staff, making him concerned for his safety and wellbeing during incarceration.

419.    Mr. O'Dell fears that certain incarcerated people and prison staff construe Mr. O'Dell's lack of response to verbal communication as a lack of respect.

420.    In turn, Mr. O'Dell fears he will be attacked and injured because CDOC fails to provide him with properly functioning hearing aids.

421.    In May 2020, CDOC moved Mr. O'Dell to restrictive housing following an assault that took place at Sterling.

422.    Prior to placing Mr. O'Dell in restrictive housing, Sterling staff confiscated Mr. O'Dell's hearing aids.

423.    Ten days later, CDOC held a disciplinary hearing for Mr. O'Dell.

424.    Sterling staff refused to return Mr. O'Dell's hearing aids to him for the disciplinary hearing.

425.    Without hearing aids, Mr. O'Dell could not understand the charges brought against him or meaningfully defend himself during the disciplinary hearing, denying him access to the CDOC's discipline program.

426. Despite denying Mr. O'Dell equally effective communication in his disciplinary hearing, CDOC still found him guilty.

427. Following the disciplinary hearing, CDOC transferred Mr. O'Dell to CSP, CDOC's maximum security facility.

### James Fling

428. Mr. Fling is hard of hearing.

429. Mr. Fling is currently incarcerated at Territorial. He has been in CDOC's custody since 1997.

430. In approximately 2010, Mr. Fling began requesting that CDOC provide him with hearing aids; it took approximately ten years for CDOC to do so.

431. In 2016 or 2017, Mr. Fling visited an ear, nose, and throat ("ENT") doctor who noticed Mr. Fling's hearing impairment.

432. The ENT told Mr. Fling she would call Mr. Fling back on a later date to have his hearing checked by an audiologist.

433. Mr. Fling finally saw an audiologist for a hearing test in April 2019.

434. However, when Mr. Fling requested the results to this hearing test, CDOC medical staff informed Mr. Fling that they had no record of a hearing test ever being performed.

435. Because CDOC staff informed him they did not have a record of the hearing test performed in April 2019, Mr. Fling again requested hearing evaluations on multiple occasions.

436. CDOC finally provided hearing aids to Mr. Fling in March 2020.

437. Mr. Fling cannot communicate effectively or fully participate in CDOC's programs, services, and activities without hearing aids.

438.    CDOC wrote Mr. Fling up for lack of participation in one of his CDOC classes.

439.    Mr. Fling could not participate in this class due to CDOC's failure to provide him hearing aids. He could not hear or understand the teachers; to him, it sounded like the CDOC staff members teaching the class were whispering.

440.    Mr. Fling requested the two CDOC staff members teaching the class speak up so he could hear them, but they refused.

441.    CDOC eventually removed Mr. Fling from this class because of his lack of participation.

442.    But Mr. Fling could not participate because CDOC refused to provide Mr. Fling with hearing aids necessary for him to hear the class discussion and meaningfully respond.

443.    In addition to removing Mr. Fling from this class, CDOC also issued him a disciplinary report.

444.    This disciplinary report resulted in Mr. Fling losing his job at the Tag Plant.

445.    Mr. Fling lost his comparatively well-paying prison job at the Tag Plant because he could not participate in the class due to CDOC's refusal to accommodate Mr. Fling's hearing disability and provide him with hearing aids to ensure equally effective communication.

446.    After firing him from his job at the Tag Plant, CDOC reassigned Mr. Fling to a laundry job.

447.    Mr. Fling earned about $700 less per month at his laundry job than he did at his previous job at the Tag Plant.

***Kyotte Knobee***

448.    Mr. Knobee, who is Deaf, requires hearing aids for awareness of his surroundings.

449.    However, since Mr. Knobee is Deaf, he requires hearing aids powerful enough and specifically designed for people with severe to profound hearing loss.

450.    On information and belief, CDOC only provides hearing aids powerful enough and specifically designed for people with moderate hearing loss.

451.    Because of CDOC's failure to provide Mr. Knobee with sufficiently powerful hearing aids specifically designed for people with severe to profound hearing loss, Mr. Knobee does not gain any benefit from his CDOC issued hearing aids.

452.    In approximately 2017, when Mr. Knobee attempted to get stronger hearing aids than his current CDOC-issued hearing aids, the audiologist and CDOC staff told Mr. Knobee that he did not need to hear better than he already does.

453.    When Mr. Knobee tried to use his CDOC-issued hearing aids, CDOC delayed hearing aid repairs for Mr. Knobee.

454.    For example, on May 1, 2018, Mr. Knobee requested to see CDOC medical staff to fix a broken hearing aid.

455.    CDOC medical staff did not see Mr. Knobee regarding this hearing aid issue until October 9, 2018.

456.    This delay meant that Mr. Knobee could not benefit from even the very limited assistance that his CDOC-issued hearing aids provide for over five months.

457.    Similarly, the hearing aid batteries CDOC provides to Mr. Knobee often only work for a short duration before needing to be replaced.

458.    Without sufficiently powerful hearing aids, Mr. Knobee is unable to hear staff calling his name, some background noises, and movement of others. As a result, he has limited

awareness of his surroundings. In addition, he is unable to hear the content of announcements. Thus, lack of hearing aids excludes Mr. Knobee from CDOC's communications about programs and activities.

### Kevin Montgomery

459.    Mr. Montgomery, who is deaf, relies on his hearing aids to amplify sounds rather than to discern speech.

460.    On June 19, 2019, CDOC provided Mr. Montgomery with a new mold[13] for his right hearing aid.

461.    However, this mold is too large, so it is painful to wear in his ear.

462.    Further, in or around the summer or fall of 2019, Mr. Montgomery's hearing aids began producing a painful static noise.

463.    Because of these two issues, Mr. Montgomery experiences extreme discomfort while wearing his hearing aids, so he does not wear them.

464.    Mr. Montgomery has submitted fifteen to twenty kites requesting that his right hearing aid mold be resized and that his hearing aids be re-calibrated to eliminate the static noise.

465.    CDOC has never responded to Mr. Montgomery's kites about his hearing aids and has never had them repaired.

466.    Because of CDOC's failure to repair Mr. Montgomery's hearing aids, Mr. Montgomery is deprived of an assistive device that allows him to equally access CDOC programs services, and activities. For example, hearing sounds can supplement sign language because

---

[13] A "mold" is the piece of the hearing aid that is shaped to fit the wearer's ear.

occasionally, one sign in ASL can translate to two slightly different English words. This can assist a d/Deaf person, like Mr. Montgomery, in understanding what a medical provider or program teacher says in a way that is equal to a hearing person.

## D. Defendant CDOC's Failure to Provide Other Auxiliary Aids to DHOH People: Captioning

### *Closed Captioning*

467.    Closed captioning is a feature on a television, video screen, or other visual display that transcribes the audio into words that appear on the top or bottom of the screen.

468.    Closed captioning allows some d/Deaf people who can read and understand some written English to have at least limited access the content of the videos by reading the captions while viewing the video.

469.    Further, closed captioning can make spoken words easier to understand for hard of hearing people.

470.    CDOC facilities and personnel often fail to provide captioning of video content.

471.    CDOC facilities and personnel often refuse to turn on captioning where it is available.

472.    CDOC often provides information in video format without captions. In these instances, it is unclear whether CDOC is choosing to use uncaptioned videos or choosing not to turn on existing captions.  Either way, CDOC does not provide the captions on these videos that would permit some DHOH people to access at least some of the verbal information in these videos.

