## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00792-RBJ

CENTER FOR LEGAL ADVOCACY
d/b/a DISABILITY LAW COLORADO,

       Plaintiff,

v.

 COLORADO DEPARTMENT OF CORRECTIONS,

       Defendant.

---

### FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

---

Plaintiff Center for Legal Advocacy d/b/a Disability Law Colorado ("DLC"), by and through counsel, hereby files this Complaint against Defendant Colorado Department of Corrections ("CDOC"), alleging systemic and ongoing discrimination against people with hearing disabilities.

## I.      INTRODUCTION

1.      Prison is a difficult environment for anyone. It is exponentially more challenging and dangerous for deaf and hard of hearing ("DHOH") incarcerated people when the prison does not accommodate them. Incarcerated individuals who are not provided effective communication and equal access to programming are essentially trapped in a prison inside a prison. In violation of federal law, CDOC has denied and continues to deny DHOH incarcerated people effective communication and equal access to CDOC's programs, services, and activities at every stage of

their incarceration, from intake and orientation to parole services and re-entry planning. CDOC has discriminated and continues to discriminate against DHOH prisoners throughout all stages of and programs related to their incarceration.

2. DLC, Colorado's Protection and Advocacy System, brings this case on behalf of all DHOH individuals in CDOC's custody challenging CDOC's violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA" or "Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), including but not limited to the individuals listed in Paragraph 3.

3. Andrew Atkins, Cathy Begano, Dennis Dunann, James Fling, Kerry Gallegos, Edward Hicks, Bradley Hogue, Kyotee Knobee, Daniel Martinez, Rogerio Martinez, Kennith Meadows, Merl Mitchell, Robert O'Dell, Jeremy Peterson, Leonid Rabinkov, Zachary Radford, Bruce Scheiber, Marc Trevithick, and Justyn Tyme are or were[1] people who are d/Deaf or hard of hearing and currently incarcerated by CDOC. They all are or were constituents of DLC and are referred to herein as "Exemplar Constituents."

4. Ms. Begano and Messrs. Atkins, Gallegos, Knobee, Daniel Martinez, Peterson, Rabinkov, Radford, and Trevithick will be referred to as the "d/Deaf Exemplar Constituents."

5. Messrs. Dunann, Hicks, Hogue, Rogerio Martinez, Meadows, Mitchell, O'Dell, Schieber, and Tyme will be referred to as the "HOH Exemplar Constituents."

6. CDOC has discriminated against and continues to discriminate against Exemplar Constituents and all other DHOH incarcerated people who are or will be in CDOC's custody in violation of the ADA and Section 504.

[1] Mr. Knobee died on or around August 12, 2021.

II.    **JURISDICTION AND VENUE**

7.     This action arises under the laws of the United States. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

8.     Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b)(1) because CDOC resides in the District of Colorado.

III.   **PARTIES**

9.     Plaintiff DLC is a Colorado nonprofit corporation with its principal place of business in Denver, Colorado. DLC also maintains a regional office in Grand Junction, Colorado, and serves people with disabilities in all 64 counties in Colorado.

10.    DLC is the federally mandated protection and advocacy ("P&A") system for the State of Colorado. As such, DLC is authorized by multiple federal statutes to, among other things, pursue administrative, legal, and other remedies on behalf of people with disabilities. DLC is therefore authorized to seek relief on behalf of people who are DHOH in the custody of CDOC and whose federally protected rights are being violated. Congress has charged DLC with the statutory responsibility to represent and advocate for the rights of people with disabilities, including DHOH people in state institutions, including state prisons. DLC's mission is to protect and promote the rights of people with disabilities and older people in Colorado through direct legal representation, advocacy, education, and legislative analysis. DLC is also committed to protecting the rights of people in institutions to be treated with dignity and respect.

11.    DLC has statutory authority to pursue legal remedies on behalf of people with disabilities whose federal rights are being violated pursuant to the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 300d-53(k), the Protection and

Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10805(a)(1)(B),

and the Protection and Advocacy for Individual Rights Act ("PAIR Act"), 29 U.S.C.A

§ 794e(f)(2).  Specifically, these statutes give P&As "the authority to pursue legal,

administrative, and other appropriate remedies to ensure the protection of, and advocacy for the

rights of such people within the State…." 42 U.S.C. § 15043(a)(2)(A)(i). DLC has associational

standing to bring this action. DLC is the functional equivalent of a voluntary membership

organization created by Congress to protect and advocate for its Colorado constituents, which

include DHOH people in CDOC's custody. DLC's Colorado constituents possess many indicia

of membership, including influence over what issues DLC takes on in the performance of its

federal mandate through, for example, governing boards and a grievance procedure.

12.     DLC brings this lawsuit in its representative capacity on behalf of and to vindicate

the rights of Exemplar Constituents and all other DHOH people incarcerated in CDOC's custody

who are being denied effective communication and equal access to CDOC's programs, services,

and activities in violation of the ADA and Section 504.

13.     Defendant Colorado Department of Corrections ("CDOC") is a department of the

State of Colorado.

14.     CDOC is responsible for the operation of the Colorado state prison system and for

the care and custody of incarcerated people in its twenty-two facilities.

15.     CDOC receives federal financial assistance as that term is used in 29 U.S.C. § 794

and it is a "public entity" within the meaning of Title II of the ADA. 42 U.S.C. § 12131(1).

## IV.    EXEMPLAR CONSTITUENTS

16.     With respect to the d/Deaf Exemplar Constituents:

     a.   They are d/Deaf.

     b.   CDOC is aware they are Deaf.

     c.   ASL (and, in the case of Mr. Rabinkov, Russian Sign Language) is their primary language;

     d.   They have requested sign language interpreters for effective communication;

     e.   Their need for ASL interpretation for effective communication is obvious;

     f.   Because English is not their primary language, writing notes does not provide them communication that is as effective as that provided to hearing people.

17.    With respect to the HOH Exemplar Constituents:

     a.   They are hard of hearing;

     b.   CDOC knows they are hard of hearing.

18.    The following HOH Exemplar Constituents require hearing aids for effective communication and equal access to CDOC's programs, services, and activities; without functioning hearing aids, they are excluded from these programs, services, and activities: Messrs. Dunann, Tyme, Hicks, O'Dell, Rogerio, Mitchell, Meadows, and Scheiber.

19.    Cathy Begano is currently incarcerated at the Denver Women's Correctional Facility. She has been deaf since the age of three. In 2015, CDOC staff noted that Ms. Begano was illiterate in English and approved ASL interpretation as an accommodation for her.

20.    Zachary Radford is currently incarcerated at Colorado Territorial Correctional Facility ("Territorial"). He has been deaf since the age of two. CDOC approved ASL interpretation as an accommodation for Mr. Radford on October 3, 2019.

21.     Leonid Rabinkov is currently incarcerated at Territorial. Mr. Rabinkov has been deaf since infancy. CDOC approved ASL interpretation as an accommodation for Mr. Rabinkov on March 19, 2019.

22.     Marc Trevithick is currently incarcerated at Territorial. He has been deaf since birth. CDOC approved ASL interpretation as an accommodation for Mr. Trevithick on September 28, 2007.

23.     Andrew Atkins is currently incarcerated at Territorial. Mr. Atkins has been deaf since the age of three. CDOC approved ASL as an accommodation for Mr. Atkins on April 9, 2008.

24.     Jeremy Peterson is currently incarcerated at Territorial. Mr. Peterson has been deaf since infancy. CDOC approved Mr. Peterson's accommodation for ASL interpretation on August 31, 2018.

25.     Until his death on or around August 12, 2021, Kyotte Knobee was incarcerated at Territorial. Mr. Knobee was Deaf. CDOC approved ASL interpretation as an accommodation for Mr. Knobee on January 21, 2016.

26.     Kerry Gallegos is currently incarcerated at Territorial. On information and belief, CDOC has approved ASL interpretation as an accommodation for Mr. Gallegos.

27.     Daniel Martinez is currently incarcerated at Territorial. Mr. Daniel Martinez is Deaf. On information and belief, CDOC approved ASL interpretation as an accommodation for Mr. Daniel Martinez on on or before September, 2008.

28.     Dennis Dunann is currently incarcerated at Sterling Correctional Facility ("Sterling").

29.     Justyn Tyme is currently housed at Fremont Correctional Facility ("Fremont").

30.     Edward Hicks is currently incarcerated at Colorado State Penitentiary ("CSP").

31.     Robert O'Dell is currently incarcerated at Limon Correctional Facility.

32.     James Fling is currently incarcerated at Territorial.

33.     Rogerio Martinez is currently incarcerated at Arkansas Valley Correctional Facility ("Arkansas Valley"). Mr. Rogerio Martinez has a difficult time understanding speech because he is hard of hearing, especially during parole hearings because these hearings are conducted by video.

34.     Merl Mitchell is currently incarcerated at San Carlos Correctional Facility. Mr. Mitchell is completely deaf in his left ear and has severe hearing loss in his right ear. CDOC is aware of Mr. Mitchell's hearing disability.

