## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00792-RBJ

CENTER FOR LEGAL ADVOCACY
d/b/a DISABILITY LAW COLORADO,

      Plaintiff,

v.

 COLORADO DEPARTMENT OF CORRECTIONS, and
DEAN WILLIAMS, in his official capacity as Executive Director of the Colorado Department of
Corrections,

      Defendants.

---

## ORDER APPROVING JOINT MOTION TO DISMISS AND
## REQUEST TO RETAIN JURISDICTION TO ENFORCE SETTLEMENT AGREEMENT

---

      Plaintiff and Defendants have reached a settlement of this case and have moved the Court

to acknowledge the settlement and dismiss the case. For good cause shown, the Parties' Joint

Motion to Dismiss and Request to Retain Jurisdiction to Enforce is GRANTED and this action is

dismissed with prejudice. The terms and conditions of the Release and Settlement Agreement are

incorporated by reference into this Order. Notwithstanding the dismissal of this action, the Court

retains jurisdiction solely to enforce the terms of the attached Release and Settlement Agreement,

in accordance with § 16 of the Release and Settlement Agreement. *See Floyd v. Ortiz*, 300 F.3d

1223, n. 3 (10th Cir. 2002) (citing *Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir. 1994));

and *Kokkonen v. Guardian Life Ins. Co*., 511 U.S. 375 (1994).

IT IS SO ORDERED

Dated:  August 15, 2022

                        _____
                        R. Brooke Jackson
                        Senior United States District Judge

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement Agreement (the "Agreement") is made as of the __th day of _____, 2022 (notwithstanding the actual date of execution) by and between THE CENTER FOR LEGAL ADVOCACY d/b/a DISABILITY LAW COLORADO the "Plaintiff", the STATE OF COLORADO, and the Office of Risk Management for the State of Colorado, collectively, the "State."

WHEREAS, Plaintiff filed a civil lawsuit entitled *THE CENTER FOR LEGAL ADVOCACY d/b/a DISABILITY LAW COLORADO v. COLORADO DEPARTMENT OF CORRECTIONS and DEAN WILLIAMS in his capacity as Executive Director of the Colorado Department of Corrections,* United States District Court for the District of Colorado, Civil Action No. 21-CV-07792 (the "Litigation"), alleging that the Colorado Department of Corrections failed to abide by Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794) with respect to the accommodations it provides to Deaf and hard of hearing individuals in its custody (the "Allegations"); and

WHEREAS, the Parties wish to avoid the uncertainties and expense of litigation and to settle and compromise, on the terms set forth below, all claims that are or could be asserted in any litigation or any claim otherwise arising from or relating to the Allegations; and

WHEREAS, the Parties acknowledge that the promises and covenants contained herein are good and valuable consideration for all Parties to execute this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises, the Parties hereby agree and covenant as follows:

1.   <u>DEFINITIONS.</u> The Parties agree that for purposes of this Agreement the terms listed below shall be defined as follows:

    a.   "ASL" means American Sign Language.

    b.   "ASR" means automatic speech recognition, that is, the rendering of speech into text using machine automation. To be used in conjunction with this Agreement, an ASR system must provide real-time text transcription that

# EXHIBIT 1

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

provides communication for DHOH people that is as effective as communication for hearing people.

c. "CDOC" means the Colorado Department of Corrections, an agency of the State.

d. "CHP" means Correctional Health Partners, a Colorado Limited Liability Corporation, and a non-party to the Litigation.

e. A person is "Deaf or Hard of Hearing" or "DHOH" when they are a person determined to have a hearing disability pursuant to the examination referred to in § 2(f) below or, while awaiting such examination, a person whose inability to hear is obvious and/or was previously known to CDOC.

f. "Exemplar Constituents" means the individuals identified as such in the Plaintiff's Second Amended Complaint.

g. "Interpreter" means a qualified, certified sign language interpreter who meets the requirements of 28 C.F.R. § 35.104. As used in this Settlement, it shall be understood to include a Certified Deaf Interpreter (as part of a Deaf/hearing team, where a Deaf person's ASL literacy is not sufficient to rely only on ASL) as well as an interpreter into a different sign language (for example, Mexican Sign Language or Black American Sign Language) where necessary.

h. "Major medical appointment" means:

    i. audiology screenings and appointments;

    ii. discussion of patient's symptoms for any diagnostic purpose, and discussing medical conditions, medications, and/or medical history;

    iii. explaining medical conditions, treatment options, tests, medications, surgery, and other procedures;

    iv. providing a diagnosis or recommendation for treatment;

    v. communications immediately preceding, during, and immediately after surgery or other procedures and all post-op check ups;

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

    vi.   obtaining informed consent for treatment;

    vii.   mental or behavioral health appointments;

    viii.   providing instructions for medications, post-treatment activities, and follow-up treatments; and

    ix.   all appointments where new or complex information will be discussed.

    x.   Major medical appointments does not include routine medical appointments, including blood pressure checks, medication refills, and dental cleanings.

    xi.   Major medical appointments does not include emergency medical services.

i.   "OCA" means Offender Care Aid, a job designation held by certain individuals in CDOC's custody assigned to assist disabled individuals with daily tasks and necessities.

j.   "Policies" means Administrative Regulations, Clinical Standards, and any other memorialization of rules and procedures maintained by CDOC.

k.   "VRI" means video remote interpretation. As used in this Settlement, it is understood to mean the provision of sign language interpretation by remote video connection on demand, without the need for an advance request.