473.    For example, when Mr. Radford arrived for intake and orientation at DRDC in September 2019 and at Territorial in October 2019, CDOC failed to provide closed captioning in the orientation videos that described prison operations and rules.

474.   Consequently, Mr. Radford did not understand these videos.

475.   Because of CDOC's failure to make the orientation video accessible, CDOC excluded Mr. Radford from its orientation program, causing him to feel lost and overwhelmed during his first days in CDOC's custody and at a new facility.

476.   Similarly, in August or September 2018, CDOC did not provide closed captioning for Mr. Peterson on an orientation video.

477.   As a result, Mr. Peterson did not understand the content of the video and was thus excluded from CDOC's orientation program.

478.   Further, CDOC inconsistently provides closed captioning on televisions, making this recreational activity inaccessible to DHOH people.

479.   For example, beginning in June 2019, the television in Mr. O'Dell's cell did not have closed captioning services for certain channels.

480.   Mr. O'Dell repeatedly requested CDOC provide closed captioning on his television for these channels.

481.   Despite his requests, CDOC failed to provide closed captioning on his television for these channels for nearly six months.

482.   Mr. O'Dell relies on closed captioning to understand the information displayed on and to enjoy the programming provided through his television.

483.   Without closed captioning, Mr. O'Dell misses out on the educational and recreational programming conveyed through his television.

484.   As a result, CDOC deprives Mr. O'Dell of the opportunity to use and enjoy the television programming provided by CDOC in a way that is equal to a hearing person.

485.    Additionally, on the weekends of May 1-3 and 8-10, 2020, Mr. Trevithick wanted to watch the movies that CDOC showed during recreation. However, CDOC staff at Territorial failed to turn on closed captioning on the movies, so Mr. Trevithick did not get to enjoy the movies while hearing people did. Thus, CDOC excluded Mr. Trevithick from this CDOC program.

486.    Also, CDOC staff at Sterling consistently fail to enable closed captioning on facility-wide movies, despite  Mr. Montgomery's repeated requests that CDOC staff enable them.

487.    Because of this, Mr. Montgomery is consistently unable to enjoy facility-wide movies like hearing people can; thus, CDOC excludes Mr. Montgomery from this CDOC program.

488.    Even when CDOC does turn on closed captioning, it does not make the closed captioning accessible. For example, on July 29, 2017, CDOC personnel denied Ms. Begano's request to sit in the front row when watching television, which is necessary for her to be able to see the captioning. Even though CDOC did turn on closed captioning in this instance, Ms. Begano could not actually see it.

### *Communication Access Realtime Translation*

489.    Communication Access Realtime Translation ("CART") refers to the instant word-for-word transcription of the spoken word into English text, for example, by using a stenotype machine, notebook computer, and real-time software, similar to the technology used by court reporters.

490.    CART is a method to provide at least limited access to spoken communication for people who are d/Deaf, hard of hearing, or who have certain cognitive or learning impairments, and who are able to read and understand some written English.

491.    Mr. Rogerio Martinez is hard of hearing.

492.    Mr. Martinez is currently incarcerated at Arkansas Valley Correctional Facility ("Arkansas Valley"), a prison operated by CDOC.

493.    CDOC is aware that Mr. Martinez is hard of hearing.

494.    Mr. Martinez has a difficult time understanding speech because he is hard of hearing, especially during parole hearings because these hearings are conducted by video.

495.    CDOC denied Mr. Martinez's requests for CART at his parole hearing in April 2019 and at his parole hearing in October or November 2020.

496.     Due to CDOC's failure to provide CART, Mr. Martinez cannot understand what the parole board says and does not have access to equally effective communication or meaningful participation in parole hearings.  He is thus denied access to these CDOC programs and activities.

## E.  Defendant CDOC's Failure to Provide Equal Access to Notifications and Alarms for DHOH People

497.    In almost all of its facilities, CDOC uses announcements over a loudspeaker system to notify incarcerated people of daily events or movement calls. These include calls for laundry, meals, count, med-line,[14] recreation and yard time, and other prison activities.

498.    Incarcerated people rely on these announcements to know when it is time to engage in many required and optional programs and activities.

499.    DHOH incarcerated people cannot rely on such audible announcements and thus require accommodations to ensure they are notified of these various programs and activities.

500.    CDOC often attempts to accommodate the need for information contained in audible announcements through personal notifications by either prison staff or a designated

---

[14] See footnote 6.

incarcerated person, often referred to as an Offender Care Aide ("OCA"), to alert the DHOH person when an announcement has been made.

501.   This is an inadequate solution for notifying DHOH persons because prison staff and OCAs are not reliable in conveying all information announced audibly.

502.   Minimum accommodations include the use of visual announcements or flashing lights to alert the DHOH person to the announcements. For example, two flashes of their cell lights may mean that it is time for a meal.

503.   CDOC does not use visual announcements or consistently flash the lights despite many DHOH people having requested these accommodations.

504.   Additionally, incarcerated people rely on alarms to wake up in the morning and ensure they attend appointments, work, classes, and other programs on time.

505.   DHOH people cannot rely on audible alarms and thus require accommodations to ensure they can equally access these various programs, services, and activities.

506.   Such accommodations include vibrating watches and bed shaker alarms. A vibrating watch is similar to a standard watch except that its alarm vibrates instead of making an audible sound. Similarly, a bed shaker alarm functions like an alarm clock except that it vibrates or shakes a bed instead of making an audible sound when an alarm goes off.

507.   CDOC offers vibrating watches but requires DHOH people to purchase them at a cost that prohibits many DHOH people from buying them.

508.    CDOC does not accommodate DHOH people with bed shaker alarms, despite requests from multiple DHOH people.

509.    With both a vibrating watch and a bed shaker, the user sets an alarm in advance. This pre-set alarm only works for regular announcements or notifications.  A vibrating watch or bed shaker does not take the place of accommodations for irregular announcements.

510.    For those who do own a vibrating watch, the vibration is not strong enough to properly notify them of pre-set alarms.

511.    Further, CDOC uses alarms, such as fire alarms, to alert staff and incarcerated people within the facility of emergencies.

512.    Failure to effectively alert DHOH people of emergency situations hinders the safety of those people in an emergency situation because it does not allow those people to adapt and respond to the situation.

513.    DHOH people cannot hear audible emergency alarms and thus require accommodations to ensure they are aware of emergency situations.

514.    Without accommodations, DHOH people often live in fear that they will be unaware of an imminent threat to their safety.

515.    Such accommodations include installing strobe alarms in common areas and cells that flash simultaneously with the audible alarm in the event of an emergency.

516.    CDOC only houses a few DHOH people in cells with strobe alarms, so many other DHOH people remain unaware of emergency notifications.

517.    In many of the limited situations where CDOC provides strobe alarms in common areas, such as the dayroom of a person's pod, the strobe alarm does not actually work.

*Andrew Atkins*

518.   On or around January 7, 2021, CDOC moved Mr. Atkins from a cell with a strobe alarm into a cell without a strobe alarm.

519.   Mr. Atkins requested that he be moved back to a cell with a strobe alarm.

520.   On information and belief, in June or July 2020, CDOC policy changed to state that DHOH incarcerated people do not need to be housed in a cell with a strobe alarm if they can see the strobe alarm in the pod from their cell.

521.   DHOH people are more likely to wake up in the event of an emergency if the strobe alarm is in their cell than if the strobe alarm is in the pod, outside of their cell.

522.   On information and belief, many cells doors at Territorial are solid with only one small window.

523.   On information and belief, when an incarcerated person's cell door is closed, it is very difficult to see the strobe alarm flashing.