35.     Kennith Meadows is currently incarcerated at Territorial.

36.     Bruce Scheiber is currently incarcerated at Territorial.

37.     Bradley Hogue is currently incarcerated at Arkansas Valley.

V.     **FACTS**

38.     CDOC discriminates on the basis of disability against the DHOH people in its custody including but not limited to

a.  failure to properly assess hearing, deafness, and the need for auxiliary aids and services and medical devices;

b.  failure to provide effective communication, including sign language interpreters, Communication Access Realtime Translation ("CART"), visual messaging, and captioning of audible content;

     c.   use of improper restraint methods that impede communication;

     d.   failure to provide and maintain adequate hearing aids; and

     e.   other unequal and improper treatment.

39.     The paragraphs below provide examples of this discrimination. While each type of discrimination is illustrated through the experience(s) of one or a handful of DHOH incarcerated people, that discrimination has also occurred with respect to other DHOH incarcerated people.

**A. Failure to Properly Assess Hearing, Deafness, and the Need for Auxiliary Aids and Services and Medical Devices.**

40.     CDOC does not properly assess incarcerated people for hearing, hearing loss, deafness, or the need for auxiliary aids and services.

41.     Merl Mitchell entered CDOC custody in August 2014.

42.     CDOC failed to identify Mr. Mitchell's hearing disability for the first fourteen months of his incarceration despite Mr. Mitchell entering CDOC custody with profound hearing loss.

43.     Mr. Mitchell spent the first fourteen months of his incarceration continuously requesting accommodations for his hearing disability, such as hearing aids and personal notification of irregular announcements, yet CDOC failed to provide him with any accommodations.

44.     CDOC finally identified Mr. Mitchell's hearing loss during a hearing disability screening in October 2015.

**B. Failure to Provide DHOH Incarcerated People with Communication as Effective as Communication Provided Hearing Incarcerated People.**

45.     Title II of the Americans with Disabilities Act requires that CDOC ensure that communications with DHOH people in their custody is as effective as communications with others. 28 C.F.R. § 35.160(a)(1). For convenience, this Amended Complaint will refer to this comparative standard as "effective communication."

46.     A person with a hearing disability is a person who has limited or no hearing in one or both ears. Hearing disabilities encompass both deafness and hearing loss. This Amended Complaint uses the adjective "deaf" to describe the audiological condition of hearing loss and "Deaf" to describe individuals who view themselves as members of the Deaf community; it uses the term d/Deaf to encompass both groups of people. A d/Deaf person has little to no functional hearing, whereas a hard of hearing person has some residual hearing, but needs an amplification device, such as a hearing aid, to provide effective communication.

47.     People in the United States who are deaf from birth or early childhood often acquire American Sign Language ("ASL") as their native or primary language.

48.     ASL is a visual language. It is "a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body." For example, "English speakers ask a question by raising the pitch of their voice; ASL users ask a question by raising their eyebrows, widening their eyes, and tilting their bodies forward." https://www.nidcd.nih.gov/health/american-sign-language.

49.     ASL is not just English in gestures. It has grammar and syntax that are completely different from English. When d/Deaf people are raised using ASL as their first or primary language, written English is a foreign language, which is often acquired incompletely and imperfectly.

50.     For these reasons, writing notes with a d/Deaf person will not result in effective communication. In addition, complex written materials, for example, facility handbooks or course materials, are often inaccessible to people whose primary language is ASL.

51.     Many individuals who were pre-lingually deaf were raised communicating in ASL. They will generally need ASL interpreters for effective communication.

52.     For other DHOH people, hearing loss or deafness comes later in life – after they have become fluent in English, but too late to become fluent in a second language such as ASL. For these individuals, a sign language interpreter is not effective; rather, they often need some form of captioning, that is, English rendered into text. As a person's hearing loss progresses, the ability to effectively communicate with the prison community without appropriate auxiliary aids and services decreases – sometimes drastically. Given the aging of the prison population, age-related hearing loss is common – and often undiagnosed and not accommodated in CDOC prisons.

53.     CDOC has repeatedly failed to provide effective communication for d/Deaf incarcerated people, including but not limited to many of the Exemplar Constituents, for interactions that include but are not limited to: intake and orientation; medical interactions; educational and therapeutic classes; case manager meetings; religious programming; work assignments; parole-related meetings; disciplinary investigations and proceedings; vocational programs; grievance preparation; library services; and interpretation of complex written materials.

54.     In order to receive proper medical care and engage in thorough discussion about symptoms, care, and treatment, most d/Deaf people incarcerated in CDOC's custody require

qualified sign language interpreters for effective communication with CDOC medical staff. When CDOC fails to provide interpreters, as is often the case, these d/Deaf individuals must reschedule medical appointments, something hearing people are not forced to do. This delays their medical care and causes them to lose additional time off from work, school, and other activities.

55. Between January 2017 and March 2020, Cathy Begano had at least forty-one appointments with CDOC medical staff where CDOC did not provide her a qualified sign language interpreter. CDOC forced Ms. Begano to write notes back and forth with its health providers during at least ten of these appointments.

56. On January 19, 2018, for example, CDOC nurse Kimberly Retallack used written notes with Ms. Begano; she noted that Ms. Begano "is having a very hard time explaining what is wrong."

57. On July 6, 2018, CDOC nurse Debra Reilly used written notes with Ms. Begano; she noted that Ms. Begano "has difficulty using words to describe details regarding her pain, gets somewhat frustrated." In notes from that appointment, Ms. Begano wrote, "I wish interpreter help explain you," to which CDOC medical staff responded, "tell me in words…use your words." (emphasis in original).

58. During Zachary Radford's facility orientation at Crowley Correctional Facility, CDOC failed to provide a qualified sign language interpreter and instead forced Mr. Radford to attempt to communicate with staff by typing back and forth in a Microsoft Word document as he read through the orientation packet. Mr. Radford did not understand these orientation materials because English is not his primary language and he is not fluent in written English.

59.     Since his arrival at Territorial in October 2019, CDOC has not provided Mr. Radford a qualified sign language interpreter at any of his medical appointments even though medical staff wrote in Mr. Radford's medical records on November 19, 2019 that "reading lips is challenging" for Mr. Radford.

60.     CDOC has denied Mr. Radford the benefit of several educational and rehabilitative programs, such as a cognitive behavioral program called "Thinking for a Change." Mr. Radford enrolled in Thinking for a Change in or around the summer or fall of 2020. CDOC failed to provide a qualified sign language interpreter for the classes. Mr. Radford did not understand what the teachers and other classmates communicated in the class. Eventually, the teacher removed Mr. Radford from the class, while hearing incarcerated people continued attending.

61.     CDOC told Mr. Radford that CDOC will not provide a qualified sign language interpreter for programs unless at least two d/Deaf people are enrolled in the program. Because of this policy, CDOC puts d/Deaf people on the waitlist for classes until at least two d/Deaf people sign up. CDOC put Mr. Radford on the waitlist for the educational and rehabilitative classes "The 7 Habits on the Inside" and "Why Try?" in November 2019. Mr. Radford remains on the waitlist for these classes while CDOC has admitted hearing people.

62.     A number of other Exemplar Constituents have been turned away from programs because they were the only d/Deaf participant and CDOC refused to provide an interpreter.

63.     CDOC holds a "Deaf Offender Staffing" at Territorial, which was a bi-weekly – and is now a monthly – meeting with all of the d/Deaf incarcerated people at Territorial, case managers, and a qualified sign language interpreter. On information and belief, CDOC holds

Deaf Offender Staffings so that it can avoid scheduling multiple qualified sign language interpreters for more frequent one-on-one meetings between d/Deaf people and their case managers.

64.    Currently, Deaf Offender Staffing is the only access d/Deaf incarcerated people have to a case manager, while hearing people have ready access to one-on-one meetings with their assigned case managers.

65.    Mr. Rabinkov has several serious chronic medical conditions and a history of cancer. CDOC did not provide Leonid Rabinkov with a qualified sign language interpreter during at least forty-two health service encounters between July 2016 and December 2020. Of these forty-two health service encounters without a qualified sign language interpreter, CDOC forced Mr. Rabinkov to write notes with his health providers during at least thirty-eight appointments.

66.    During two of Mr. Rabinkov's forty-two health service encounters without a qualified sign language, CDOC staff forced Mr. Rabinkov to rely on lip reading.

67.    CDOC staff have recognized that communication is difficult with Mr. Rabinkov because of the lack of interpretation during his medical appointments. On August 29, 2017, a CDOC medical staff member wrote in Mr. Rabinkov's medical encounter notes that Mr. Rabinkov "needs a sign language interpreter [because] writ[ing] back [and] forth…will be very slow."

68.    Mr. Rabinkov enrolled in a General Education Diploma ("GED") class with CDOC in September 2019 and attempted to re-enroll in this GED class in December 2020. At various times, CDOC told Mr. Rabinkov that it would provide interpreters every other day of

classes or for only a half-day for full-day classes. When CDOC does not provide qualified sign language interpreters for full day GED classes, Mr. Rabinkov does not receive equal access to his GED class as would a hearing person.