2.   <u>AUDIOLOGICAL SCREENING AND REFERRAL FOR AUDIOLOGICAL EXAM</u>. CDOC agrees to screen all individuals in its custody for hearing loss, audiological examination, and provision of hearing aids in accordance with the following terms.

a.   All individuals over the age of 65 in CDOC's custody shall be screened for referral to an audiologist at least every three years.

b.   All individuals in CDOC's custody with a comorbidity, or a history of hearing loss risk factors shall be screened for referral to an audiologist at least every two years.

   c. All individuals in CDOC's custody may request screening for referral to an audiologist at any time, regardless of their last screening date.

   d. When CDOC screens individuals in its custody for referral to an audiologist, it shall utilize an otoacoustic emissions test applying the DPOAE DP 4s Screening protocol on the MAICO Ero-Scan® OAE Test System maintained by CDOC.

   e. When the result of the screening procedure specified in subparagraph (d) indicates referral to an audiologist, CDOC shall submit a request for a referral for examination by an audiologist on behalf of the screened individual within two business days of such screening.

   f. When an individual in CDOC's custody is examined by an audiologist pursuant to § 2(e), CDOC will ask the audiologist to determine whether the individual has a hearing disability and/or requires hearing aids by applying community standards of care. The current hearing aid provision criteria in CDOC's "Clinical Standards and Procedures, Health Care Appliances" will be removed and instead state that an audiologist will make the determination as to whether the incarcerated person has a hearing disability and/or needs hearings aids, applying community standards of care. CDOC will notify all contracted audiologists of this policy change.

   g. When an audiologist makes a determination pursuant to § 2(f), CDOC shall adopt the determination of the audiologist as to whether the examined individual has a hearing disability and/or requires hearing aids. For purposes of this Agreement, an individual in CDOC's custody requires hearing aids when an audiologist has determined that the individual requires hearing aids by applying community standards of care pursuant to § 2(f), and reported that determination to CDOC.

   h. CDOC shall revise its policies to include and conform to the requirements of §§ 2(a) – (g).

3. <u>PROVISION OF HEARING AIDS</u>. CDOC agrees to provide hearing aids to individuals in its custody in accordance with the following terms.

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

a. CDOC shall provide hearing aids to all individuals in its custody who require hearing aids, regardless of whether CDOC has previously provided those individuals with hearing aids, unless CDOC can demonstrate that an individual in its custody has previously lost or damaged their CDOC-issued hearing aids on at least two prior occasions.

b. CDOC shall permit individuals in its custody who require hearing aids to possess a remote-control associated with their hearing aids.

c. CDOC shall permit individuals in its custody who require hearing aids to exchange depleted hearing aid batteries for new ones (at no cost to the individual) during med line, which occurs twice daily.  If an individual who requires hearing aids needs to replace a battery at another time, they may request a replacement from CDOC staff members assigned to their housing unit, who will provide a replacement as soon as possible.

d. CDOC will make good faith efforts to ensure that batteries for all types of hearing aids in use by individuals housed at a given facility are stocked and available at all times.

e. CDOC shall revise its policies to include and conform to the requirements of §§ 3(a) – (d).

f. CDOC will make good faith efforts to amend its contracts with CHP to require:

    i. that individuals in its custody who are provided with new hearing aids receive at least one in-person follow-up appointment with an audiologist no more than six months after their receipt of new hearing aids.

    ii. that individuals in its custody who require hearing aids have annual re-evaluations utilizing equipment that meets the requirements set forth in the American National Standards Institute (ANSI) standard S3.6-2018, and that testing will be conducted in an acoustic environment that will not adversely influence the measurement of auditory thresholds. If there is a hearing threshold

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

        shift of 10 dB or more across any tested frequency, the individual will be referred to an audiologist.

    iii.  that individuals in its custody who require hearing aids have annual hearing aid assessments that shall be conducted by a clinical nursing staff member trained to conduct such assessments by an audiologist and are provided what the audiologist, in their professional opinion, believes is adequate supervision. This trained clinical staff member will provide hearing aid assessments in accordance with the procedure set forth in Exhibit B.

    iv.  that individuals in its custody who require hearing aids receive loaner hearing aids within ten days at no cost to the individual from an audiologist while their hearing aids are repaired, calibrated, or replaced.

    v.  that when individuals in its custody are determined by an audiologist to require hearing aids pursuant to § 2(f) of this Agreement, the individual receives the required hearing aids within sixty (60) days of that determination.

    vi.  that repairs or calibration of hearing aids take place within sixty (60) days of the date when the hearing aids are conveyed to an audiologist for repair or recalibration.

g.  If, within six months of the Effective Date, CDOC is unable to amend its contracts with CHP to achieve the requirements of § 3(f)(iii), it will provide loaner hearing aids as described in that section.

4.  <u>ACCOMODATIONS AND AUXILIARY AIDS.</u>  CDOC agrees to evaluate individuals in its custody for accommodations and auxiliary aids in accordance with the following terms:

a.  When an individual in CDOC's custody is determined to have a hearing disability pursuant to § 2(f) of this Agreement, they will be assessed by a qualified professional to determine the auxiliary aids and services reasonably necessary to ensure equally effective communication and access to services (the "Assessment").

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

    b.  The parties will designate one or more mutually agreed upon expert consultants in issues relating to deafness, hearing loss, and adaptation, with whom CDOC can confer periodically throughout the Agreement to undertake the following tasks:

        i.  recommend to CDOC Assistive Technology and other measures to implement this agreement;

        ii.  recommend to CDOC Reasonable Modifications and Auxiliary Aids and Services programs and facilities accessible to DHOH incarcerated people;

        iii.  report annually on any newly-available assistive technology and improvements to existing assistive technology that it recommends CDOC adopt; and

        iv.  evaluate DHOH incarcerated people to assess appropriate assistive technology, auxiliary aids and services, and other reasonable modifications, and training in the same that each such person requires.

    c.  CDOC will approve and provide the auxiliary services recommended in the Assessment in accordance with its duties and obligations under 28 CFR § 35.160-164.

    d.  When new accommodations are approved pursuant to § 4(c), CDOC shall provide the individual for whom those accommodations were approved with a printed copy of their Accommodation Tracking System (ATS) report listing all of their approved accommodations, and that individual shall be permitted to carry the report on their person.

    e.  For DHOH individuals, the following accommodations and auxiliary aids are presumed not to require a fundamental alteration in the nature of a service, program, or activity or an undue financial and administrative burden pursuant to 28 CFR § 35.164:

        i.  Hearing aids, batteries, and remote controls;

        ii.  Interpreters;

        iii.  ASR;

        iv.  Vibrating watches;

        v.  Armband alarms;

        vi.  Captioned telephones; and

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

       vii.  Videophones.