524.   Further, CDOC staff at Territorial consistently fail to flash the lights in Mr. Atkins's housing unit to notify him of prison announcements.

525.   Mr. Atkins relies on hearing incarcerated people to figure out what is going on by either following them or attempting to ask them.

526.   Sometimes the hearing incarcerated people ignore Mr. Atkins, and he remains in the dark about the announcement while hearing incarcerated people are fully aware.

*Kyottee Knobee*

527.   Mr. Knobee requested a bed shaker alarm on December 28, 2020 as an accommodation to wake up on time since his vibrating watch does not wake him up.

528.    Without this bed shaker alarm, Mr. Knobee must either rely on his internal alarm clock, hearing cellmates, OCAs, or CDOC personnel to wake him up.

529.    Hearing people wake up by hearing announcements and other auditory alarms to wake up on their own.

530.    In approximately February 2021, CDOC denied Mr. Knobee's request for a bed shaker alarm.

531.    Mr. Knobee often misses auditory announcements, in addition to wake up announcements, because he cannot hear them.

532.    Mr. Knobee therefore must rely on hearing cellmates and correctional staff to notify him of announcements.

533.    As a result, CDOC denies Mr. Knobee equal access to facility announcements and auditory notifications.

534.    Mr. Knobee has repeatedly requested CDOC correctional staff to flash the lights when there is an announcement.

535.    CDOC correctional staff are unreliable at flashing the lights to notify Mr. Knobee of announcements.

536.    As a Deaf person, Mr. Knobee cannot hear emergency auditory alarms and thus relies on visual cues to be properly and safely informed of an emergency, such as a fire.

537.    CDOC recently moved Mr. Knobee from a cell with a strobe alarm into a cell without a strobe alarm.

538.    Mr. Knobee is not currently housed in a cell with a strobe alarm.

539.    Due to CDOC's failure to house him in a cell with a strobe alarm and to provide stroble alarms in other areas, Mr. Knobee experiences stress because he never knows when the next emergency will occur and is constantly on the lookout.

### Leonid Rabinkov

540.    Mr. Rabinkov requested a bed shaker alarm in January 2021 as an accommodation to wake up on time since his vibrating watch does not vibrate strongly enough to wake him up.

541.    Mr. Rabinkov has not received a response from CDOC about his bed shaker alarm accommodation request.

542.    Mr. Rabinkov is not currently housed in a cell with a strobe alarm.

543.    Mr. Rabinkov fears for his safety because he may not be aware of an emergency situation at any given time.

### Zachary Radford

544.    On November 10, 2019, Mr. Radford filled out a "Request for Accommodation" for a vibrating watch. In the request, he stated that without the watch, he "alway[s] missed important errands appt – classes – food – meds – etc." He also indicated he does not have enough funds in his prison account to purchase the watch on his own.

545.    On November 27, 2019, CDOC approved his request for accommodation but told him he must "go into the red" to purchase the watch. This means that his "Inmate Banking Account"[15] balance will go below zero in order for him to purchase a vibrating watch.

---

[15] Incarcerated people in CDOC's custody are given an internal banking account to use while they are incarcerated. Wages earned from prison jobs and donations from friends and family are deposited in the person's account. Deductions from the account balance are made when the incarcerated person owes restitution or some other payment to a third-party; owes a co-payment

546.    On or around December 20, 2019, Mr. Radford ordered his vibrating watch. He learned, however, that the watch was backordered.

547.    CDOC still has not provided Mr. Radford with his vibrating watch.

548.    Additionally, Mr. Radford cannot hear audible emergency alarms.

549.    Mr. Radford is not housed in a cell with a strobe alarm.

550.    Mr. Radford has asked CDOC multiple times to accommodate his hearing disability by moving him to a cell with a strobe alarm.

551.    In the fall of 2019, Mr. Radford and his Deaf cellmate were the last people to evacuate during a fire-drill because they did not know that the alarm sounded and could not see a strobe alarm flashing from their cell.

552.    Mr. Radford fears for his safety and is at risk because he cannot rely on auditory alarms or the strobe alarm in the pod and may not be aware of an emergency situation at any given time.

***Edward Hicks***

553.    Mr. Hicks, who is hard of hearing, routinely experiences difficulty hearing and understanding prison announcements and notifications.

554.    Mr. Hicks has an approved accommodation for personal notification of irregular audible announcements.

555.    CSP staff consistently fail to follow Mr. Hicks's approved accommodation of personal notification of irregular announcements.

---

to medical; purchases something from canteen, such as toothpaste or a snack item; or otherwise owes CDOC money.

556.    As a result, Mr. Hicks has missed important appointments and essential activities, such as meals and laundry.

557.    On April 15, 2020, CSP staff failed to personally notify Mr. Hicks of his disciplinary hearing using face-to-face communication.

558.    Mr. Hicks relies on lip reading for effective communication when interacting with CDOC staff.

559.    Instead, CSP staff attempted to notify Mr. Hicks through the intercom in his cell, which Mr. Hicks could not hear.

560.    Mr. Hicks remained unaware of his disciplinary hearing.

561.    As a result, Mr. Hicks did not attend his disciplinary hearing, depriving him of the ability to meaningfully participate and defend himself in his disciplinary hearing.

562.    Despite this, CDOC found Mr. Hicks guilty in his disciplinary hearing.

563.    When CDOC fails to personally notify Mr. Hicks of irregular audible announcements, it denies him equally effective communication and equal access to CDOC's programs, services, and activities.

564.    In turn, Mr. Hicks has no way to understand or be aware of irregular announcements and notifications.

565.    Mr. Hicks has repeatedly requested CDOC provide him with personal notification of irregular announcements to ensure that he is aware of and understands irregular prison announcements and notifications.

566.    Despite these requests, CDOC continues to fail to personally notify Mr. Hicks of irregular prison announcements and notifications.

567.    When CDOC fails to follow Mr. Hicks's approved accommodation for personal notification of irregular announcements, Mr. Hicks has no way to understand or be aware of irregular announcements.

568.    Further, CDOC's policies do not allow Mr. Hicks to have a vibrating watch to remind him of regular announcements.

569.    Mr. Hicks has repeatedly requested CDOC provide him with a vibrating watch to allow him to set a vibrating alarm to remind him of regular announcements, such as count and meal calls.

570.    Because of CDOC's failure to provide Mr. Hicks with a vibrating watch, he has no means to be made aware of regular announcements other than to try to memorize the timing of the prison's schedule while constantly watching the clock.

571.    As a result, Mr. Hicks is being denied equal access to CDOC's auditory announcements and notifications.

572.    When CDOC denies Mr. Hicks equal access to its auditory announcements and notifications, CDOC deprives Mr. Hicks of equal access to and effective communication in CDOC's daily services and activities.

### *Merl Mitchell*

573.    Mr. Mitchell is completely deaf in his left ear and has severe hearing loss in his right ear.

574.    Mr. Mitchell is currently incarcerated at Fremont.

575.    CDOC is aware of Mr. Mitchell's hearing disability.

576.    Mr. Mitchell entered CDOC custody in August 2014.

577.    CDOC failed to identify Mr. Mitchell's hearing disability for the first fourteen months of his incarceration despite Mr. Mitchell entering CDOC custody with profound hearing loss.

578.    Mr. Mitchell spent the first fourteen months of his incarceration continuously requesting accommodations for his hearing disability, such as hearing aids and personal notification of irregular announcements, yet CDOC failed to provide him with any accommodations.