69.     Mr. Rabinkov has difficulty understanding GED assignments in written English because CDOC denies Mr. Rabinkov GED tutoring support with a qualified sign language interpreter. CDOC offers tutoring support to hearing people enrolled in its GED classes.

70.     CDOC also does not provide Mr. Rabinkov with qualified sign language interpreters at one-on-one meetings with his case manager. Because of this, Mr. Rabinkov does not receive the same benefit from his one-on-one case manager meetings as a hearing person would.

71.     In or around April 2020, CDOC failed to provide a qualified sign language interpreter for Marc Trevithick at his colonoscopy appointment. Without the ability to communicate with the medical provider, Mr. Trevithick was confused throughout the examination, as he was consistently unaware of what to expect next. When Mr. Trevithick attempted to ask the medical provider for his results, the medical provider responded by gesturing "thumbs up."

72.     On June 4, 2020, Mr. Trevithick had a medical appointment at Rocky Mountain Eye Center ("RMEC"). A few months prior to his appointment, Mr. Trevithick asked for a qualified sign language interpreter for this appointment. A CDOC nurse assured Mr. Trevithick that a qualified sign language interpreter would be present for his eye appointment. However, after being transported from Territorial to the RMEC in Pueblo, CDOC failed to provide a qualified sign language interpreter for the appointment.

73.     The RMEC nurse made Mr. Trevithick write notes in an attempt to communicate, despite the inherent complexity of the conversation, Mr. Trevithick's difficulty in understanding written English, and CDOC staff's decision to keep Mr. Trevithick shackled with highly restrictive black box handcuffs for the entire duration of the appointment.

74.     CDOC's failure to provide a qualified sign language interpreter jeopardizes Mr. Trevithick's eligibility for parole. Mr. Trevithick has been eligible for parole since September 14, 2013. In mid-February 2021, Mr. Trevithick met with his counselor from his rehabilitative treatment program, a program that Mr. Trevithick is required to complete before he is eligible to parole. CDOC did not provide a qualified sign language interpreter for this meeting. Instead, Mr. Trevithick and his counselor attempted to communicate with written notes. Because Mr. Trevithick and his counselor were not able to effectively communicate, Mr. Trevithick did not know how to prepare for the test.

75.     When Mr. Trevithick complained to CDOC about not having an interpreter for this meeting, Mr. Trevithick's counselor told him that he had no right to request an interpreter and threatened his parole eligibility. Mr. Trevithick, fearful fear that his long-awaited opportunity to parole may be jeopardized if he pursued his complaint, withdrew his complaint and apologized for requesting an interpreter to understand the test.

76.     In addition, CDOC forces Mr. Trevithick to meet with a case manager on a group basis and does not consistently provide qualified sign language interpreters for his one-on-one case manager meetings.

77.     Andrew Atkins is housed in the incentive pod at Territorial. Incarcerated people who reside in the incentive pod have privileges that other incarcerated people do not have.

People housed in the incentive pod are required to attend incentive pod meetings during which incarcerated people and staff discuss scheduled activities for people in the incentive pod, collaborate on how to build a stronger community, and resolve any issues amongst incarcerated people or CDOC staff.

78.     CDOC has never provided a qualified sign language interpreter for any of Mr. Atkins's incentive pod meetings.

79.     Because of this, d/Deaf people, including Mr. Atkins, cannot understand the information that CDOC staff and other incarcerated people communicate—information that could affect their incentive pod eligibility or give them the opportunity to equally access an activity.

80.     Instead, Mr. Atkins relies on notes taken by a hearing incarcerated person in the incentive pod, which does not provide effective communication for him.

81.     Mr. Atkins works at the Tab Shop at Territorial in a leadership position, where he oversees the printing of license plate validation tags. On at least one occasion at the Tab Shop, CDOC forced Mr. Atkins to have a lengthy and complex discussion without a qualified sign language interpreter. On October 2, 2020, an error occurred in the print room, the part of the Tab Shop where Mr. Atkins works. CDOC staff at the Tab Shop forced Mr. Atkins to try to explain the situation with written notes. As a result, he could not adequately explain the error, staff misunderstood the situation, and ultimately gave Mr. Atkins a negative chron.

82.     Since his intake at the Denver Reception and Diagnostic Center ("DRDC"), the facility through which incarcerated people enter CDOC custody, CDOC has failed to provide Jeremy Peterson with a qualified sign language interpreter at all but one of his medical

appointments. On at least four occasions, CDOC required Mr. Peterson to write notes in attempt to communicate at medical appointments, which does not provide him effective communication.

83.     CDOC's failure to provide qualified sign language interpreters also excludes Mr. Peterson from educational programs and vocational opportunities. In November or December of 2019, Mr. Peterson submitted a kite requesting an interpreter for a class that would give him a custodian certification.

84.     CDOC staff at Territorial told Mr. Peterson that there must be more than one d/Deaf person in a class in order for CDOC to provide an interpreter for it, so Mr. Peterson would have to wait until another d/Deaf person signed up. By making Mr. Peterson wait to take the custodian certification class when hearing people do not have to wait, CDOC failed to provide Mr. Peterson equal access to its programs.

85.     CDOC did not provide Kyotte Knobee with a qualified sign language interpreter during at least four health service encounters between March 2018 and December 2020. At the December 21, 2020 appointment, CDOC health providers x-rayed Mr. Knobee's foot for possible broken bones. The CDOC health provider then attempted to communicate with Mr. Knobee with written notes. Mr. Knobee did not understand the complex medical terminology in these notes and left his appointment unaware of what he needed to do for his foot to heal properly.

86.     In early January 2021, Mr. Knobee requested to again meet with a medical provider to follow up on his injured foot. When he arrived for that appointment in approximately the second or third week of January, there was no sign language interpreter. After Mr. Knobee requested an interpreter, CDOC medical staff cancelled the appointment and said they would

make a new appointment. After that appointment, Mr. Knobee submitted three kites to request another appointment. He eventually received an appointment but he endured ongoing pain in his injured foot while he was forced to wait for treatment. In addition, he was forced to put extra weight on his non-injured foot which caused heel pain in that foot during his prolonged wait.

87.     On or about June 24, 2021, Mr. Knobee had surgery on his foot.  No interpreter was provided for that procedure.

88.     On information and belief, on August 11, 2021, Mr. Knobee sought medical attention for increasing pain in his leg and foot and his chest. CDOC medical personnel sent him back to his cell, where he died, early in the morning of August 12, 2021.

89.     Communication Access Realtime Translation ("CART") refers to the instant word-for-word transcription of the spoken word into English text, similar to the technology used by court reporters.

90.     Rogiero Martinez has a difficult time understanding speech because he is hard of hearing, especially during parole hearings because these hearings are conducted by video.

91.     CDOC denied Mr. Martinez's requests for CART at his parole hearing in April 2019 and at his parole hearing in October or November 2020.

92.      Due to CDOC's failure to provide CART, Mr. Martinez cannot understand what the parole board says and does not have access to effective communication or meaningful participation in parole hearings.  He is thus denied access to these CDOC programs and activities.

93.     While many other HOH incarcerated people would benefit from CART technology, many do not know that the technology exists and are thus unable to request it.  This would be part of any reasonable assessment for auxiliary aids and services.

94.     In almost all of its facilities, CDOC uses announcements over a loudspeaker system to notify incarcerated people of daily events or movement calls. These include calls for laundry, meals, count, med-line, recreation and yard time, and other prison activities.

95.     DHOH incarcerated people cannot rely on such audible announcements and thus require accommodations to ensure they are notified of these various programs and activities.

96.     CDOC purports to use flashing lights or to rely on other incarcerated people or staff to alert DHOH people to announcements. However, these accommodations occur only very inconsistently, and DHOH people often do not know when they have been called to an appointment, or when their pod is being permitted to go to a meal or to the yard.

97.     For example, CDOC staff at Territorial consistently fail to flash the lights in Andrew Atkins's housing unit to notify him of prison announcements. Mr. Atkins relies on hearing incarcerated people to figure out what is going on by either following them or attempting to ask them. Sometimes the hearing incarcerated people ignore Mr. Atkins, and he remains in the dark about the announcement while hearing incarcerated people are fully aware.

98.     Kyotte Knobee often missed auditory announcements because he could not hear them, and therefore relied on hearing cellmates and correctional staff to notify him of announcements. As a result, CDOC denied Mr. Knobee equal access to facility announcements and auditory notifications.

99.     Mr. Knobee repeatedly requested CDOC correctional staff flash the lights when there was an announcement. CDOC correctional staff were unreliable at flashing the lights to notify Mr. Knobee of announcements.

100.     Merl Mitchell has missed critical medical and mental health appointments because he cannot hear announcements and notifications for these appointments.

101.     In addition to Mr. Mitchell's hearing disability, Mr. Mitchell suffers from Post-Traumatic Stress Disorder, severe anxiety, night terrors, and sleep walking. Mr. Mitchell also has a traumatic brain injury, removed thyroid, central apnea, diabetes, vertigo, and memory loss. He has also had three heart attacks.