f.  Once an accommodation or auxiliary aid or service is approved pursuant to an Assessment, that status will not change as a result of an individual's transfer to another housing assignment at the same or lower custody level, and such accommodations or auxiliary aids or services will not be revoked except pursuant to a later Assessment, provided that CDOC may temporarily revoke such accommodations or auxiliary aids or services pending an Assessment if they pose a threat to safety or security.

g.  When an incarcerated person is transferred to a housing assignment with a higher custody level, a new Assessment shall be conducted to determine which auxiliary aids are reasonably necessary to ensure equally effective communication and access to services consistent with the individual's new housing assignment.

h.  CDOC shall revise its policies to include and conform to the requirements of §§ 4(d) – (g).

i.  Nothing in this Agreement precludes an individual incarcerated person from requesting a specific accommodation pursuant to the CDOC's accommodation request process.

5.  <u>INTERPRETER AND ASR SERVICES.</u> CDOC agrees to provide interpretation and ASR services to DHOH individuals in accordance with the following terms.

a.  CDOC shall provide an Interpreter or ASR as appropriate based on the person's primary language and any determination made pursuant to § 4(c), when individuals in its custody previously determined to have a hearing disability pursuant to § 2(f) of this Agreement request such services for any of the following activities:

       i.  Intake and orientation;

      ii.  Major medical appointments;

     iii.  Educational courses during class time;

     iv.  Religious programming;

      v.  Case manager meetings;

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

      vi.   Disciplinary investigations and hearings;

     vii.   PREA complaints and investigations;

    viii.   Classification/re-classification hearings;

     ix.   Parole board hearings; and

      x.   Substantive meetings relating to vocational and residential programming, including, for example, meeting in which information is exchanged that can affect the DHOH incarcerated person's ability to participate in the program in question.

b. Where necessary based on ASL literacy, country of origin, or other relevant factors, CDOC will provide a Certified Deaf Interpreter, Black American Sign Language interpreter, or interpreter in other sign languages.

c. Where necessary based on timing of hearing loss and ASL literacy, CDOC will provide ASR.

d. When CDOC has two or more days of advanced notice that ASL interpretation services are required for any activity listed in § 5(a), it shall provide an on-site interpreter during that activity, except when on-site interpretation would materially interfere with security or infection control measures. In such cases, CDOC shall provide VRI in lieu of on-site interpretation.

e. When CDOC has less than two days of advanced notice that ASL interpretation services are required for any activity listed in § 5(a), it shall provide an on-site interpreter or VRI during that activity.

f. CDOC will evaluate requests for Interpreters or ASR for other types of interaction, including but not limited to routine meetings related to vocational and residential programming, grievance preparation, library services, and interpretation of complex written materials. CDOC will evaluate such requests on a person-by-person and/or case-by-case basis, and approve them when the incarcerated person demonstrates that the accommodation is necessary for them to access the full benefits of CDOC's services and programs. Where a person has demonstrated that a specific type of accommodation is necessary in a specific context to

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

access the full benefits of CDOC's services and programs, they will be entitled to this accommodation in this context going forward, and will not have to reestablish the necessity for each request. They may be required to provide notice to CDOC of the need for the accommodation in a new context.

g. CDOC shall revise its policies to include and conform to the requirements of this § 5.

6. <u>ADAPTIVE TECHNOLOGY</u>.

   a. CDOC shall provide the following communications technologies at all facilities where individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement are housed:

      i. VRI; and

      ii. ASR services.

   b. All VRI services provided by CDOC shall meet the standards set forth at 28 C.F.R. § 35.160(d).

   c. CDOC shall furnish sufficient equipment such that the technologies identified in § 6(a) are readily accessible during:

      i. All medical encounters, including unscheduled, minor, or emergency medical encounters;

      ii. Case management interactions;

      iii. Investigations of potential COPD violations and other disciplinary matters; and

      iv. Other unscheduled interactions between staff and individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement.

   d. CDOC shall provide training to both medical and non-medical staff on how and when to utilize the communications technologies listed in § 6(a).

   e. CDOC shall provide at least one captioned telephone in each living unit housing one or more individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement.

   f. CDOC shall provide closed captioning of all video content presented at CDOC facilities, including intake and

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

orientation videos, educational videos, and CDOC-generated content.

g. CDOC shall implement MMCall or substantially similar technology (including similar length and intensity of vibration upon receipt of a notification) to provide text-based notifications of auditory announcements.

   i. Text-based notifications of auditory announcements will be provided to individuals who meet certain eligibility criteria through a two-step process.

      1. First, as an initial screening, individuals will automatically qualify for this technology if, based on the most recent available medical records, they have a present diagnosis by an audiologist of a:

         a. "severe" or greater level of hearing loss. This will be defined as an average hearing loss of 71 dBHL or greater at the frequencies of 500 Hz, 1000 Hz, and 2000 Hz in the better ear.

         OR

         b. PB Max score of 60% or below in the better ear on a recorded presentation of a phonemically or phonetically balanced monosyllabic word recognition test.

      2. Second, if an individual wears hearing aids and does not meet either initial screening criteria in § 6(g)(1) of this Agreement, that individual will receive a QuickSIN test. The QuickSIN will be administered in a sound field while the individual is wearing their hearing aids at their typical use settings. If the individual receives a score of 12 or higher on the QuickSIN test, then they will qualify for the technology described in § 6(g) of this Agreement.