579.    CDOC finally identified Mr. Mitchell's hearing loss during a hearing disability screening in October 2015.

580.    Throughout the entirety of his incarceration, CDOC has failed to provide Mr. Mitchell with equal access to and equally effective communication of CDOC's announcements, notifications, and alarms.

581.    Mr. Mitchell has missed critical medical and mental health appointments because he cannot hear announcements and notifications for these appointments.

582.    In addition to Mr. Mitchell's hearing disability, Mr. Mitchell suffers from Post-Traumatic Stress Disorder, severe anxiety, night terrors, and sleep walking.

583.    Mr. Mitchell also has a traumatic brain injury, removed thyroid, central apnea, diabetes, vertigo, and memory loss. He has also had three heart attacks.

584.    Because CDOC fails to effectively notify Mr. Mitchell of his medical and mental health appointments, CDOC deprives Mr. Mitchell of the essential medical and rehabilitative services he relies on to maintain his physical and mental health.

585.    As a result, Mr. Mitchell's physical and mental health have rapidly declined.

586.    In turn, Mr. Mitchell reports that he is losing his will to live.

587.    Mr. Mitchell has repeatedly requested CDOC provide him with an accommodation for personal notification of irregular announcements.

588.    Despite this, CDOC continues to deny Mr. Mitchell's requests and fails to personally notify him of irregular announcements.

589.    Mr. Mitchell suffers each day that CDOC fails to provide him with his necessary accommodation for personal notification of irregular announcements.

590.    Further, CDOC fails to provide Mr. Mitchell with equal access to and equally effective communication of regular prison announcements and notifications.

591.    Because Mr. Mitchell cannot hear or understand regular auditory announcements and notifications, Mr. Mitchell misses many essential programs, services, and activities provided by CDOC, such as mealtimes, recreational activities, and crucial diabetic snacks.

592.    Mr. Mitchell has repeatedly requested staff flash the lights in his housing unit to alert him to essential daily services, such as mealtimes, laundry, and recreational activities.

593.    Despite his repeated requests and CDOC's guarantee that staff would flash the lights to ensure Mr. Mitchell is notified of essential daily activities, CDOC staff still consistently fail or refuse to flash the lights in Mr. Mitchell's housing unit.

594.    Mr. Mitchell has requested CDOC provide him with a vibrating watch to allow him to set a vibrating alarm to remind him of essential daily services offered by CDOC, such as meal calls and recreational activities.

595.    Despite his requests, CDOC refuses to provide Mr. Mitchell with a vibrating watch.

596.     Mr. Mitchell is forced to rely on other incarcerated people for notifications of essential daily services, depriving him of the self-control and autonomy he hopes to reclaim.

597.     A vibrating watch would enable Mr. Mitchell to remind himself of essential daily services.

598.     In turn, Mr. Mitchell would not have to rely on Territorial staff or other incarcerated people to remind him of regular announcements and essential daily services.

599.     Because CDOC denies Mr. Mitchell these necessary accommodations, it denies him of equal access to and equally effective communication of CDOC's announcements and notification services.

600.     When CDOC denies Mr. Mitchell equal access to its auditory announcements and notifications, it deprives Mr. Mitchell of equal access to and equally effective communication of CDOC's daily services and activities.

### Robert O'Dell

601.     Mr. O'Dell, who is hard of hearing, has an approved accommodation for personal notification of irregular audible announcements.

602.     Despite this, CDOC staff consistently fail to follow Mr. O'Dell's approved accommodation for personal notification of irregular audible announcements.

603.     CDOC staff instead attempt to notify Mr. O'Dell through the intercom in his housing unit or cell.

604.     When CDOC staff communicate with Mr. O'Dell through the intercom in his housing unit or cell, he cannot hear or understand the information being conveyed to him.

605.     As a result, Mr. O'Dell misses essential prison services.

606.    Mr. O'Dell has repeatedly requested staff personally notify him of irregular announcements.

607.    Despite his repeated requests, CDOC staff still routinely fail to personally notify Mr. O'Dell of irregular announcements.

608.    Because CDOC fails to personally notify Mr. O'Dell of irregular announcements, it deprives him of equal access to and equally effective communication of CDOC's announcements and notification services.

609.    When CDOC denies Mr. O'Dell equal access to its auditory announcements and notifications, CDOC deprives Mr. O'Dell of equal access to and equally effective communication of CDOC's daily services and activies.

### Justyn Tyme

610.    Mr. Tyme, who is hard of hearing, has an approved accommodation for personal notification of irregular  announcements.

611.    When CDOC transferred Mr. Tyme to Fremont in February 2020, Fremont staff refused to honor Mr. Tyme's accommodation for personal notification of irregular announcements.

612.    CDOC forced Mr. Tyme to wait two months before assigning Mr. Tyme an OCA at Fremont to personally notify him of irregular announcements.

613.    Even after CDOC assigned Mr. Tyme an OCA, he still misses many irregular announcements because his OCA consistently fails to notify him of these announcements.

614.    Mr. Tyme believes his OCA is not trained to work with people with hearing disabilities because his OCA often does not pay attention to or is not aware of announcements pertaining to Mr. Tyme.

615.    On January 21, 2021, CDOC staff attempted to notify Mr. Tyme of a legal visit over the intercom in his housing unit.

616.    Mr. Tyme never heard the announcements, nor did CDOC provide him personal notification of the announcement as required by his approved accommodation.

617.    In turn, Mr. Tyme sat in his cell for one hour until Fremont staff came to personally notify him of his legal visit.

618.    When CDOC staff fail to personally notify Mr. Tyme, he misses essential prison services such as medical appointments and legal services.

619.    Because CDOC fails to personally notify Mr. Tyme of irregular announcements, it deprives him of equal access to and equally effective communication of CDOC's announcements and notification services.

620.    When CDOC denies Mr. Tyme equal access to its auditory announcements and notifications, CDOC deprives Mr. Tyme of equal access to and equally effective communication of CDOC's daily services.

### Kennith Meadows

621.    Mr. Meadows is hard of hearing.

622.    Mr. Meadows is currently incarcerated at Territorial.

623.    CDOC is aware Mr. Meadows is hard of hearing.

624.    CDOC identified that Mr. Meadows is hard of hearing during his ADA intake screening in November 2009.

625.    Mr. Meadows has an approved accommodation for personal notification of irregular audible announcements.

626.     Despite this, Territorial staff consistently fail to follow Mr. Meadows's approved accommodation for personal notification of irregular announcements.

627.     Territorial staff instead attempt to notify Mr. Meadows through the intercom in his housing unit.

628.     When Territorial staff communicate with Mr. Meadows through the intercom in his housing unit, he cannot hear or understand the information being conveyed to him.

629.     In turn, Mr. Meadows misses essential prison services such as law library appointments and recreational activities.

630.     Further, CDOC fails to provide Mr. Meadows with equal access to and equally effective communication of regular prison announcements and notifications, such as meal calls and laundry.

631.     Mr. Meadows has requested Territorial staff flash the lights in his housing unit to alert him to these regular prison announcements and notifications.

632.     Despite his requests, Territorial staff still consistently fail or refuse to flash the lights in Mr. Meadows's housing unit.

633.     As a result, Mr. Meadows has missed essential daily services such as meals and laundry.

634.     Because CDOC deprives Mr. Meadows of these necessary accommodations, it deprives him of equal access to and equally effective communication of CDOC's announcements and notification services.

635.    When CDOC denies Mr. Meadows equal access to its auditory announcements and notifications, CDOC denies Mr. Meadows of equal access to and equally effective communication of CDOC's daily services and activites.