102.     Because CDOC fails to effectively notify Mr. Mitchell of his medical and mental health appointments, CDOC deprives Mr. Mitchell of the essential medical and rehabilitative services he relies on to maintain his physical and mental health. As a result, Mr. Mitchell's physical and mental health have rapidly declined.

103.     Mr. Mitchell has repeatedly requested CDOC provide him with an accommodation for personal notification of irregular announcements. Despite this, CDOC continues to deny Mr. Mitchell's requests and fails to personally notify him of irregular announcements.

104.     Mr. Mitchell has also repeatedly requested staff flash the lights in his housing unit to alert him to essential daily services, such as mealtimes, laundry, and recreational activities. CDOC staff consistently fail or refuse to flash the lights in Mr. Mitchell's housing unit.

105.     Daniel Martinez has not had an interpreter present for most of his medical appointments in CDOC custody, including during intake at DRDC. Mr. Daniel Martinez also has

not had an interpreter for meetings relating to his work assignment.  CDOC staff do not flash the lights, tap on his shoulder for attention, or use any other means of communication to help Mr. Daniel Martinez understand what is going on.

106.    Robert O'Dell, who is hard of hearing, has an approved accommodation for personal notification of irregular audible announcements. Despite this, CDOC staff consistently fail to follow Mr. O'Dell's approved accommodation for personal notification of irregular audible announcements. CDOC staff instead attempt to notify Mr. O'Dell through the intercom in his housing unit or cell. When CDOC staff communicate with Mr. O'Dell through the intercom in his housing unit or cell, he cannot hear or understand the information being conveyed to him.

107.    Justyn Tyme, who is hard of hearing, has an approved accommodation for personal notification of irregular announcements.

108.    When CDOC transferred Mr. Tyme to Fremont in February 2020, Fremont staff refused to honor Mr. Tyme's accommodation for personal notification of irregular announcements. CDOC forced Mr. Tyme to wait two months before assigning Mr. Tyme an OCA at Fremont to personally notify him of irregular announcements. Even after CDOC assigned Mr. Tyme an OCA, he still misses many irregular announcements because his OCA consistently fails to notify him of these announcements. Mr. Tyme believes his OCA is not trained to work with people with hearing disabilities because his OCA often does not pay attention to or is not aware of announcements pertaining to Mr. Tyme.

109.    On January 21, 2021, CDOC staff attempted to notify Mr. Tyme of a legal visit over the intercom in his housing unit. Mr. Tyme never heard the announcements, nor did CDOC

provide him personal notification of the announcement as required by his approved accommodation. Mr. Tyme sat in his cell for one hour until Fremont staff came to personally notify him of his legal visit.

110.    Bradley Hogue cannot understand anything spoken over the loudspeaker system at Arkansas Valley. Despite Mr. Hogue having an approved accommodation for personal notification of irregular announcements, CDOC staff at Arkansas Valley routinely convey announcements over the loudspeaker system without personally notifying Mr. Hogue.

111.    Mr. Hogue has missed law library appointments because CDOC staff at Arkansas Valley attempt to alert him of his appointment or announce schedule changes via the loudspeaker system which he cannot hear. Mr. Hogue has also missed meals, recreation, canteen distribution, med-line, and mail call because he cannot understand the calls for movement over the loudspeaker and the calls are made at inconsistent times, so he cannot rely on keeping track of time.

112.    Kerry Gallegos is Deaf and thus cannot hear announcements over the public address system. CDOC staff at Territorial consistently fail to flash the lights in Mr. Gallegos's cell to notify him that it is time for count or med-line. For example, on June 13, 2020, CDOC staff failed to flash the lights in Mr. Gallegos's cell to inform him that it was time for med-line. As a result, Mr. Gallegos arrived late and was sent away without any medications.

113.    Edward Hicks, who is hard of hearing, routinely experiences difficulty hearing and understanding prison announcements and notifications. Mr. Hicks has an approved accommodation for personal notification of irregular audible announcements.

114.     CSP staff consistently fail to follow Mr. Hicks's approved accommodation of personal notification of irregular announcements. As a result, Mr. Hicks has missed important appointments and essential activities, such as meals and laundry.

115.     On April 15, 2020, CSP staff failed to personally notify Mr. Hicks of his disciplinary hearing using face-to-face communication. Instead, CSP staff attempted to notify Mr. Hicks through the intercom in his cell, which Mr. Hicks could not hear. Mr. Hicks remained unaware of his disciplinary hearing. As a result, Mr. Hicks did not attend his disciplinary hearing, depriving him of the ability to meaningfully participate and defend himself in his disciplinary hearing. CDOC found Mr. Hicks guilty in his disciplinary hearing.

116.     Although Bruce Scheiber has a vibrating watch, it cannot notify him of irregular announcements as he cannot set alarms for these irregular announcements in advance. As a result, Mr. Scheiber must rely on other means of notification, such as Territorial correctional staff flashing the lights. CDOC staff at Territorial consistently fail to flash the lights in Mr. Scheiber's pod or otherwise notify him of announcements.

117.     Mr. Scheiber misses meals weekly because Territorial correctional officers fail to notify him of meal announcements by flashing the lights. For example, on January 20, 2021, Mr. Scheiber missed all three meals because Territorial correctional officers failed to notify him of mealtime. Mr. Scheiber also regularly misses other programs, including med-line, church services, work, the library, and yard recreation time, because CDOC fails to notify Mr. Scheiber of these programs. Mr. Scheiber notified CDOC of his need for notification accommodations through CDOC's grievance procedure and by sending a kite to the AIC. The AIC responded that Mr. Scheiber's hearing aids were good enough for notification and any other issues should be

discussed with the Territorial correctional officers in his cell house. However, when Mr.
Scheiber requests the Territorial correctional officers in his cell house flash the lights, many
correctional officers respond that it is not their responsibility to flash the lights.

118.     Incarcerated people rely on alarms to wake up in the morning and ensure they
attend appointments, work, classes, and other programs on time. DHOH people cannot rely on
audible alarms and thus require accommodations to ensure they can equally access these various
programs, services, and activities.

119.     CDOC offers vibrating watches but requires DHOH people to purchase them at a
cost that prohibits many DHOH people from buying them. The vibrating watches that CDOC
offers for sale are not strong enough to wake many DHOH people. However, CDOC does not
accommodate DHOH people with bed shaker alarms, despite requests from multiple DHOH
people.

120.     Kyotte Knobee requested a bed shaker alarm on December 28, 2020 as an
accommodation to wake up on time since his vibrating watch does not wake him up. Without
this bed shaker alarm, Mr. Knobee needed to rely on his internal alarm clock, other incarcerated
people, or CDOC personnel to wake him up. In approximately February 2021, CDOC denied Mr.
Knobee's request for a bed shaker alarm.

121.     Leonid Rabinkov requested a bed shaker alarm in January 2021 as an
accommodation to wake up on time since his vibrating watch does not vibrate strongly enough to
wake him up. CDOC has not provided Mr. Rabinkov with a bed shaker alarm.

122.     On November 10, 2019, Zachary Radford filled out a "Request for
Accommodation" for a vibrating watch. On November 27, 2019, CDOC approved his request for

accommodation but told him he must "go into the red" in his inmate banking account to purchase the watch. On or around December 20, 2019, Mr. Radford ordered his vibrating watch. He learned, however, that the watch was backordered. CDOC still has not provided Mr. Radford with his vibrating watch.

123.    CDOC's policies do not allow Edward Hicks to have a vibrating watch to remind him of regular announcements.

124.    Mr. Hicks has repeatedly requested CDOC provide him with a vibrating watch to allow him to set a vibrating alarm to remind him of regular announcements, such as count and meal calls. Because of CDOC's failure to provide Mr. Hicks with a vibrating watch, he has no means to be made aware of regular announcements other than to try to memorize the timing of the prison's schedule while constantly watching the clock.

125.    Mr. Mitchell has requested CDOC provide him with a vibrating watch to allow him to set a vibrating alarm to remind him of essential daily services offered by CDOC, such as meal calls and recreational activities. On information and belief, Mr. Mitchell cannot afford to purchase the vibrating watch, and CDOC refuses to provide Mr. Mitchell with a vibrating watch at no cost.  Mr. Mitchell is forced to rely on other incarcerated people for notifications of essential daily services. A vibrating watch would enable Mr. Mitchell to remind himself of essential daily services. In turn, Mr. Mitchell would not have to rely on Territorial staff or other incarcerated people to remind him of regular announcements and essential daily services.

126.    Bruce Scheiber has a vibrating watch. However, the vibration in his watch is not powerful enough to properly notify him of alarms for regular announcements.

127.    CDOC uses alarms, such as fire alarms, to alert staff and incarcerated people within the facility of emergencies. Failure to effectively alert DHOH people of emergency situations hinders the safety of those people in an emergency situation because it does not allow those people to adapt and respond to the situation. Without accommodations, DHOH people often live in fear that they will be unaware of an imminent threat to their safety. Such accommodations include installing strobe alarms in common areas and cells that flash simultaneously with the audible alarm in the event of an emergency.