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

3. In order to implement the provisions of §
6(g) of this agreement, CDOC will offer a
one-time screening opportunity for text-
based notification eligibility once such
technology is available. CDOC will screen
DHOH individuals upon intake to determine
eligibility for text-based notification.

ii. Individuals who qualify for text-based notifications
must elect to receive either text-based
notifications, or face-to-face notifications of
announcements from an OCA.

iii. CDOC shall transmit all announcements that
would otherwise be conveyed over the public
address system to qualifying individuals via the
text-based notification system, including but not
limited to:

1. General announcements such as mealtimes,
med lines, and lockdowns;

2. Individual or irregular announcements,
such as instructions for an individual to
report to a particular location within a
facility.

iv. CDOC shall provide a receiver to individuals who
qualify for text-based notifications at no cost to the
individual, except where CDOC can demonstrate
that the individual has lost or destroyed the
receiver on at least two prior occasions.  In such
cases, CDOC may charge the qualifying individual
for a replacement receiver.

v. CDOC shall revise its policies to include and
conform to the requirements of this § 6(g).

h. CDOC will provide individuals determined to have
hearing disabilities pursuant to § 2(f) of this Agreement
with a vibrating watch upon request. To be used in
conjunction with this Agreement a vibrating watch must
be able to permit the user to set at least three alarms
and must be able to wake the average person from deep
sleep.

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

7. EMERGENCY NOTIFICATION SYSTEM. CDOC will ensure that DHOH incarcerated people receive notice of emergencies at the same time as all other incarcerated people in their living unit.  To do this, CDOC will:

    a. Send a notice through the notification system referenced in paragraph 6(g) whenever the existing emergency notification system is used;

    b. Ensure that there are strobes in day halls in all facilities Level 3 and higher, and in all dorm rooms in Level 1 and 2 facilities;

    c. Ensure that all DHOH incarcerated people who meet the qualifications for text-based notifications in § 6(g)(i) have the opportunity to be housed in a cell that either has a strobe or is within line of sight to a strobe;

    d. Ensure that staff evacuate DHOH incarcerated people who meet the qualifications for text-based notifications in § 6(g)(i) when the emergency notification system is used in an active emergency or during a drill where other incarcerated people are evacuating, including checking cells and other locations to ensure that no such person is left behind;

    e. Staff will otherwise notify these individuals if the emergency notification system is being used for a drill or non-emergency situation in which other incarcerated people are not evacuating; and

    f. Continue to evaluate other technologies capable of individually notifying DHOH incarcerated people who meet the qualifications for text-based notifications in § 6(g)(i) when the emergency notification system is used.

8. CLEAR FACE MASKS. Whenever protective masks are worn by CDOC personnel, such personnel shall use clear face masks during communications with DHOH individuals.

9. USE OF RESTRAINTS. CDOC agrees to revise its policies regarding the use of restraints on individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement in accordance with the following terms.

    a. CDOC shall refrain from handcuffing individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement behind their backs.

    b. In general, CDOC will refrain from using black box restraints on individuals in its custody who utilize sign

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

language or handwriting as their primary means of communication. Notwithstanding this provision, CDOC may use black box restraints during transport where an individualized assessment determines that a failure to do so would create unacceptable safety risks.

c.  In general, CDOC will refrain from using black box restraints on any individuals in its custody who utilize sign language or handwriting as their primary means of communication during any outside medical appointment. Notwithstanding this provision, CDOC may use black box restraints during outside medical appointments where an individualized assessment determines that a failure to do so would create unacceptable safety risks, or during an emergent security situation.

10. <u>TRAINING</u>.  The Parties will meet and confer regarding any additional training necessary to implement the terms of this Agreement.

11. <u>ASSISTIVE LISTENING SYSTEMS</u>. CDOC shall provide to DHOH incarcerated people, as an accommodation upon request and when appropriate, an assistive listening system for use during group interactions that include individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement. To be used in conjunction with this Agreement, an assistive listening system must ensure that the average hard of hearing person(s) using the system, including but not limited to those who use hearing aids, can effectively and simultaneously understand the words spoken by the hearing person(s).

12. <u>INFORMATIONAL MATERIALS FOR INDIVIDUALS WITH HEARING DISABILITIES</u>.  An informational document for individuals with hearing disabilities, drafted by the Parties, is attached to this document as Exhibit A.

a.  CDOC shall make Exhibit A available at no charge:

i.  to all individuals in its custody following resolution of this matter;

ii.  to all individuals in its custody upon request;

iii.  to all individuals in its custody during the intake process;

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

      iv.  to all individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement annually.

13. <u>CHANGES TO CDOC POLICY.</u> If CDOC believes it is necessary to alter or amend any of the policies controlled by this Agreement in a manner that is inconsistent with its terms, it shall meet and confer with Plaintiff before making any such changes. Notwithstanding such conferral, the terms of this Agreement shall continue to bind the Parties unless and until the Agreement is amended in writing and signed by the Parties.

14. <u>IMPLEMENTATION AND REPORTING.</u>

    a.  Within thirty (30) days of the effective date of this Agreement, CDOC shall provide notice to all individuals in its custody of this Agreement and its terms. The notice will be substantially in the form of Exhibit A to this Agreement. CDOC shall create an ASL version of Exhibit A and make it available during staffing meetings with individuals for whom ASL is their primary language, monthly on day hall televisions in day halls where such individuals are housed, upon intake and orientation, and upon request.

    b.  Within thirty (30) days of the effective date of this Agreement, CDOC will provide Plaintiff with copies of all relevant training materials so that the parties can meet and confer as anticipated by § 10.

    c.  CDOC shall disclose the following documents and information to Plaintiff and its counsel monthly for the first three months of the term of this Agreement and quarterly thereafter for the period preceding disclosure:

        i.  a summary of all negotiations and minutes of all meetings with CHP relating to CDOC's obligations under §3(f) of this Agreement;

       ii.  all ADA grievances filed by the Exemplar Constituents, and CDOC's responses to those grievances,;

     iii.  all requests for accommodations filed by the Exemplar Constituents, and CDOC's responses to those requests;

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

      iv.   logs of all messages sent using the text-based notification system described in § 6(g) of this Agreement, including the date, time, sender, and recipient of such messages; and

      v.   transcripts of all ASR communications by Exemplar Constituents.

d.  If Plaintiff believes that additional information or documents is/are necessary to monitor the implementation of this Agreement or if Defendants believe any of the disclosure requirements in ¶ 14(c) are too burdensome, the parties shall meet and confer to discuss provision or discontinuation of provision of such information or documents.

e.  Representatives of CDOC and Plaintiff shall meet monthly for the first three months of the term this agreement, and quarterly thereafter, to discuss the implementation of this Agreement and the needs of DHOH incarcerated people until the end of the term of this Agreement.

f.  CDOC shall notify Plaintiff when its implementation of the terms of this agreement is complete.  CDOC shall provide such notification no later than one hundred and eighty (180) days after the effective date of this Agreement.