636.    Additionally, Mr. Meadows cannot hear emergency auditory alarms and thus relies on visual cues to be properly and safely informed of an emergency, such as a fire.

637.    Between September 2019 and December 2019, Mr. Meadows's strobe alarm failed to go off for three separate fire-drills.

638.    Mr. Meadows asked CDOC multipe times to repair the storbe alarm in his cell.

639.    Despite this, on or around January 10, 2020, Mr. Meadows's strobe alarm again failed to go off.

640.    Due to CDOC's failure to house him in a cell with a functioning strobe alarm and to provide strobe alarms in other areas, Mr. Meadows fears for his safety—and he is at risk—because he may not be aware of an emergency situation at any given time.

*Bruce Scheiber*

641.    Mr. Scheiber is hard of hearing.

642.    Mr. Scheiber is currently incarcerated at Territorial.

643.    Mr. Scheiber is not currently housed in a cell with a strobe alarm.

644.    While the day hall in Mr. Scheiber's pod has a strobe alarm, it does not work when the auditory fire alarm sounds.

645.    Mr. Scheiber fears for his safety—and he is at risk—because he may not be aware of an emergency situation at any given time.

646.    As a result, Mr. Scheiber must sleep with his hearing aids in his ears in order to be notified of any emergency at night.

647.    Hearing aids are not meant to be worn when sleeping. Mr. Scheiber experiences discomfort when wearing his hearing aids at night and fears he may break them while sleeping with them in his ears. Mr. Scheiber's hearing aids also wear out more quickly when he wears them at night.

648.    Mr. Scheiber has a vibrating watch.

649.    However, the vibration in his watch is not powerful enough to properly notify him of alarms for regular announcements. Furthermore, even if his vibrating watch worked properly, his vibrating watch cannot notify him of irregular announcements as he cannot set alarms for these irregular announcements in advance.

650.    As a result, Mr. Scheiber must rely on other means of notification, such as Territorial correctional staff flashing the lights.

651.    CDOC staff at Territorial consistently fail to flash the lights in Mr. Scheiber's pod to notify him of announcements.

652.    Mr. Scheiber misses meals weekly because Territorial correctional officers fail to notify him of meal announcements by flashing the lights.

653.    For example, on January 20, 2021, Mr. Scheiber missed all three meals because Territorial correctional officers failed to notify him of mealtime.

654.    Mr. Scheiber also regularly misses other programs, including med-line, church services, work, the library, and yard recreation time, because CDOC fails to notify Mr. Scheiber of these programs.

655.    Mr. Scheiber notified CDOC of his need for notification accommodations through CDOC's grievance procedure and by sending a kite to the AIC.

656.    The AIC responded that Mr. Scheiber's hearing aids were good enough for notification and any other issues should be discussed with the Territorial correctional officers in his cell house.

657.    However, when Mr. Scheiber requests the Territorial correctional officers in his cell house flash the lights, many correctional officers respond that it is not their responsibility to flash the lights.

658.    CDOC's refusal to provide Mr. Scheiber with accommodations for emergency notifications, regular announcements, and irregular announcements denies Mr. Scheiber equal access to and equally effective communication of CDOC's programs, services, and activities.

### *Bradley Hogue*

659.    Mr. Hogue is hard of hearing.

660.    Mr. Hogue is currently incarcerated at Arkansas Valley.

661.    CDOC is aware Mr. Hogue is hard of hearing.

662.    In January 2003, Mr. Hogue's CDOC hearing test revealed that he has 63 decibel ("dB") loss in his left ear and 43 dB loss in his right ear, meaning he cannot hear sounds lower than 63 dB in his left ear and 43 dB in his right ear, which is categorized as moderate to severe hearing loss.

663.    People with moderate to severe hearing loss cannot hear normal-level speech.

664.    Mr. Hogue cannot understand anything spoken over the loudspeaker system at Arkansas Valley.

665.    Despite  Mr. Hogue having an approved accommodation for personal notification of irregular announcements, CDOC staff at Arkansas Valley routinely convey announcements over the loudspeaker system without personally notifying Mr. Hogue.

666.    Mr. Hogue has missed law library appointments because CDOC staff at Arkansas Valley attempt to alert him of his appointment or announce schedule changes via the loudspeaker system which he cannot hear.

667.    Mr. Hogue has also missed meals, recreation, canteen distribution, med-line, and mail call because he cannot understand the calls for movement over the loudspeaker and the calls are made at inconsistent times, so he cannot rely on keeping track of time.

668.    CDOC's refusal to provide Mr. Hogue with accommodations for irregular and regular announcements denies Mr. Hogue's equal access to and equally effective communication of CDOC's programs, services, and activities.

***Kerry Gallegos***

669.    Mr. Gallegos is Deaf.

670.    Mr. Gallegos is currently incarcerated at Territorial.

671.    ASL is Mr. Gallegos's primary language.

672.    CDOC staff at Territorial consistently fail to flash the lights in Mr. Gallegos's cell to notify him that it is time for count or med-line.

673.    For example, on June 13, 2020, CDOC staff failed to flash the lights in Mr. Gallegos's cell to inform him that it was time for med-line.

674.    As a result, Mr. Gallegos arrived late and was sent away without any medications.

675.   CDOC's refusal to provide Mr. Gallegos with accommodations for regular announcements denies Mr. Gallegos equal acess to and equally effective communication of CDOC programs, services, and activities.

**F.  Unequal and Improper Treatment of DHOH People by Defendant CDOC**

676.    CDOC staff often fail or refuse to interact with DHOH incarcerated people in a way that makes equally effective communication possible.

677.   On information and belief, CDOC fails to adequately train staff on how to properly interact with people who are DHOH.

678.   CDOC correctional officers often single out DHOH incarcerated people and subject them to abusive and discriminatory treatment due to their inability to hear. For example, CDOC correctional staff have mocked and humiliated DHOH people in CDOC's custody (including but not limited to some of the Exemplar Constituents mentioned above) for their inability to hear or effectively communicate. They endure hostility and anger from staff because they cannot hear information conveyed to them verbally. Moreover, CDOC staff discipline DHOH incarcerated people for misconduct when they fail to respond to orders that they do not hear.

*Kevin Montgomery*

679.   When Mr. Montgomery first arrived at DRDC in December 2014, CDOC gave him a temporary accommodation for face-to-face communication when communicating with CDOC staff.

680.   Mr. Montgomery relies on face-to-face communication to know when someone is talking to him and to read lips.

681.    On December 30, 2014, CDOC staff at DRDC attempted to administer a drug and alcohol assessment of Mr. Montgomery.

682.    However, CDOC staff did not speak to Mr. Montgomery face-to-face to alert him that he needed to submit to the assessment.

683.    Mr. Montgomery did not know of the assessment and did not participate.

684.    Because of this, CDOC labeled Mr. Montgomery non-compliant with the drug and alcohol assessment requirements until he was assessed on April 4, 2017.

685.    When an incarcerated person is not program compliant, CDOC has the discretion to take away this person's "earned time."[16]

686.    For each month that Mr. Montgomery remained non-compliant, CDOC took away four days of Mr. Montgomery's earned time.

687.    Mr. Montgomery did not know until the fall of 2020 that CDOC had determined him non-compliant, and he lost earned time for over two years.

688.    Therefore, as a result of CDOC's failure to respect Mr. Montgomery's accommodations, Mr. Montgomery lost around 108 days of earned time.