128.    CDOC only houses a few DHOH people in cells with strobe alarms, so many other DHOH people remain unaware of emergency notifications. In many of the limited situations where CDOC provides strobe alarms, they do not actually work.

129.    On or around January 7, 2021, CDOC moved Andrew Atkins from a cell with a strobe alarm into a cell without a strobe alarm. Mr. Atkins requested that he be moved back to a cell with a strobe alarm.

130.    On information and belief, in June or July 2020, CDOC policy changed to state that DHOH incarcerated people do not need to be housed in a cell with a strobe alarm if they can see the strobe alarm in the pod from their cell. DHOH people are more likely to wake up in the event of an emergency if the strobe alarm is in their cell than if the strobe alarm is in the pod, outside of their cell.

131.    As a Deaf person, Mr. Knobee could not hear emergency auditory alarms and thus relied on visual cues to be properly and safely informed of an emergency, such as a fire. CDOC recently moved Mr. Knobee from a cell with a strobe alarm into a cell without a strobe alarm.

132.    Due to CDOC's failure to house him in a cell with a strobe alarm and to provide strobe alarms in other areas, Mr. Knobee experienced stress because he never knew when the next emergency would occur and was constantly on the lookout.

133.    In the fall of 2019, Mr. Radford and his Deaf cellmate were the last people to evacuate during a fire-drill because they did not know that the alarm sounded and could not see a strobe alarm flashing from their cell. Mr. Radford fears for his safety and is at risk because he cannot rely on auditory alarms or the strobe alarm in the pod and may not be aware of an emergency situation at any given time.

134.    Kennith Meadows cannot hear emergency auditory alarms and thus relies on visual cues to be properly and safely informed of an emergency, such as a fire. Between September 2019 and December 2019, Mr. Meadows's strobe alarm failed to go off for three separate fire-drills. Mr. Meadows asked CDOC multipe times to repair the strobe alarm in his cell. Despite this, on or around January 10, 2020, Mr. Meadows's strobe alarm again failed to go off.

135.    Due to CDOC's failure to house him in a cell with a functioning strobe alarm and to provide strobe alarms in other areas, Mr. Meadows fears for his safety—and he is at risk—because he may not be aware of an emergency situation at any given time.

136.    Bruce Scheiber is not currently housed in a cell with a strobe alarm. While the day hall in Mr. Scheiber's pod has a strobe alarm, it does not work when the auditory fire alarm sounds. Mr. Scheiber fears for his safety—and he is at risk—because he may not be aware of an emergency situation at any given time. As a result, Mr. Scheiber must sleep with his hearing aids in his ears in order to be notified of any emergency at night. Hearing aids are not meant to be

worn when sleeping. Mr. Scheiber experiences discomfort when wearing his hearing aids at night and fears he may break them while sleeping with them in his ears. Mr. Scheiber's hearing aids also wear out more quickly when he wears them at night.

### C. Defendant CDOC's Failure to Provide Functioning Hearing Aids to DHOH People

137.    Hearing aids are assistive devices that improve hearing and speech comprehension for people who have hearing loss. Many hard of hearing people in prison require hearing aids to ensure effective communication and enable meaningful and equal participation in prison programs, services, and activities.

138.    Additionally, some d/Deaf people wear hearing aids because they have some residual hearing, typically in very low frequencies. For these people, while hearing aids will not permit them to understand speech, they can amplify sounds to create a higher environmental awareness, thus increasing safety for d/Deaf incarcerated people.

139.    To ensure effective communication for people who rely on hearing aids, it is critical that their hearing aids are calibrated and working properly. If hearing aids are not properly calibrated, the hearing aids will not work effectively and can produce static noise that causes pain and discomfort, rendering the hearing aids unusable. In order for hearing aids to be effective, repairs must be made in a timely manner. It is also critical that DHOH people are provided the necessary tools and batteries to maintain and use their hearing aids.

140.    CDOC does not ensure timely assessments, calibration, repair, and replacement of hearing aids.

141.    On information and belief, CDOC only allows for two secondary consults (*i.e.*, consultations with specialists like audiologists, cardiologists, neurologists, and the like) to be

generated at one time. In order to request a secondary consult, an incarcerated person must first request to see their facility's Clinical Services for an examination. CDOC medical staff will generate the secondary consult once this medical staff member determines the secondary consult is necessary. People with multiple health problems often have to decide what two issues are most pressing when deciding to seek a consult with a secondary health professional. For DHOH people, this often means foregoing hearing aid consultations because of the necessity of meeting with other secondary health professionals, such as a cardiologist or neurologist.

142.    Dennis Dunann submitted a request for a hearing aid repair on January 30, 2017. At that time, Mr. Dunann had submitted two prior requests for this hearing aid repair. CDOC did not schedule an audiologist appointment for him until April 12, 2017.

143.    Mr. Dunann requested a hearing aid repair on March 30, April 19, and April 26, 2019. CDOC did not generate a consultation for repair until April 29, 2019. Mr. Dunann did not see the audiologist until June 18, 2019. Mr. Dunann did not have his hearing aid refitted until July 9, 2019. Thus, Mr. Dunann did not have a working hearing aids from March 30 through July 9 of 2019.

144.    Mr. Dunann requested a hearing aid repair in June 2020; he did not get his hearing aids repaired until December 2020.

145.    Mr. Dunann often goes one or two days without functional hearing aids because CDOC denies him access to new batteries. CDOC delayed Mr. Dunann's access to new batteries at least twice between December 2020 and January 2021. When Mr. Dunann goes without fully functioning hearing aids, he cannot fully converse with those around him, and he is unable to fully participate in CDOC's programs and activities.

146.     In December 2018, Justyn Tyme's hearing aids began malfunctioning and needed to be repaired and re-calibrated. When Mr. Tyme's hearing aids are not properly funtioning, his hearing aids are rendered ineffective and produce ambient noise and static feedback, causing Mr. Tyme constant pain. Mr. Tyme needs access to a hearing aid remote to be able to adjust the settings on his hearing aids. Because CDOC failed to repair Mr. Tyme's hearing aids and provide him with access to a hearing aid remote to adjust the settings on his hearing aids, Mr. Tyme could not understand information conveyed to him verbally, fully participate in classes or programs, or hear auditory announcements.

147.     In February 2019, Mr. Tyme requested CDOC repair his hearing aids and provide him with a hearing aid remote to allow him to adjust the settings on his hearing aids. In April 2019, Sterling's chief medical officer told Mr. Tyme that he would schedule him for a medical appointment to repair his hearing aids and get Mr. Tyme a remote for his hearing aids to adjust the settings on his hearing aids himself.

148.     Despite this, Mr. Tyme did not see medical services to repair his hearing aids for another four months. Between February 2019 and August 2019, Mr. Tyme repeatedly requested that his hearing aids be repaired through kites, grievances, and meetings with Sterling staff.

149.     When Mr. Tyme arrived at his medical appointment in August 2019, medical staff informed Mr. Tyme that they did not receive any paperwork on his requests for CDOC to repair his hearing aids or for a remote to adjust the settings on his hearing aids and denied his requests.

150.     From August 2019 to January 2020, Mr. Tyme continued requesting that CDOC repair his hearing aids and that he be provided access to a hearing aid remote to adjust the settings on his hearing aids.

151.    In January 2020, eleven months after his initial request, CDOC took Mr. Tyme on a day trip from Sterling to Territorial to have his hearing aids repaired. CDOC required Mr. Tyme to leave his hearing aids at Territorial for the hearing aids to be repaired. This forced Mr. Tyme to return to Sterling without hearing aids. CDOC refused to provide Mr. Tyme with replacement hearing aids or any other type of auxiliary aid or service. In February 2020, CDOC transferred Mr. Tyme from Sterling to Fremont. After requiring Mr. Tyme to leave his hearing aids at Territorial in January 2020, CDOC failed to return Mr. Tyme's hearing aids until September 16, 2020. As a result, CDOC deprived Mr. Tyme of the assistive device that he relies on to navigate his daily life in CDOC and converse with those around him for nearly eight months.

152.    Despite his hearing aids being repaired, Mr. Tyme's hearing aids still do not function properly because he cannot adjust the hearing aid settings. Because Mr. Tyme is not able to adjust the settings on his hearing aids, these hearing aids do not properly function in loud environments, rendering them ineffective in most areas. Without properly functioning hearing aids, Mr. Tyme cannot understand information conveyed to him verbally or auditorily. As a result of not having functioning hearing aids, Mr. Tyme has missed calls for work, meals, recreation, and showers.

153.    Further, Mr. Tyme endures consistent hostility from Fremont staff for not responding to auditory announcements or verbal commands that he cannot hear.

154.    Edward Hicks's hearing aid broke in April 2020, and he immediately requested his hearing aid be repaired by CDOC. Despite repeated requests, CDOC failed to repair Mr. Hicks's hearing aid for five months.