15. INFORMAL DISPUTE RESOLUTION.

a.  Anytime during the term of this Agreement, if either party believes that a dispute exists relating to the performance or interpretation of this Agreement, it shall notify the other party in writing that it is invoking this dispute resolution process.  Its notice shall describe the dispute in sufficient detail to enable the other party to conduct a meaningful investigation of the alleged dispute.

b.  The other party shall respond in writing to such notice within ten (10) business days of receipt of the notice.

c.  Counsel for the Parties shall meet and confer regarding the dispute by telephone or in person within ten (10) days of the transmittal of the response described in §

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

15(b), either in person or telephonically, to attempt to
resolve the issue informally.

d. If the Parties are unable to resolve the dispute through
the informal process described in this § 15, then either
party may submit the dispute for judicial resolution in
accordance with the terms of § 16.

16. <u>JUDICIAL DISPUTE RESOLUTION.</u>

a. If after completing the informal dispute resolution
process in § 15 of this Agreement, either party believes
that the other party remains in breach of the terms of
this Agreement, that party may submit the dispute for
resolution by the Court.

b. In resolving the dispute, the Court will apply Title II of
the Americans with Disabilities Act (42 U.S.C. § 12131),
and Section 504 of the Rehabilitation Act (29 U.S.C. §
794).

c. The Parties agree that the United States District Court
for the District of Colorado shall retain continuing
jurisdiction over any attempt to enforce this Settlement
Agreement by either of the Parties.

d. The Parties may move the U.S. District Court to enforce
the Agreement, subject to the terms of §§ 14-16 of this
Agreement.

e. The prevailing party in any court proceeding shall be
entitled to its attorneys' fees and costs pursuant to 42
U.S.C. § 12205 and the cases interpreting that provision
including the fee-shifting standards in *Christiansburg
Garment Co. v. Equal Employment Opportunity Comm'n*,
434 U.S. 412, 422 (1978).

17.    <u>TERM.</u>  The term of this Agreement shall be two years from
the date of CDOC's notice of implementation described in § 14(f), provided
that the dispute resolution mechanism in §§ 14-16 remain in force through
the resolution of any disputes pending at the end of the term.

18.    <u>NOTICE TO PARTIES.</u> All notices required or permitted
hereunder shall be in writing and shall be served on the Parties at the
email addresses set forth below.

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

| | |
|---|---|
| To Defendants | Cole Woodward |
| | cole.woodward@coag.gov |
| | |
| | Phil Barrett |
| | philip.barrett@coag.gov |
| | |
| To Plaintiffs | Amy Robertson |
| | arob@foxrob.com |
| | |
| | Laura Rovner |
| | lrovner@law.du.edu |
| | |
| | Pilar Gonzalez Morales |
| | pgonzalez@creeclaw.org |
| | |
| | Meghan Baker |
| | mbaker@disabilitylawco.org |

19.    <u>FEES & COSTS.</u>  This Agreement is contingent on execution of an agreement among the parties addressing Plaintiff's claim for attorneys' fees.

20.    <u>RELEASE</u>. Plaintiff, for itself and its heirs, successors, assigns, agents, and representatives, including legal representatives, hereby releases, acquits, and forever discharges the State of Colorado, the State's departments, agencies, and instrumentalities, and the State's current and former officers, employees, agents, and successors from any and all claims, demands, causes of action, and obligations, whether asserted or unasserted, whether matured, unmatured, or wholly inchoate, and whether known or unknown, including but not limited to all claims pursuant to Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and Section 504 of  the Rehabilitation Act (29 U.S.C. § 794) with respect to the Allegations concerning conduct occurring before or during the Term of this Agreement.

21.    <u>STIPULATION TO DISMISS AND COVENANT NOT TO SUE.</u> The Parties agree to jointly file this Agreement with the Court, together with a stipulation to conditionally dismiss the Complaint pursuant to Federal Rule of Civil Procedure 41(a), with the Court retaining

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

jurisdiction to enforce this Agreement in the event of any disputes that may arise between the Parties until the Agreement terminates.

Plaintiff expressly agrees and covenants that it will not sue or assert any cause of action, at law or equity, and whether before a court of law or an administrative agency, on its behalf, or on behalf of the Exemplar Constituents, against the State or any of the state's current or former officers, official, employees, departments, or agencies for any claims for damages or injunctive relief that Plaintiff has or may have in the future arising from the Allegations.

22.   <u>INTENDED THIRD PARTY BENEFICIARIES</u>. The Parties agree and acknowledge that all agencies, officers and employees of the State, although they are not signatory Parties hereto, are intended third-party beneficiaries of this Release and Settlement Agreement, and each and all of them shall have the right to rely upon and enforce this Release and Settlement Agreement in any court of competent jurisdiction in the event that any action or proceeding based upon claims or causes of action released hereby may be threatened or commenced.

23.   <u>NO ADMISSION OF LIABILITY</u>.  This Agreement is entered into for the purposes of avoiding litigation and does not constitute an admission of liability or evidence of any wrongdoing or omission of any kind.  This Agreement shall not be offered or received into evidence or otherwise filed or lodged in any proceeding against any party except as may be necessary to prove or enforce its terms.