689.    Further, CDOC staff have given Mr. Montgomery a negative chron at least twice because of his deafness.

690.    On June 22, 2019, Mr. Montgomery had a disagreement with a correctional officer.

691.    The officer reported that Mr. Montgomery spoke loudly and that she asked him to stop yelling.

---

[16] The term "earned time" refers to a credit that is awarded to an incarcerated person's sentence when the incarcerated person exerts positive behavior.

692.     Mr. Montgomery responded that he normally talks loudly because he is deaf.

693.     As a result, the officer gave Mr. Montgomery a negative chron.

694.     Additionally, on September 12, 2019, a CDOC correctional officer reported that he told Mr. Montgomery to uncover a security light in his cell.

695.     Mr. Montgomery did not obey this directive because he did not hear the officer.

696.     The officer reported asking Mr. Montgomery to come to the window to talk to him, but again, Mr. Montgomery could not hear the directive and never came to the window.

697.     The correctional officer gave Mr. Montgomery a negative chron as a result of this incident, but the correctional officer never informed Mr. Montgomery of this chron.

698.     Mr. Montgomery becomes eligible for parole in March 2021.

699.     The parole board considers negative chrons when determining whether to parole an incarcerated person.

700.     Therefore, CDOC correctional officers' failure to understand Mr. Montgomery's deafness and discrimination against him jeopardizes his opportunity to parole.

### Jeremy Peterson

701.     On February 2, 2020, when CDOC transferred Mr. Peterson from Territorial to Fremont, and on February 7, 2020, when CDOC transferred him back to Territorial, CDOC staff used handcuffs with a black box handcuff cover to restrain Mr. Peterson.

702.     A black box handcuff cover is a box-like piece of plastic or metal that can be placed around a pair of handcuffs, covering the handcuff chain, wrist shackles, and keyholes. In other words, the black box converts a standard pair of handcuffs into rigid handcuffs that provide a more severe restraint and further limit the hand movements of the wearer.

703.    Additionally, the black box is most often connected with a belly chain, which is a chain that is wrapped around a person's waist. This restricts a person's hands even further by keeping them chained at that person's waist.

704.    Using the black box to shackle a d/Deaf person eliminates their ability to communicate in sign language because sign language requires extensive movements of the hands.

705.    Despite that a black box completely eliminates a d/Deaf person's ability to communicate and is the functional equivalent of gagging a hearing person, CDOC staff routinely shackle d/Deaf people in this way.

706.    This means that incarcerated people who do not have hearing loss have the ability to converse while being shackled, sometimes for several hours, during transport. Meanwhile, d/Deaf people are denied the same opportunity.

707.    As a result of CDOC's discriminatory behavior, CDOC stripped Mr. Peterson of his ability to communicate with other incarcerated people or correctional staff while being transported.

### *Marc Trevithick*

708.    On June 4, 2020, Mr. Trevithick went to an eye appointment at Rocky Mountain Eye Center in Pueblo, Colorado.

709.    CDOC used the black box handcuffs to restrain Mr. Trevithick during transport and during his eye doctor appointment.

710.    As noted above, CDOC had failed to provide a sign language interpreter for this appointment; the black box handcuffs removed any possibility of even attempting to communicate with gestures or writing.

### Kyotte Knobee

711.     In February 2020, CDOC correctional staff transported Mr. Knobee to a disciplinary hearing.

712.     During transport, CDOC correctional staff handcuffed Mr. Knobee behind his back.

713.     This prevented Mr. Knobee from signing in ASL—effectively eliminating all means of even attempting to communicate with correctional staff.

714.      Handcuffing a d/Deaf person's hands behind their back is equivalent to gagging a hearing person.

### Leonid Rabinkov

715.     In October 2019, CDOC transported Mr. Rabinkov and two other Deaf people to the federal courthouse in Denver.

716.     CDOC used the black box to restrain all three people during transport.

717.     Consequently, Mr. Rabinkov and the other Deaf people could not communicate at all during transport.

718.     Further, Mr. Rabinkov and the other Deaf people could not communicate with CDOC correctional staff when they needed something.

719.     Mr. Rabinkov waited four hours to use the restroom because he could not communicate to CDOC correctional staff about his need to use the restroom. Conversely, in the same or similar situation, a hearing person would be able to communicate to CDOC correctional staff about their need to use the restroom and would be relieved much faster.

720.     The transport to and from Denver to Territorial took at least eight hours.

721.    In February 2020, CDOC correctional staff transported Mr. Rabinkov from Territorial to Fremont into restrictive housing.

722.    During transport, CDOC correctional staff used the black box to restrain Mr. Rabinkov.

723.    Two weeks later, when transporting Mr. Rabinkov back to Territorial from Fremont, CDOC again used the black box to restrain Mr. Rabinkov.

724.    CDOC's discriminatory use of the black box on Mr. Rabinkov prevented him from communicating at all with correctional staff during transport.

725.    On June 27, 2020, CDOC correctional staff transported Mr. Rabinkov to restrictive housing within Territorial.

726.    During transport CDOC correctional staff handcuffed Mr. Rabinkov behind his back.

727.    Being handcuffed behind the back prevented Mr. Rabinkov from even attempting to communicate with correctional staff

### *Merl Mitchell*

728.    Mr. Mitchell has an approved accommodation for face-to-face communication when interacting with CDOC staff.

729.    Face-to-face communication is necessary because Mr. Mitchell relies on lip reading for effective communication when interacting with CDOC staff.

730.    CDOC staff consistently fail to follow Mr. Mitchell's approved accommodation for face-to-face communication when interacting with Mr. Mitchell.

731.    Instead, CDOC staff will speak to Mr. Mitchell with their backs turned or when he cannot see them.

732.    For example, CDOC staff will yell verbal orders at Mr. Mitchell when his back is turned and when he is walking away from them during daily movements such as meal calls.

733.    When CDOC staff fail to interact with Mr. Mitchell through face-to-face communication, Mr. Mitchell cannot read their lips and thus cannot understand what they are saying.

734.    Further, when CDOC staff fail to interact with Mr. Mitchell through face-to-face communication he is often unaware that staff are trying to communicate with him.

735.    In turn, CDOC staff think Mr. Mitchell is being rude or ignoring verbal orders, and construe his lack of understanding or awareness as disrespect.

736.    Because of this, Mr. Mitchell has been disciplined and reprimanded by CDOC staff for not responding to verbal orders or commands that he did not hear or understand.

737.    As a result, Mr. Mitchell endures significantly more hostility, anger, and retaliation from CDOC staff than hearing incarcerated people.

738.    Further, during remote video mental health appointments, CDOC's medical and mental health staff fail to angle the camera in a way that allows Mr. Mitchell to see their face and read their lips.

739.    Because Mr. Mitchell cannot see the faces and read the lips of medical and mental health staff during his medical and mental health appointments, he cannot understand what they are saying to him.

740.    As a result, CDOC deprives Mr. Mitchell of crucial information necessary for Mr. Mitchell to properly care for his mental and physical health conditions.

741.    When CDOC denies Mr. Mitchell the ability to read lips through face-to-face communication in its medical and mental health services, CDOC denies Mr. Mitchell equal opportunity to participate in and benefit from CDOC's medical and mental health services.

### Edward Hicks

742.    Mr. Hicks has an approved accommodation for face-to-face communication when interacting with CDOC staff.

743.    Face-to-face communication is necessary because Mr. Hicks relies on lip reading for effective communication when interacting with CDOC staff.

744.    CDOC staff consistently fail or refuse to follow Mr. Hicks's approved accommodation for face-to-face communication when interacting with Mr. Hicks.

745.    Instead, CDOC staff will speak or yell verbal orders to Mr. Hicks with their backs turned or when he cannot see them.