155.     Mr. Hicks is not able to adjust the settings on his hearing aids. As a result, his hearing aids do not properly function in loud environments, rendering them ineffective in most areas. Without properly functioning hearing aids, Mr. Hicks talks louder to CSP staff, which some CSP staff perceive as yelling and threatening. Mr. Hicks also uses increased body language and gestures to communicate, which some CSP staff perceive as acts of aggression.

156.     In order for Mr. Hicks to properly care for his mental health, it is critical that he have the ability to converse with other incarcerated people and prison staff and to be aware of his surroundings. Because CDOC fails to provide Mr. Hicks with the necessary accommodations, such as functioning hearing aids, for him to effectively communicate with other incarcerated people and prison staff and to be aware of his surroundings, his mental health is deteriorating.

157.     Without functioning hearing aids, Mr. Hicks does not understand what CSP's mental health providers say to him during his mental health appointments.

158.     Without functioning hearing aids, Mr. Hicks often cannot understand commands and orders given by CSP staff and thus cannot comply with them. For example, when CSP staff break up fights, staff yell orders that Mr. Hicks does not hear. Mr. Hicks fears that he will be injured by CSP staff for failing to respond to an order that he does not hear. As a result of CDOC's failure to provide Mr. Hicks with properly functioning hearing aids, Mr. Hicks endures constant worry about his safety and wellbeing during incarceration.

159.     Robert O'Dell's hearing aids regularly break and thus do not function properly. In July 2019, Mr. O'Dell's hearing aids broke and began making a constant rattling sound. As a result, Mr. O'Dell developed severe headaches that caused him constant pain.

160.    When Mr. O'Dell's hearing aids are not functioning properly, he is not able to converse and communicate effectively with other incarcerated people and prison staff, making him concerned for his safety and wellbeing during incarceration. Mr. O'Dell fears that certain incarcerated people and prison staff construe Mr. O'Dell's lack of response to verbal communication as a lack of respect. In turn, Mr. O'Dell fears he will be attacked and injured because CDOC fails to provide him with properly functioning hearing aids.

161.    In May 2020, CDOC moved Mr. O'Dell to restrictive housing following an assault that took place at Sterling. Prior to placing Mr. O'Dell in restrictive housing, Sterling staff confiscated Mr. O'Dell's hearing aids. Ten days later, CDOC held a disciplinary hearing for Mr. O'Dell. CDOC staff refused to return Mr. O'Dell's hearing aids to him for the disciplinary hearing. Without hearing aids, Mr. O'Dell could not understand the charges brought against him or meaningfully defend himself during the disciplinary hearing, denying him access to the CDOC's discipline program. Despite denying Mr. O'Dell effective communication in his disciplinary hearing, CDOC still found him guilty. Following the disciplinary hearing, CDOC transferred Mr. O'Dell to CSP, CDOC's maximum security facility.

162.    In approximately 2010, James Fling began requesting that CDOC provide him with hearing aids; it took approximately ten years for CDOC to do so.

163.    In 2016 or 2017, Mr. Fling visited an ear, nose, and throat ("ENT") doctor who noticed Mr. Fling's hearing impairment. The ENT told Mr. Fling she would call Mr. Fling back on a later date to have his hearing checked by an audiologist. Mr. Fling finally saw an audiologist for a hearing test in April 2019. However, when Mr. Fling requested the results to

this hearing test, CDOC medical staff informed Mr. Fling that they had no record of a hearing test ever being performed.

164.     Because CDOC staff informed him they did not have a record of the hearing test performed in April 2019, Mr. Fling again requested hearing evaluations on multiple occasions. CDOC finally provided hearing aids to Mr. Fling in March 2020. Mr. Fling was unable to participate in class due to CDOC's failure to provide him hearing aids and his resulting inability to hear the teachers. CDOC eventually removed Mr. Fling from this class because of his lack of participation and issued a disciplinary report based on his removal from class. This disciplinary report resulted in Mr. Fling losing his job at the Tag Plant.

165.     After firing him from his job at the Tag Plant, CDOC reassigned Mr. Fling to a laundry job. Mr. Fling earned less at his laundry job than he did at his previous job at the Tag Plant.

166.     Kyotte Knobee, who was Deaf, required hearing aids for awareness of his surroundings. These hearing aids needed to be powerful enough and specifically designed for people with severe to profound hearing loss. On information and belief, CDOC only provides hearing aids powerful enough and specifically designed for people with moderate hearing loss.

167.     Because of CDOC's failure to provide Mr. Knobee with sufficiently powerful hearing aids specifically designed for people with severe to profound hearing loss, Mr. Knobee did not gain much benefit from his CDOC-issued hearing aids.

168.     In approximately 2017, when Mr. Knobee attempted to get stronger hearing aids than his CDOC-issued hearing aids at the time, the audiologist and CDOC staff told Mr. Knobee that he did not need to hear better than he already did.

169.    When Mr. Knobee tried to use his CDOC-issued hearing aids, CDOC delayed

hearing aid repairs for Mr. Knobee. For example, on May 1, 2018, Mr. Knobee requested to see

CDOC medical staff to fix a broken hearing aid. CDOC medical staff did not see Mr. Knobee

regarding this hearing aid issue until October 9, 2018. This delay meant that Mr. Knobee could

not benefit from even the very limited assistance that his CDOC-issued hearing aids provide for

over five months. Without sufficiently powerful hearing aids, Mr. Knobee was unable to hear

some background noises and movement of others. As a result, he had limited awareness of his

surroundings.

### D.  Defendant CDOC's Failure to Provide Other Auxiliary Aids to DHOH People

170.    Closed captioning is a feature on televisions, video screens, and other visual

displays that transcribes the audio content into words that appear on the top or bottom of the

screen. It allows some d/Deaf people who can read and understand some written English to have

at least limited access the content of the videos by reading the captions while viewing the video.

Further, closed captioning can make spoken words easier to understand for hard of hearing

people.

171.    CDOC often fails to provide captioning of video content and often refuses to turn

on captioning where it is available.

172.    For example, when Zachary Radford arrived for intake and orientation at DRDC

in September 2019 and at Territorial in October 2019, CDOC failed to provide closed captioning

in the orientation videos that described prison operations and rules. Consequently, Mr. Radford

did not understand these videos. Because of CDOC's failure to make the orientation video

accessible, CDOC excluded Mr. Radford from its orientation program, causing him to feel lost and overwhelmed during his first days in CDOC's custody and at a new facility.

173.    Similarly, in August or September 2018, CDOC did not provide closed captioning for Mr. Peterson on an orientation video. As a result, Mr. Peterson did not understand the content of the video and was thus excluded from CDOC's orientation program.

174.    Further, CDOC inconsistently provides closed captioning on televisions, making this recreational activity inaccessible to DHOH people. For example, beginning in June 2019, the television in Mr. O'Dell's cell did not have closed captioning services for certain channels. Mr. O'Dell repeatedly requested CDOC provide closed captioning on his television for these channels. Despite his requests, CDOC failed to provide closed captioning on his television for these channels for nearly six months. Mr. O'Dell relies on closed captioning to understand the information displayed on and to enjoy the programming – including educational programming – provided through his television.

175.    On the weekends of May 1-3 and 8-10, 2020, Mr. Trevithick wanted to watch the movies that CDOC showed during recreation. However, CDOC staff at Territorial failed to turn on closed captioning on the movies, so Mr. Trevithick did not get to enjoy the movies while hearing people did. Thus, CDOC excluded Mr. Trevithick from this CDOC program.

### E.  Improper Handcuffing Practices Impede Communication by d/Deaf People.

176.    During transport, CDOC will often handcuff incarcerated people behind their back or using "black box cuffs." The latter are handcuffs with a hard plastic or metal box over the chain between the cuffs, forcing the wearer's hands into a static position very close to each

other and to the wearer's body. CDOC uses them with a belly chain – linking the cuffs to a metal chain around the wearer's waist – to further restrict movement.

177.    Cuffing behind the back or in black box cuffs makes it impossible for DHOH people to communicate in ASL or even write. It is the functional equivalent of gagging a hearing person.

178.    On February 2, 2020, when CDOC transferred Jeremy Peterson from Territorial to Fremont, and on February 7, 2020, when CDOC transferred him back to Territorial, CDOC staff used black box handcuffs to restrain Mr. Peterson. As a result of CDOC's discriminatory behavior, CDOC stripped Mr. Peterson of his ability to communicate with other incarcerated people or correctional staff while being transported.

179.    On June 4, 2020, Mr. Trevithick went to an eye appointment at Rocky Mountain Eye Center in Pueblo, Colorado. CDOC used the black box handcuffs to restrain Mr. Trevithick during transport and during his eye doctor appointment.

180.    As noted above, CDOC had failed to provide a sign language interpreter for this appointment; the black box handcuffs removed any possibility of even attempting to communicate with gestures or writing.

181.    In February 2020, CDOC correctional staff transported Kyotte Knobee to a disciplinary hearing. During transport, CDOC correctional staff handcuffed Mr. Knobee behind his back. This prevented Mr. Knobee from signing in ASL—effectively eliminating all means of even attempting to communicate with correctional staff.