24.   <u>PORTIONS OF SETTLEMENT PAYMENTS MAY BE WITHHELD</u>.  Pursuant to C.R.S. §24-30-202.4, the State Controller may offset the Settlement Payments by any debts owed by Plaintiff or the Civil Rights Education and Enforcement Center ("CREEC") to State agencies under the vendor offset interception system for:  (a) unpaid child support or child support arrearages; (b) unpaid balance of tax, accrued interest and other charges specified in Article 21, Title 39, C.R.S.; (c) unpaid loans due to the Student Loan Division of the Department of Higher Education; (d) owed amounts required to be paid to the Unemployment Compensation Fund; (e) medical bills incurred by Plaintiff paid in part or in full by Medicaid or Medicare; and (f) other unpaid debts owing to the State or any state agency thereof, the amount of which is found to be owing as a result of final agency determination or reduced to judgment as certified by the Controller.  Any debts owed by Plaintiff shall solely be taken from his portion of the settlement.

25.   <u>INTERNAL REVENUE SERVICE W-9 FORMS</u>. Plaintiff and CREEC will provide fully executed and signed I.R.S. W-9 forms, or ITIN

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

(Individual Taxpayer Identification Number) forms, to the State prior to payment of any amounts under this Release and Settlement Agreement.

26. <u>REPORTING AND TAX TREATMENT OF SETTLEMENT PAYMENT</u>. It is expressly intended and understood that the Fees and Costs Payments represent recovery of Plaintiff's attorneys' fees and costs associated with the Litigation. Notwithstanding such intent and understanding, Plaintiff and CREEC agree that the State may file such tax forms and reports reflecting the Fees and Costs Payments that it deems necessary or appropriate, including but not limited to a Form 1099, with taxing authorities. In the event any part of the Settlement Payments is determined to be taxable, Plaintiff or CREEC will be solely responsible for any tax liability arising therefrom related to their tax obligations, including any interest or penalty assessed. In the event that any claim is ever asserted against the State to satisfy a tax liability arising from Plaintiff's or CREEC's failure to pay any tax owed from them on the Settlement Payment, Plaintiff and CREEC agree to defend, indemnify, and hold the State harmless on such claim, including any interest or penalties, within thirty (30) days after notification from the State that a taxing authority has asserted a tax claim, or such longer period as specified by the taxing authority. Plaintiff and CREEC agree that neither the State of Colorado, any other state employee and/or agency, nor the Office of the Colorado Attorney General have made any representations or given any legal opinion concerning the tax treatment of the Fees and Costs Payments, and are expressly not relying on any such representation or opinion. Plaintiff and CREEC have sought and received such tax opinions and advice as they deem necessary from attorneys and/or tax advisors of their choice.

27. <u>OPEN RECORDS REQUIREMENTS</u>. This Release and Settlement Agreement is not confidential. Plaintiff understands and agrees that the State of Colorado and its agencies and departments are bound by applicable public disclosure laws including, without limitation, the provisions of C.R.S. §24-72-101, *et seq.* (Colorado Open Records Act), as presently or subsequently amended, and that the State of Colorado may be required to disclose this Release and Settlement Agreement in its entirety if requested to do so under such statutes. Plaintiff understands that this Release and Settlement Agreement are public records and further agrees that he will not hold the State of Colorado, or its administrators, officers, agents, or employees, liable for release of information contained in public records under such statutes.

28. <u>WARRANTIES AND REPRESENTATIONS</u>. Plaintiff represents and warrants that he has not assigned or transferred any claim arising from or related to the Incident to any third party and that no third

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

party has been subrogated to their interest in claims purported to be released hereby, or, if any third party has been subrogated to Plaintiff's interest, the interest of any subrogee has been settled, compromised, and extinguished.  Plaintiff agrees to defend and indemnify the State, its departments, agencies, officers, and employees, and to hold them harmless against the claims of any assignee or subrogee to claims purported to be released hereby that may hereafter be asserted.

29.   <u>INTEGRATION</u>.  This Release and Settlement Agreement constitutes the entire agreement of the Parties regarding the subject matter hereof.  The terms of this Release and Settlement Agreement are contractual in nature and not mere recitals.  As such, the Parties understand, acknowledge and agree that this Release and Settlement Agreement is fully integrated and supersedes all previous oral or written agreements of the Parties.

30.   <u>BINDING EFFECT</u>.   This Release and Settlement Agreement shall take effect to the benefit of, and be binding upon, the heirs, successors, assigns and legal representatives of the Parties and any third-party beneficiaries.

31.   <u>GOVERNING LAW</u>.  This Release and Settlement Agreement is entered into in Colorado and shall be governed by the laws of the State of Colorado, except as provided in § 16.

32.   <u>HEADINGS</u>.  The headings used in this Release and Settlement Agreement are for the convenience of the Parties only. As such, these headings shall not have any legal effect whatsoever or, in any other way alter or modify the meaning or interpretation of this Release and Settlement Agreement.

33.   <u>SEVERABILITY</u>.  If any provision of this Release and Settlement Agreement should be declared to be unenforceable, the remainder of this Release and Settlement Agreement shall continue to be binding upon the Parties.

34.   <u>ADVICE OF COUNSEL.</u> Plaintiff represents that (a) it has relied upon the advice of attorneys and/or other consultants of his own choice concerning the legal and federal, state and local tax consequences of this Release and Settlement Agreement, (b) this Release and Settlement Agreement has been thoroughly read by Plaintiff and its terms have been explained to its satisfaction by an attorney or attorneys of its choice, and (c) the terms of this Release and Settlement Agreement, including its release of unasserted and unknown claims, are fully understood and voluntarily accepted by Plaintiff.  Plaintiff further understands and agrees that this Release and Settlement Agreement shall be forever binding and that no

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

cancellation, rescission, or modification of, or release from the terms of, this Release and Settlement Agreement shall be made based upon any mistake of fact or of law.

35.   <u>EXECUTION IN COUNTERPARTS.</u>   This Release and Settlement Agreement may be executed in counterparts, each of which shall have full force and effect upon execution by all Parties to this Release and Settlement Agreement, but which together shall constitute a single instrument.

36.   <u>EFFECTIVE DATE/CONTROLLER APPROVAL.</u> This Release and Settlement Agreement shall not be deemed valid until it shall have been approved by the State Controller or his designee, as provided by C.R.S. §2430202(1).