746.    When CDOC staff fail to interact with Mr. Hicks through face-to-face communication, Mr. Hicks cannot read their lips and thus cannot understand what they are saying.

747.    Further, when CDOC staff fail to interact with Mr. Hicks through face-to-face communication he is often unaware that staff are trying to communicate with him.

748.    CDOC staff think Mr. Hicks is being rude or ignoring verbal orders, and construe his lack of understanding or awareness as disrespect.

749.    In turn, Mr. Hicks endures significantly more hostility, anger, and retaliation from CDOC staff than hearing incarcerated people.

750.    On April 30, 2019, CDOC staff tased Mr. Hicks for not responding to a verbal order that he did not hear.

751.    Mr. Hicks must constantly remind CDOC staff that he requires face-to-face communication so that he can read lips to ensure effective communication when interacting with CDOC staff.

752.    Having to constantly remind CDOC staff of his need for face-to-face communication is exhausting for Mr. Hicks.

753.    Further, other incarcerated people harbor animosity towards Mr. Hicks because the constant reminders of his need for face-to-face communication and lip reading cause delays to CSP's daily prison activities.

754.    Despite continuously reminding CDOC staff of his accommodation for face-to-face communication, CDOC staff still fail or refuse to interact with Mr. Hicks through face-to-face communication.

755.    CDOC staff told Mr. Hicks that they cannot follow his face-to-face accommodation because they have too many incarcerated people to take care of and too many things to do.

756.    When CDOC staff fail to communicate with Mr. Hicks through face-to-face communication, they deny him equally effective communication.

757.    Further, when Mr. Hicks experiences hostility or retaliation from CDOC staff because he does not understand information conveyed to him verbally, CDOC discriminates against him by reason of his hearing disability.

*Bradley Hogue*

758.   On March 24, 2020, Mr. Hogue, who is hard of hearing, entered the law library for a scheduled appointment.

759.   Around twenty-five minutes before Mr. Hogue's appointment ended, the librarian made an announcement that the law library was closing early.

760.   Mr. Hogue did not hear this announcement and continued working.

761.   The librarian approached Mr. Hogue and told him the law library was closing early and that he needed to leave. Mr. Hogue closed down his computer and left the law library.

762.   On March 27, 2020, CDOC gave Mr. Hogue a COPD violation for disobeying a lawful order.

763.   At Mr. Hogue's disciplinary hearing on March 31, 2020, the librarian alleged that Mr. Hogue pretended not to hear her.

764.   CDOC found Mr. Hogue guilty and punished him with "loss of privileges" for forty days.

765.   CDOC's punishment of Mr. Hogue because he did not hear the librarian constitutes discrimination due to his hearing disability.

**G.  Summary**

766.   CDOC routinely discriminates against DHOH people in its custody as detailed above.

767.   The allegations above are only some of the examples of CDOC's discrimination against DHOH people.

768.     CDOC's failure to provide qualified sign language interpreters, effective hearing aids (including batteries, repairs, and maintenance), captioning, CART, accessible notifications and alarms, and other required accommodations, as well as its discrimination on the basis of disability, has caused the Exemplar Constituents and other DHOH people in CDOC's custody to be denied equal access to and equally effective communication about and during CDOC's programs, services and activities.

## H.  DLC's Advocacy for Incarcerated People who are DHOH in CDOC's Custody

769.     As of March 18, 2021, DLC has received requests from all nineteen Exemplar Constituents for DLC to intervene on their behalf. All nineteen Exemplar Constituents are DHOH people who are currently in CDOC's custody.

770.     DLC has associational standing on behalf of the Exemplar Constituents and other constituents who are injured by CDOC's failure to comply with the ADA and Section 504 because such injuries and CDOC's noncompliance fall within DLC's general scope of interest and activity.

771.     Neither the claims asserted, nor the relief requested require the participation of individual members or constituents in the lawsuit.

772.     It is appropriate for DLC to advocate for the relief requested on behalf of its Exemplar Constituents and other constituents.

773.     DLC's constituents, including but not limited to the Exemplar Constituents, have suffered injury and continue to suffer injury that would allow them to have standing to sue in their own right. The interests that DLC seeks to protect in this lawsuit are germane to its purpose.

774.     Examplar Constituents made CDOC aware of these issues beginning in October 2019.

775.    Prior to filing this lawsuit, DLC attempted to resolve the issue of CDOC denying DHOH incarcerated people in its custody equally effective communication and equal access to its programs, services, and activities.

776.    DLC wrote to CDOC and attempted to resolve CDOC's failures to provide DHOH incarcerated people with equal access and equally effective communication to CDOC's programs services and activites, and requested that CDOC cease its discriminatory conduct against DHOH incarcerated people prior to filing this lawsuit.

777.    DLC's attempts to resolve this matter through nonadversarial processes were unsuccessful. In turn, DLC determined that this matter would not be resolved within a reasonable time and pursued alternative remedies as provided by 42 C.F.R. § 51.32(d), including initiating legal action.

778.    DLC brings this action on behalf of DHOH incarcerated people in CDOC's custody, including but not limited to the Exemplar Constituents, who are being denied equally effective communication and equal access to CDOC's programs, services, and activities in violation of the ADA and Section 504.

### V.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF:**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12131 et seq.**

779.    DLC incorporates the allegations set forth in the remainder of this Complaint as if fully set forth herein.

780.    Title II prohibits public entities, such as CDOC, from excluding people with disabilities from participation in or denying them the benefits of its services, programs, or activities, or otherwise subjecting such people to discrimination. 42 U.S.C. § 12132.

781.    Because the Exemplar Constituents are DHOH, are currently in the custody of CDOC, and have been incarcerated in the custody of CDOC during all occurrences alleged herein, they are qualified people with disabilities within the meaning of the ADA. 42 U.S.C. § 12102.

782.    CDOC excluded and continues to exclude the Exemplar Constituents and other incarcerated DHOH people in CDOC's custody from participation in its programs, services, and activities. CDOC also denied and continues to deny the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody the benefits of its programs, services, and activities. Finally, CDOC subjected and continues to subject the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

783.    Such discrimination includes but is not limited to:

    a.    denying the Exemplar Constituents the opportunity to participate in or benefit from an aid, benefit, or service, 28 C.F.R. § 35.130(b)(1)(i);

    b.    affording the Exemplar Constituents the opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded to others, *see id*. § 35.130(b)(1)(ii);

    c.    providing the Exemplar Constituents with aids, benefits, and services that are not as effective in affording equal opportunity to obtain the same result, to

gain the same benefit, or to reach the same level of achievement as that provided to others, *see id.* § 35.130(b)(1)(iii);

d.   using criteria and methods of administration that have the effect of subjecting the Exemplar Constituents to discrimination on the basis of disability, *see id.* § 35.130(b)(3)(i);

e.   using criteria and methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of CDOC's programs with respect to the Exemplar Constituents, *see id.* § 35.160(b)(1); and

f.   failing to give primary consideration to the requests of Exemplar Constituents concerning the types of auxiliary aids and services necessary, *see id.* § 35.160(b)(2).

g.   failing to provide communication as effective as that provided to others, *see id.* § 35.160(a)(1).

h.   failing to provide auxiliary aids and services necessary to provide equal opportunity to participate, *see id.* § 35.160(b)(1)).

784.   At all times relevant to their allegations in this Complaint, which are ongoing, the Exemplar Constituents were and remain qualified to participate in CDOC's programs, services, and activities within the meaning of Title II.