182.    In October 2019, CDOC transported Leonid Rabinkov, Marc Trevithick, and Andrew Atkins to the federal courthouse in Denver. CDOC used the black box to restrain all

three people during transport. Consequently, these individuals could not communicate with each other or CDOC staff during transport.  Hearing individuals in CDOC custody can communicate with each other and with CDOC staff during transport.

183.    In May 2021, CDOC transported Kerry Gallegos to a medical appointment off site. Mr. Gallegos remained cuffed – with the black box – during his medical appointment, so he was unable to communicate in any way with medical personnel.

184.    On a number of occasions, CDOC has transported Daniel Martinez in black box handcuffs and, on a number of occasions, left these restraints in place during his medical appointment, preventing him from even attempting to communicate with medical staff.

### F.  Unequal and Improper Treatment of DHOH People by Defendant CDOC

185.     CDOC staff often fail or refuse to interact with DHOH incarcerated people in a way that makes effective communication possible.

186.    On information and belief, CDOC fails to adequately train staff on how to properly interact with people who are DHOH.

187.    CDOC correctional officers often single out DHOH incarcerated people and subject them to abusive and discriminatory treatment due to their inability to hear. For example, CDOC correctional staff have mocked and humiliated DHOH people in CDOC's custody (including but not limited to some of the Exemplar Constituents mentioned above) for their inability to hear or effectively communicate. They endure hostility and anger from staff because they cannot hear information conveyed to them verbally. Moreover, CDOC staff discipline DHOH incarcerated people for misconduct when they fail to respond to orders that they do not hear.

188.     Merl Mitchell has an approved accommodation for face-to-face communication when interacting with CDOC staff, which is necessary because he relies on lip reading for effective communication. CDOC staff consistently fail to follow this approved accommodation for face-to-face communication when interacting with Mr. Mitchell. Instead, CDOC staff will speak to Mr. Mitchell with their backs turned or when he cannot see them.

189.     For example, CDOC staff will yell verbal orders at Mr. Mitchell when his back is turned and when he is walking away from them during daily movements such as meal calls. When CDOC staff fail to interact with Mr. Mitchell through face-to-face communication, he cannot read their lips and thus cannot understand what they are saying.

190.     When CDOC staff fail to interact with Mr. Mitchell through face-to-face communication he is often unaware that staff are trying to communicate with him. As a result, CDOC staff think Mr. Mitchell is being rude or ignoring verbal orders, and construe his lack of understanding or awareness as disrespect. Mr. Mitchell has been disciplined and reprimanded by CDOC staff for not responding to verbal orders or commands that he did not hear or understand and endures significantly more hostility, anger, and retaliation from CDOC staff than hearing incarcerated people.

191.     During remote video mental health appointments, CDOC's medical and mental health staff fail to angle the camera in a way that allows Mr. Mitchell to see their face and read their lips. Because Mr. Mitchell cannot see the faces and read the lips of medical and mental health staff during his medical and mental health appointments, he cannot understand what they are saying to him. As a result, CDOC deprives Mr. Mitchell of crucial information necessary for Mr. Mitchell to properly care for his mental and physical health conditions.

192.     Edward Hicks has an approved accommodation for face-to-face communication when interacting with CDOC staff, which is necessary because he relies on lip reading for effective communication. CDOC staff consistently fail or refuse to follow Mr. Hicks's approved accommodation for face-to-face communication when interacting with Mr. Hicks. Instead, CDOC staff will speak or yell verbal orders to Mr. Hicks with their backs turned or when he cannot see them. When CDOC staff fail to interact with Mr. Hicks through face-to-face communication, Mr. Hicks cannot read their lips and thus cannot understand what they are saying.

193.     When CDOC staff fail to interact with Mr. Hicks through face-to-face communication he is often unaware that staff are trying to communicate with him. CDOC staff think Mr. Hicks is being rude or ignoring verbal orders, and construe his lack of understanding or awareness as disrespect. In turn, Mr. Hicks endures significantly more hostility, anger, and retaliation from CDOC staff than hearing incarcerated people.

194.     On April 30, 2019, CDOC staff tased Mr. Hicks for not responding to a verbal order that he did not hear.

195.     Mr. Hicks must constantly remind CDOC staff that he requires face-to-face communication so that he can read lips to ensure effective communication when interacting with CDOC staff. Other incarcerated people harbor animosity towards Mr. Hicks because the constant reminders of his need for face-to-face communication and lip reading cause delays to CSP's daily prison activities.

196.     Despite continuously reminding CDOC staff of his accommodation for face-to-face communication, CDOC staff still fail or refuse to interact with Mr. Hicks through face-to-face communication.

197.     CDOC staff told Mr. Hicks that they cannot follow his approved face-to-face accommodation because they have too many incarcerated people to take care of and too many things to do.

198.     When CDOC staff fail to communicate with Mr. Hicks through face-to-face communication, they deny him effective communication.

199.     Further, when Mr. Hicks experiences hostility or retaliation from CDOC staff because he does not understand information conveyed to him verbally, CDOC discriminates against him by reason of his hearing disability.

200.     On March 24, 2020, Bradley Hogue, who is hard of hearing, entered the law library for a scheduled appointment.

201.     Around twenty-five minutes before Mr. Hogue's appointment ended, the librarian made an announcement that the law library was closing early. Mr. Hogue did not hear this announcement and continued working. The librarian approached Mr. Hogue and told him the law library was closing early and that he needed to leave. Mr. Hogue closed down his computer and left the law library.

202.     On March 27, 2020, CDOC gave Mr. Hogue a COPD violation for disobeying a lawful order. At Mr. Hogue's disciplinary hearing on March 31, 2020, the librarian alleged that Mr. Hogue pretended not to hear her. CDOC found Mr. Hogue guilty and punished him with

"loss of privileges" for forty days. CDOC's punishment of Mr. Hogue because he did not hear the librarian constitutes discrimination due to his hearing disability.

### G.  Summary

203.    CDOC routinely discriminates against DHOH people in its custody as detailed above.

204.    The allegations above are only some of the examples of CDOC's discrimination against DHOH people.

205.    CDOC's failure to provide qualified sign language interpreters, effective hearing aids (including batteries, repairs, and maintenance), captioning, CART, accessible notifications and alarms, and other required accommodations, as well as its discrimination on the basis of disability, has caused the Exemplar Constituents and other DHOH people in CDOC's custody to be denied equal access to and effective communication about and during CDOC's programs, services and activities.

206.    CDOC's discrimination is ongoing with respect to all Exemplar Constituents and other DHOH people in CDOC's custody.

### VI.    DLC's Advocacy for Incarcerated People who are DHOH in CDOC's Custody

207.    As of March 18, 2021, DLC has received requests from all Exemplar Constituents for DLC to intervene on their behalf. All of the Exemplar Constituents are DHOH people who are currently in CDOC's custody.

208.    DLC has associational standing on behalf of the Exemplar Constituents and other constituents who are injured by CDOC's failure to comply with the ADA and Section 504

because such injuries and CDOC's noncompliance fall within DLC's general scope of interest and activity.[2]

209.     Neither the claims asserted, nor the relief requested, require the participation of individual members or constituents in the lawsuit.

210.     It is appropriate for DLC to advocate for the relief requested on behalf of its Exemplar Constituents and other constituents.

211.     DLC's constituents, including but not limited to the Exemplar Constituents, have suffered injury and continue to suffer injury that would allow them to have standing to sue in their own right. The interests that DLC seeks to protect in this lawsuit are germane to its purpose.

212.     Examplar Constituents made CDOC aware of these issues beginning in October 2019.

213.     Prior to filing this lawsuit, DLC attempted to resolve the issue of CDOC denying DHOH incarcerated people in its custody effective communication and equal access to its programs, services, and activities.

214.     DLC wrote to CDOC and attempted to resolve CDOC's failures to provide DHOH incarcerated people with equal access and effective communication to CDOC's programs services and activites, and requested that CDOC cease its discriminatory conduct against DHOH incarcerated people prior to filing this lawsuit.

---

[2] *See Cunningham v. Fed. Bureau of Prisons,* 222 F. Supp. 3d 959, 961 (D. Colo. 2015) (holding that "[t]he [Center for Legal Advocacy d/b/a Disability Law Colorado] has established [associational] standing to pursue claims for declaratory and injunctive relief for prisoners with mental illness housed at ADX").

215.    DLC's attempts to resolve this matter through nonadversarial processes were unsuccessful. In turn, DLC determined that this matter would not be resolved within a reasonable time and pursued alternative remedies as provided by 42 C.F.R. § 51.32(d), including initiating legal action.

216.    DLC brings this action on behalf of DHOH incarcerated people in CDOC's custody, including but not limited to the Exemplar Constituents, who are being denied effective communication and equal access to CDOC's programs, services, and activities in violation of the ADA and Section 504.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF:**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12131 et seq.**

217.    DLC incorporates the allegations set forth in the remainder of this Complaint as if fully set forth herein.

218.    Title II prohibits public entities, such as CDOC, from excluding people with disabilities from participation in or denying them the benefits of its services, programs, or activities, or otherwise subjecting such people to discrimination. 42 U.S.C. § 12132.