[*The remainder of this page has intentionally been left blank.*]

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

FOR THE PLAINTIFF:

Date: 6/22/2022

THE CENTER FOR LEGAL ADVOCACY d/b/a DISABILITY LAW COLORADO

FOR THE COLORADO DEPARTMENT OF CORRECTIONS & EXECUTIVE DIRECTOR DEAN WILLIAMS

BY: _____   Date: 07/19/2022
     DEAN WILLIAMS,
     Executive Director

FOR THE COLORADO DEPARTMENT OF PERSONNEL & ADMINISTRATION:

BY: _____   Date: 7/29/2022
     KARA VEITCH (or designee)
     Executive Director

FOR THE STATE OF COLORADO:

BY: _____   Date: 8/1/2022
     ROBERT JAROS, CPA, MBA, JD (or designee)
     State Controller

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

[*The remainder of this page has intentionally been left blank.*]

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

## APPROVED AS TO FORM ONLY:


PHILIP J. WEISER
Attorney General

*Philip Barrett*                    7/29/2022
COLE J. WOODWARD
PHILIP BARRETT
Attorneys    CDOC    and    Executive
Director Dean Williams




FOX & ROBERTSON, PC


_____
AMY ROBERTSON




STUDENT LAW OFFICE
Laura Rovner

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
Pilar Gonzalez Morales


Attorneys for Plaintiff




[*End of Document*]

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

<u>APPROVED AS TO FORM ONLY:</u>


PHILIP J. WEISER
Attorney General


_____

COLE J. WOODWARD
PHILIP BARRETT
Attorneys   CDOC   and   Executive
Director Dean Williams




FOX & ROBERTSON, PC

_____

AMY ROBERTSON



STUDENT LAW OFFICE
Laura Rovner

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
Pilar Gonzalez Morales


Attorneys for Plaintiff




[*End of Document*]

## Information Sheet for Deaf and Hard of Hearing Incarcerated People

**INTERPRETERS**: CDOC will provide an interpreter for qualified Deaf incarcerated people for:

- Intake and orientation.
- Major medical appointments.
- Case manager meetings.
- Classes.
- Religious programming.
- Disciplinary investigations and hearings – including the initial investigation.
- PREA complaints and investigations.
- Classification hearings.
- Parole hearings.
- Other major meetings at work or in your living unit.

If you ask two days ahead of time, CDOC will try to get an in-person interpreter. You can request an interpreter by VRI at any time for any interaction, even with no notice. VRI interpreters will be available to all medical personnel, case managers, and investigators.

You may request an interpreter for other types of meetings or to help you understand things in writing, like grievances, library resources, and homework. CDOC will evaluate that request on an individual basis.

You may request a Deaf interpreter or an interpreter in another sign language such as Black American Sign Language or Mexican Sign Language.

**CAPTIONING**:

- If you are hard of hearing but do not use sign language, you can request that CDOC provide text or captions by "automatic speech recognition" (ASR) for the meetings listed above. ASR converts whatever the speaker is saying into text so you can read it.
- CDOC will provide closed captioning for any videos it shows, including intake and orientation videos and educational videos, and any videos CDOC creates.

**TELEPHONES**: CDOC will provide the following on an equal basis with the way it provides regular telephones to hearing incarcerated people:

- Videophones for Deaf incarcerated people who communicate using sign language.
- Captioned telephones for hard of hearing incarcerated people.

**TEXT NOTIFICATIONS**: If you are completely Deaf or meet certain hearing loss criteria, CDOC will provide you with a wristwatch pager that will send you a text notification that is the same as the messages broadcast over the public address system. This system will notify you of general announcements like chow or recreation, and it will also notify you of individual announcements like when you should go to visiting or medical.

**EMERGENCY NOTIFICATIONS**: CDOC will also provide qualified Deaf and hard of hearing incarcerated people with emergency notifications by strobe lights visible from their cell and by text notification. If you need to evacuate during an emergency, staff will come to your cell to tell you.

# EXHIBIT A

**RESTRAINTS**: CDOC will not handcuff Deaf or hard of hearing incarcerated people behind their backs. CDOC will not use "black box" handcuffs on incarcerated people who communicate using sign language unless they are a security risk. If CDOC uses "black box" cuffs during transport, they will be removed during any outside medical appointment unless a security or safety risk arises during the appointment.

**HEARING EXAMS**:

- You will be screened for referral to an audiologist when you first enter CDOC custody. The audiologist will determine whether you have a hearing disability and whether you require hearing aids.

- You will also be referred for an audiologist screening any time during your sentence if you request it.

- Incarcerated people over 65 will be screened at least every three years, and incarcerated people with a history of risk for hearing loss will be screened at least every two years.

**HEARING AIDS**:

- If the audiologist determines that you need hearing aids, CDOC will provide them within 60 days.

- You may exchange dead hearing aid batteries for new ones during med line. If you need a new battery at a different time, you may request one from housing unit staff.

- If your hearing aids require a remote control, you will be permitted to have that device.

- If your hearing aids require repair, recalibration, or replacement, CDOC will ensure that within 10 days you receive loaner hearing aids while your hearing aids are unavailable.

- If your hearing aids are sent out for repair, recalibration, or replacement, they will be returned to you within 60 days.

- If you use at least one hearing aid, you will be provided an annual hearing re-evaluation and an annual hearing aid assessment to see if any repairs are needed and if the hearing aids are functioning correctly.

**ASSISTIVE LISTENING SYSTEMS**: CDOC will provide qualified hard of hearing incarcerated people, if requested and appropriate, with an assistive listening device that will amplify the sound during group interactions.

**CLEAR FACE MASKS**: When CDOC staff are required to wear face masks for public health reasons, they will wear clear masks when they communicate with Deaf and hard of hearing incarcerated people.

**VIBRATING WATCHES**: CDOC will provide an effective vibrating watch for Deaf and hard of hearing incarcerated people to purchase on canteen. The watch should have the ability for the wearer to set at least three alarms and be able to wake the average person from deep sleep.