785.   The Exemplar Constituents have been injured and aggrieved by, and will continue to be injured and aggrieved by, CDOC's discrimination against them.

786.    In addition to the Exemplar Constituents, other DHOH incarcerated people who are in CDOC's custody – and who are also DLC constituents – are being denied their rights under Title II and are being injured and aggrieved by CDOC's ongoing discrimination against them.

787.    DLC's constituents have been injured and aggrieved by CDOC's discrimination against the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody. DLC's constituents will continue to be injured and aggrieved by CDOC's ongoing discrimination against DHOH incarcerated people in CDOC's custody.

788.    CDOC's failure to comply with the ADA has resulted, and will continue to result, in harm to Exemplar Constituents and other DHOH people, as Exemplar Constituents and other DHOH people will continue to be in the custody or under the supervision of CDOC, and will continue to attempt to use or avail themselves of the services, benefits, activities, programs, and privileges of the Defendant. This harm will continue unless and until CDOC is ordered by this Court to make modifications to the policies, practices, and procedures of CDOC pursuant to the ADA.

**SECOND CLAIM FOR RELIEF:**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. § 794**

789.    DLC incorporates the allegations set forth in the remainder of this Complaint as if fully set forth herein.

790.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by recipients of federal financial assistance.

791.    CDOC receives federal financial assistance as that term is used in Section 504. 29 U.S.C. § 794.

792. Because the Exemplar Constituents are DHOH, are currently in the custody of CDOC, and have been incarcerated in the custody of CDOC during all occurrences alleged herein, the Exemplar Constituents are qualified people with disabilities within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

793. CDOC excluded and continues to exclude the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody from participation in its programs, services, and activities. CDOC also denied and continues to deny the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody the benefits of its programs, services, and activities. Finally, CDOC subjected and continues to subject the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody to discrimination on the basis of disability in violation of Section 504 and its implementing regulations as more fully described in this Complaint.

794. Such discrimination includes but is not limited to:

    a. denying the Exemplar Constituents the opportunity to participate in CDOC's programs and activities, *see* 28 C.F.R. § 42.503(b)(1)(i);

    b. denying the Exemplar Constituents an equal opportunity to achieve the same benefits that others achieve in CDOC's programs and activities, *see id.* § 42.503(b)(1)(ii);

    c. denying the Exemplar Constituents an equal opportunity to achieve the same benefit that others achieve in CDOC's programs and activities by failing to provide effective communication in those programs, *see id.* § 42.503(b)(1)(vi);

d.    using criteria or methods of administration that either purposely or in effect discriminate on the basis of disability or defeat or substantially impair accomplishment of the objectives of CDOC's programs or activities with respect to the Exemplar Constituents, *see id.* § 42.503(b)(3);

e.    failing to provide appropriate auxiliary aids and services to the Exemplar Constituents as necessary to ensure that they have meaningful access to CDOC's programs, activities, or benefits, *see id.* 42.503(f); and

f.    failing to provide reasonable accommodations to the Exemplar Constituents as necessary to ensure that they have meaningful access to CDOC's programs, activities, or benefits, *see Alexander v. Choate*, 469 U.S. 287, 301 (1985).

795.    At all times relevant to their allegations in this Complaint, which are ongoing, the Exemplar Constituents were and remain qualified to participate in CDOC's programs, services, and activities within the meaning of Section 504.

796.    The Exemplar Constituents have been injured and aggrieved by, and will continue to be injured and aggrieved by, CDOC's discrimination against them.

797.    In addition to the Exemplar Constituents, other DHOH incarcerated people who are in CDOC's custody – and who are also DLC constituents – are being denied their rights under Section 504 and are being injured and aggrieved by CDOC's ongoing discrimination against them.

798.    DLC's constituents have been injured and aggrieved by CDOC's discrimination against the Exemplar Constituents and all other DHOH incarcerated people in CDOC's custody. DLC's constituents continue to be injured and aggrieved by CDOC's ongoing discrimination against DHOH incarcerated people in CDOC's custody.

799.    CDOC's failure to comply with Section 504 has resulted, and will continue to result, in harm to Exemplar Constituents and other DHOH people, as Exemplar Constituents and other DHOH people will continue to be in the custody or under the supervision of CDOC, and will continue to attempt to use or avail themselves of the services, benefits, activities, programs, and privileges of the Defendant. This harm will continue unless and until CDOC is ordered by this Court to make modifications to the policies, practices, and procedures of CDOC pursuant to the Section 504.

## VI.    PRAYER FOR RELIEF

WHEREFORE, DLC respectfully requests:

1.    That this Court assume jurisdiction;

2.    That this Court declare the actions of CDOC described in this Complaint to be in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

3.    That this Court enter an injunction ordering CDOC to cease violating the rights of DHOH incarcerated people under Title II and Section 504, and to cease discrimination against these incarcerated people on the basis of disability, and require CDOC to take measures to comply with Title II and Section 504, including but not limited to:

      a.    providing ready access to qualified sign language interpreters;

      b.    providing captioned telephone systems;

      c.    providing Communication Access Realtime Translation ("CART") services;

      d.    providing in-cell visual alarms and/or wireless notification systems;

e.    providing visual notification systems;

f.    providing prompt hearing screenings upon request;

g.    providing ASL classes for people who wish to learn ASL;

h.    providing captioning on all orientation videos and all televisions;

i.    allowing for the scheduling of more than two secondary health consultations at one time;

j.    ceasing use of the black box handcuffs and other means of restraint that limit the ability of DHOH people to communicate;

k.    providing reasonable accommodations, including free and effective hearing aids and vibrating watches, to DHOH incarcerated people upon request or when the need is obvious, without unreasonable delays;

l.    communicating face-to-face and using clear masks during the pandemic; and

m.    training CDOC staff concerning equally effective communication with and accommodations for DHOH people.

4.    That this Court award DLC its reasonable attorneys' fees and costs; and

5.    That this Court award such additional or alternative relief as must be just, proper, and equitable.

DATED: March 18, 2021

Respectfully submitted,

STUDENT LAW OFFICE

*s/ Laura Rovner*
Laura Rovner
Nicole B. Godfrey
Stephanie M. Frisinger, Student Attorney[17]
Kassidy N. Roberts, Student Attorney[18]
Thomas J. Ford, Student Attorney[19]
University of Denver Sturm College of Law
Civil Rights Clinic
2255 E. Evans Ave., Suite 335
Denver, CO 80208
P: 303.871.6441
F: 303.871.6847
E: lrovner@law.du.edu

*Attorneys for Plaintiff*

CIVIL RIGHTS EDUCATION &
ENFORCEMENT CENTER

*s/ Amy F. Robertson*
Amy F. Robertson
1245 E. Colfax Ave., Suite 400
Denver, CO 80218
P: 303.757.7901
E: arobertson@creeclaw.org

Martha M. Lafferty
525 Royal Parkway, #293063
Nashville, TN 37229
P: 615.913.5099
E: mlafferty@creeclaw.org

Center for Legal Advocacy, d/b/a Disability Law Colorado
455 Sherman St., Suite 130
Denver, CO 80203

*Plaintiff*

---

[17] Motion to Appear forthcoming pursuant to Local Rule of Practice Attorney Rule 14 – Student Practice. D.C.COLO.LAttyR 14.
[18] Motion to Appear forthcoming pursuant to Local Rule of Practice Attorney Rule 14 – Student Practice. D.C.COLO.LAttyR 14.
[19] Motion to Appear forthcoming pursuant to Local Rule of Practice Attorney Rule 14 – Student Practice. D.C.COLO.LAttyR 14.