219.    Because the Exemplar Constituents are DHOH, are currently in the custody of CDOC, and have been incarcerated in the custody of CDOC during all occurrences alleged herein, they are qualified people with disabilities within the meaning of the ADA. 42 U.S.C. § 12102.

220.    CDOC excluded and continues to exclude the Exemplar Constituents and other incarcerated DHOH people in CDOC's custody from participation in its programs, services, and

activities. CDOC also denied and continues to deny the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody the benefits of its programs, services, and activities. Finally, CDOC subjected and continues to subject the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

221. Such discrimination includes but is not limited to:

    a. denying the Exemplar Constituents the opportunity to participate in or benefit from an aid, benefit, or service, 28 C.F.R. § 35.130(b)(1)(i);

    b. affording the Exemplar Constituents the opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded to others, *see id*. § 35.130(b)(1)(ii);

    c. providing the Exemplar Constituents with aids, benefits, and services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, *see id.* § 35.130(b)(1)(iii);

    d. using criteria and methods of administration that have the effect of subjecting the Exemplar Constituents to discrimination on the basis of disability, *see id.* § 35.130(b)(3)(i);

    e. using criteria and methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of CDOC's programs with respect to the Exemplar Constituents, *see id.* § 35.160(b)(1);

     f.   failing to give primary consideration to the requests of Exemplar

        Constituents concerning the types of auxiliary aids and services necessary,

        *see id.* § 35.160(b)(2);

     g.  failing to provide communication as effective as that provided to others,

        *see id.* § 35.160(a)(1); and

     h.  failing to provide auxiliary aids and services necessary to provide equal

        opportunity to participate and enjoy the benefits of its services, programs

        and activities, *see id.* § 35.160(b)(1).

222.    At all times relevant to their allegations in this Complaint, which are ongoing, the Exemplar Constituents were and remain qualified to participate in CDOC's programs, services, and activities within the meaning of Title II.

223.    The Exemplar Constituents have been injured and aggrieved by, and will continue to be injured and aggrieved by, CDOC's discrimination against them.

224.    In addition to the Exemplar Constituents, other DHOH incarcerated people who are in CDOC's custody – and who are also DLC constituents – are being denied their rights under Title II and are being injured and aggrieved by CDOC's ongoing discrimination against them.

225.    DLC's constituents have been injured and aggrieved by CDOC's discrimination against the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody. DLC's constituents will continue to be injured and aggrieved by CDOC's ongoing discrimination against DHOH incarcerated people in CDOC's custody.

226.    CDOC's failure to comply with the ADA has resulted, and will continue to result, in harm to Exemplar Constituents and other DHOH people, as Exemplar Constituents and other DHOH people will continue to be in the custody or under the supervision of CDOC, and will continue to attempt to use or avail themselves of the services, benefits, activities, programs, and privileges of the Defendant. This harm will continue unless and until CDOC is ordered by this Court to make modifications to the policies, practices, and procedures of CDOC pursuant to the ADA.

**SECOND CLAIM FOR RELIEF:**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. § 794**

227.    DLC incorporates the allegations set forth in the remainder of this Complaint as if fully set forth herein.

228.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by recipients of federal financial assistance.

229.    CDOC receives federal financial assistance as that term is used in Section 504. 29 U.S.C. § 794.

230.    Because the Exemplar Constituents are DHOH, are currently in the custody of CDOC, and have been incarcerated in the custody of CDOC during all occurrences alleged herein, the Exemplar Constituents are qualified people with disabilities within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

231.    CDOC excluded and continues to exclude the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody from participation in its programs, services, and activities. CDOC also denied and continues to deny the Exemplar Constituents and other DHOH

incarcerated people in CDOC's custody the benefits of its programs, services, and activities. Finally, CDOC subjected and continues to subject the Exemplar Constituents and other DHOH incarcerated people in CDOC's custody to discrimination on the basis of disability in violation of Section 504 and its implementing regulations as more fully described in this Complaint.

232.   Such discrimination includes but is not limited to:

a.   denying the Exemplar Constituents the opportunity to participate in CDOC's programs and activities, *see* 28 C.F.R. § 42.503(b)(1)(i);

b.   denying the Exemplar Constituents an equal opportunity to achieve the same benefits that others achieve in CDOC's programs and activities, *see id.* § 42.503(b)(1)(ii);

c.   denying the Exemplar Constituents an equal opportunity to achieve the same benefit that others achieve in CDOC's programs and activities by failing to provide effective communication in those programs, *see id.* § 42.503(b)(1)(vi);

d.   using criteria or methods of administration that either purposely or in effect discriminate on the basis of disability or defeat or substantially impair accomplishment of the objectives of CDOC's programs or activities with respect to the Exemplar Constituents, *see id.* § 42.503(b)(3);

e.   failing to provide appropriate auxiliary aids and services to the Exemplar Constituents as necessary to ensure that they have meaningful access to CDOC's programs, activities, or benefits, *see id.* 42.503(f); and

      f.   failing to provide reasonable accommodations to the Exemplar Constituents as necessary to ensure that they have meaningful access to CDOC's programs, activities, or benefits, *see Alexander v. Choate*, 469 U.S. 287, 301 (1985).

233.    At all times relevant to their allegations in this Complaint, which are ongoing, the Exemplar Constituents were and remain qualified to participate in CDOC's programs, services, and activities within the meaning of Section 504.

234.    The Exemplar Constituents have been injured and aggrieved by, and will continue to be injured and aggrieved by, CDOC's discrimination against them.

235.    In addition to the Exemplar Constituents, other DHOH incarcerated people who are in CDOC's custody – and who are also DLC constituents – are being denied their rights under Section 504 and are being injured and aggrieved by CDOC's ongoing discrimination against them.

236.    DLC's constituents have been injured and aggrieved by CDOC's discrimination against the Exemplar Constituents and all other DHOH incarcerated people in CDOC's custody. DLC's constituents continue to be injured and aggrieved by CDOC's ongoing discrimination against DHOH incarcerated people in CDOC's custody.

237.    CDOC's failure to comply with Section 504 has resulted, and will continue to result, in harm to Exemplar Constituents and other DHOH people, as Exemplar Constituents and other DHOH people will continue to be in the custody or under the supervision of CDOC, and will continue to attempt to use or avail themselves of the services, benefits, activities, programs, and privileges of the Defendant. This harm will continue unless and until CDOC is ordered by

this Court to make modifications to the policies, practices, and procedures of CDOC pursuant to Section 504.

## **PRAYER FOR RELIEF**

WHEREFORE, DLC respectfully requests:

1. That this Court assume jurisdiction;

2. That this Court declare the actions of CDOC described in this Complaint to be in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

3. That this Court enter an injunction ordering CDOC to cease violating the rights of DHOH incarcerated people under Title II and Section 504, and to cease discrimination against these incarcerated people on the basis of disability, and require CDOC to take measures to comply with Title II and Section 504, including but not limited to:

   a. providing ready access to qualified sign language interpreters;

   b. providing captioned telephone systems;

   c. providing Communication Access Realtime Translation ("CART") services;

   d. providing in-cell visual alarms and/or wireless notification systems;

   e. providing visual notification systems;

   f. providing prompt hearing screenings upon request;

   g. providing ASL classes for people who wish to learn ASL;

   h. providing captioning on all orientation videos and all televisions;

   i. allowing for the scheduling of more than two secondary health consultations at one time;

    j.   ceasing use of the black box handcuffs and other means of restraint that limit the ability of DHOH people to communicate;

    k.   providing reasonable accommodations, including free and effective hearing aids and vibrating watches, to DHOH incarcerated people upon request or when the need is obvious, without unreasonable delays;

    l.   communicating face-to-face and using clear masks during the pandemic; and

    m.  training CDOC staff concerning effective communication with and accommodations for DHOH people.

4. That this Court award DLC its reasonable attorneys' fees and costs; and

5. That this Court award such additional or alternative relief as must be just, proper, and equitable.

Respectfully submitted,

CIVIL RIGHTS EDUCATION &
ENFORCEMENT CENTER

*s/ Amy F. Robertson*
Amy F. Robertson
1245 E. Colfax Ave., Suite 400
Denver, CO 80218
303.757.7901
arobertson@creeclaw.org

Martha M. Lafferty
525 Royal Parkway, #293063
Nashville, TN 37229
615.913.5099
mlafferty@creeclaw.org

*Attorneys for Plaintiff*


STUDENT LAW OFFICE

*s/ Laura Rovner*
Laura Rovner
Aurora L. Randolph
Nicole B. Godfrey
University of Denver Sturm College of Law
Civil Rights Clinic
2255 E. Evans Ave., Suite 335
Denver, CO 80208
303.871.6441
lrovner@law.du.edu


Dated:  August 17, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2021, I filed the foregoing First Amended and Supplemental Complaint using the Court's CM/ECF system, which will send notice of the filing via electronic mail to the following:

Scott.Bauer@coag.gov


_s/ Laura Rovner_____
Laura Rovner