**OTHER ACCOMMODATIONS**:

- You may request other accommodations that you need. If CDOC denies the accommodation, they have to tell you why.

- You also can request an Accommodation Tracking Sheet with a list of your current accommodations. You can keep this on you at all times.

- If you had a disciplinary action because of your hearing loss, you can ask the ADA coordinator to consider overturning the disciplinary action.

- When you transfer to another facility, you get to keep the same accommodations unless they are a security risk.

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

<u>**Hearing Aid Assessment – Procedure**</u>

1) The individual will first complete a written questionnaire with the below questions. If the individual is unable to complete a written questionnaire with the below questions, the trained clinical staff member will first **ask the individual who uses the hearing aids the following questions, through a sign language interpreter if necessary**:

   a) "How is the fit, feel, and comfort of this device on your ear?"

      i. If there are fit issues, these may be able to be corrected in the facility.

      ii. If not, this may require further measures, such as taking a new impression of the ears.

   b) "How is the overall volume or loudness of your hearing aid(s)?"

      i. If the hearing aid has been fit correctly and there has not been a significant change in their hearing sensitivity, the hearing aids should be delivering speech information in the listener's dynamic range.

   c) "How have your hearing aids been performing in noisier listening environments?"

      i. If an individual is experiencing significant difficulty in noisy environments, it may be due to one of the hearing aids malfunctioning or being out of balance with the other.

      ii. If this is not found to be the case, it will likely require the audiologist to make adjustments to the adaptive features of the hearing aids, which are designed to process speech in the presence of varying levels of background noise. This will likely require some computerized adjustment to the hearing aids in the office of an audiologist.

   d) "How have individuals' voices sounded to you?  Have they sounded too sharp or brassy, too muffled, or does the quality of speech seem appropriate?"

      i. These issues are typically adjusted with the fitting computer by the audiologist by varying the compression settings of the hearing aid.

   e) "Is the battery life similar in both of the hearing aids?"

      i. A significantly reduced battery life may indicate some corrosion on the battery contacts or internal corrosion.

   f) "Is the hearing aid producing internal noise that you perceive or has the hearing aid been intermittent (cutting in and out)?"

**EXHIBIT B**

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

i. This may provide some additional information on whether there are inconsistencies, distortions, or cutting in and out of the hearing aid(s) that were not able to be heard during the short listening test by the trained clinical staff member.

2) Next, complete a **visual inspection of the hearing aid**. This does not require any particular equipment. To complete this visual inspection, the trained clinical staff member will:

- Look for any cracks in tubing, earmold, shells, or the case of the hearing aids;
- Look for any damage to any parts of the hearing aid, such as the ear hook;
- Inspect the tubing that goes from a behind-the-ear hearing aid to the earmold;
- Look for missing vent plugs;
- Look for occlusions of ear wax, including in the wax traps;
- Look for damage to external controls, etc.;
- Inspect the battery contacts (in a non-rechargeable hearing aid) to ensure that there is no corrosion;
- Inspect the tubing from the ear hook to the earmold to ensure it is not occluded with moisture, wax, or other debris; and
- Ensure that there is a vent plug in place, if there is supposed to be one, with the hearing aid.

3) Next, the trained clinical staff member will conduct a **listening test on themselves** with the hearing aid. To complete this test, they will:

- Check that the hearing aid powers on and off;
- Listen for any obvious distortion or static or noise in the device;
- Listen to see if the movement of any external controls (such as volume wheels and switches) leads to any static or a cutting in and out of the sound coming through the hearing aids; and
- Complete a Ling Six Sound Test.
    i. In order to conduct this test on themselves, the trained clinical staff member will:

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

1. Set the controls to where the individual wearing the hearing aids has them in their typical listening use;

2. Say the Ling six sounds while they are listening to the hearing aid to ensure that all six sounds are audible to themselves through the hearing aids.

4) Then, the trained clinical staff member will conduct a **listening test with the individual who uses the hearing aids** while that individual is using their hearing aids. The Ling Six Sound Test will be conducted. If the individual is using two hearing aids, this listening test should be done one ear at a time. To complete this listening test:

   a) The individual should be approximately six feet away from the speaker (likely the trained clinical staff member), and either have their eyes closed or be facing the other way at the time the speaker creates the six Ling sounds in a random order.

   b) The individual who is using the hearing aid should be able to repeat those sounds back to the speaker.

   c) The person producing the Ling six sounds should make sure that they alter the order when they are doing this test so the individual cannot learn to guess which sound they are saying.

   • *Summary:* If an individual can hear all six of the Ling sounds, the hearing aids are providing adequate amplification for the entire frequency range of speech. However, if the individual can't hear all six Ling sounds, this is indicative that the hearing aid is not providing adequate amplification.

5) After completing this complete procedure, **the trained clinical staff member will determine whether the hearing aids need repair and whether it is a repair they can complete at the facility or if it necessitates repair by an audiologist or through the manufacturer.**

   a) Hearing aids will need to be repaired by audiologists when:

      i. There is a clear electrical abnormality (static, noise, intermittent, etc.);

      ii. There is damage to the structure of the hearing aid that cannot be fixed on site;

DocuSign Envelope ID: F7B518D9-27DA-41A3-9D03-C48C21776F6F

      iii.   A change is needed in terms of the amount of amplification or gain for the individual's hearing loss;

      iv.   A change is needed in the amount of noise management; or

      v.   Changes are needed in compression settings.

## **Hearing Aid Assessment – Equipment**

Necessary equipment for the trained clinical staff member completing repairs on a hearing aid includes:

- Replacement tubing and cement;
- A battery tester;
- Cleaning equipment to clean battery contacts;
- Replacement wax traps;
- Microphone covers;
- Replacement battery doors;
- Replacement ear hooks for behind the ear hearing aids;
- Cleaning solution;
- Spare batteries of various sizes for non-rechargeable hearing aids;
- A hearing aid stethoscope;
- Tools to assist in repairs (tubing expander, pliers, tools to help remove tubing); and
- Replacement vent plugs.